## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation, | |
| Plaintiffs, | |
| v. | |
| DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, in his official capacity as Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement; SAMUEL OLSON, in his official capacity as Field Director for U.S. Immigration and Customs Enforcement; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. BORDER PATROL; MICHAEL W. BANKS, in his official capacity as Chief of U.S. Border Patrol; and GREGORY BOVINO, in his official capacity as Senior Officer of the Department of Homeland Security and Illinois tactical commander, | 26-cv-321 |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

JURISDICTION AND VENUE ........................................................................................... 4

PARTIES .............................................................................................................................. 4

ALLEGATIONS ................................................................................................................... 6

   I.  President Trump's Campaign of Coercion. ................................................................. 6

  II.  The Unauthorized And Reckless Deployment of Border Patrol To Chicago With
       Catastrophic Results............................................................................................... 12

      A.  Border Patrol Is Not Authorized Or Trained For Large-Scale Removal
           Enforcement In The Interior of the United States...................................................... 12

      B.  Border Patrol's Occupation of Chicago. ................................................................. 15

  III. Defendants Adopted and Implemented Unlawful Policies. ............................................ 22

      A.  Roving Patrol Policy. ............................................................................................. 23

          1.  Roving Patrols and Indiscriminate Questioning. ................................................ 23

          2.  Defendants Implemented the Roving Patrol Policy in Illinois. ............................ 25

          3.  The Roving Patrol Policy Has Injured Plaintiffs. ............................................... 27

      B.  Biometric Scanning Policy. .................................................................................... 28

          1.  Capture and Retention of Biometric Information ............................................... 28

          2.  Defendants Implemented the Biometric Scanning Policy In Illinois.................... 31

          3.  The Biometric Scanning Policy Has Injured Plaintiffs........................................ 32

      C.  Warrantless Arrests................................................................................................. 34

          1.  Warrantless Arrests Without Probable Cause or Individualized
              Assessment of Flight Risk. ................................................................................ 35

          2.  Defendants Implemented the Warrantless Arrest Policy in Illinois..................... 36

          3.  The Warrantless Arrest Policy Injured Plaintiffs................................................ 39

      D.  Deployment of Riot Control Weapons. ................................................................... 41

          1.  Statutory and Administrative Limits On Defendants' Use of Force.................... 43

i

2. Defendants Implemented A Policy In Illinois To Deploy Tear Gas Without Warning Against Persons Who Are Not Resisting. ............................................... 45

3. The Tear Gas Policy Injured Plaintiffs. ...................................................... 51

E. Arbitrary Enforcement Policy at Sensitive Locations. .................................. 52

1. The Longstanding Sensitive Locations Policy................................................ 52

2. DHS Abrogated the Sensitive Locations Policy and Replaced it With a Policy of Arbitrary Enforcement. .......................................................... 55

3. Defendants Have Implemented the Arbitrary Enforcement Policy in Illinois. ............................................................................................... 56

(i) Courthouses.................................................................................. 56

(ii) Schools......................................................................................... 57

(iii) Social Service Organizations ..................................................... 59

(iv) Medical Facilities......................................................................... 60

4. The Arbitrary Enforcement Policy Has Injured Plaintiffs. ........................ 61

F. Concealing License Plates. ................................................................................. 67

1. Defendants Hide, Remove, and Swap License Plates in Violation of State and Federal Law.......................................................................... 67

2. Defendants Have Implemented the Conceal Plates Policy in Illinois.................. 68

3. The Conceal Plates Policy Injured Plaintiffs. .............................................. 70

G. Private Trespass. .............................................................................................. 71

1. Trespass on Private Property ....................................................................... 72

2. Trespass on City Property ............................................................................ 73

IV. Border Patrol's Incursion Has Not Concluded, and Its Unlawful and Violent Tactics Are Likely To Recur. ................................................................................ 75

CLAIMS FOR RELIEF ............................................................................................ 76

PRAYER FOR RELIEF ............................................................................................ 98

ii

## INTRODUCTION

1.        The Trump administration has unleashed an organized bombardment on the State of Illinois and the City of Chicago, causing turmoil and imposing a climate of fear. Though Defendants describe this assault as "immigration enforcement," the reality is that uniformed, military-trained personnel, carrying semi-automatic firearms and military-grade weaponry, have rampaged for months through Chicago and surrounding areas, lawlessly stopping, interrogating, and arresting residents, and attacking them with chemical weapons.

2.        The perpetrators include federal agents under the leadership of United States Border Patrol, an arm of the U.S. Customs and Border Protection ("CBP"). At the direction of Defendants Kristi Noem and Gregory Bovino, a force created, trained, and equipped to defend the United States border against smuggling and trafficking has unleashed sweeping raids and indiscriminate violence against Illinois' residents, particularly those living in Chicago. Their leaders condone this activity and demand more of it.

3.        The occupation of Illinois and Chicago is intended to coerce Plaintiffs to abandon their policies, which value and respect the State's immigrants, and devote their resources to further the immigration policies of the current administration. Illinois and Chicago have refused to do so.

4.        The U.S. Constitution stands as a bulwark against Defendants' onslaught against Illinois and Chicago. The Tenth Amendment preserves Illinois's sovereignty. That sovereignty "is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012). "[F]ederalism protects the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222 (2011).

5.        For decades, federal immigration agents enforced immigration laws in the Chicago area by targeting and arresting individuals subject to removal without significant impact on public

1

order and safety in Illinois or Chicago. But what has been happening since September 2025 is not immigration enforcement. Instead, Defendants have imported interdiction tactics from the border into Chicago's neighborhoods, and then, as one senior official put it, "turn[ed] up the creative knob . . . to 11 and push[ed] the envelope."

6.       Following orders to "push the envelope," Border Patrol, and Immigration and Customs Enforcement (ICE) agents placed under Border Patrol's command, have acted as occupiers rather than officers of the law—randomly and brutally stopping and questioning residents, separating parents from their children, detaining without warrant or probable cause citizens and non-citizens alike, and using tear gas and other chemical weapons in urban environments against unsuspecting bystanders, injuring dozens including children, the elderly and local police officers.

7.       This has left many Illinois and Chicago residents, regardless of immigration status, frightened to avail themselves of public services, or even venture outside to engage in normal daily activity.

8.       Under the pretext of enforcing federal immigration law, the federal government is attacking Illinois and Chicago's ability to carry out their core sovereign functions—to regulate public health, establish and implement a system of education for Illinois residents, defend the state's economy, provide public safety and administer a judicial system, enforce state statutes, implement state programs, and ensure that Illinois residents receive the full benefits of state and federal law. Defendants' conduct has hindered the improvement and prosperity of Illinois and Chicago and offended the core notion of dual sovereignty. This "[i]mpermissible interference with state sovereignty is not within the enumerated powers of the National Government." *Bond*, 564 U.S. at 225.

9.      Defendants' misconduct is ongoing, and they have stated that they do not intend to desist. As Defendant Bovino stated on December 30, 2025: "If you think we're done with Chicago, you'd better check yourself before you wreck yourself." Bovino added, "Don't call it a comeback; we're gonna be here [in Chicago] for years." Bovino's post included a video montage of immigration officers chasing, tackling, and arresting people.

10.      The federal government's menacing, violent, and unlawful incursion impedes Illinois and Chicago from carrying out core sovereign functions in violation of the Tenth Amendment.

11.      It also violates the Administrative Procedure Act many times over. Each of the actions that accompanied Border Patrol's incursion exceeds Defendants' statutory authority and is arbitrary and capricious, including:

- Sending armed agents to roam the streets and question those they encounter about their citizenship;

- Capturing and retaining the biometric data of people they encounter without consent;

- Arresting without a warrant or probable cause;

- Deploying tear gas in dense neighborhood among residents going about their daily lives;

- Initiating enforcement actions at courthouses, schools, medical facilities, and other sensitive locations to intimidate those who seek public services;

- Hiding their identities and avoiding accountability by concealing and swapping vehicle identification; and

- Trespassing on property belonging to the residents of Illinois and its government.

12.      Illinois and Chicago seek to vindicate their sovereign authority to govern, grow, and maintain public order and stability against an unchecked federal government seeking to coerce Illinois and Chicago to do its bidding through brute force.

3

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this matter arises under the Constitution, laws, or treaties of the United States.

14. This Court may provide the requested relief because there is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 702, 704–706, and the Court's equitable powers.

15. Venue lies in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) because the defendants are officers or employees of the United States and at least one plaintiff resides in this district; a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois; and/or at least one Defendant resides in this district.

## PARTIES

16. Plaintiff State of Illinois is a sovereign State in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief legal officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, § 15. *See* 15 Ill. Comp. Stat. 205/4.

17. Plaintiff City of Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

18. Defendant United States Department of Homeland Security (DHS) is a cabinet agency in the executive branch of the federal government. 6 U.S.C. § 111. DHS's primary mission includes, among other things, preventing terrorist attacks in the United States, minimizing damage from terrorist attacks, and ensuring that "the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland." *Id.* U.S.

4

Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) are each component agencies within DHS.

19.     Defendant Kristi Noem is the Secretary of DHS. As Secretary, Defendant Noem oversees component agencies of DHS. She is sued in her official capacity. The Secretary's duties include preventing the entry of terrorists and their weapons into the United States; securing borders, territorial waters, ports, terminals, waterways, and air; carrying out the immigration enforcement functions vested by the Immigration and Naturalization Act, as well as establishing national immigration enforcement policies and priorities; and administering customs laws. 6 U.S.C. § 202.

20.     Defendant U.S. Immigration and Customs Enforcement ("ICE"), a component agency of DHS, is tasked with managing enforcement of laws related to immigration. Among other functions, ICE carries out stops and arrests of individuals for civil immigration violations, assumes custody over individuals in immigration detention, and is responsible for management and oversight of the civil immigration detention system.

21.     Defendant Todd M. Lyons is the Senior Official Performing the Duties of the Director of ICE and is sued in his official capacity. As Acting Director of ICE, he oversees its functions, including managing enforcement of laws related to immigration, carrying out stops and arrests of individuals for civil immigration violations, and managing the civil immigration detention system.

22.     Defendant Samuel Olson is the field director for ICE in Chicago and is sued in his official capacity. As the Chicago field director, he oversees the functions of ICE in Illinois, including managing enforcement of laws related to immigration, carrying out stops and arrests of individuals for civil immigration violations, and managing the civil immigration detention system.

5

23.     Defendant U.S. Customs and Border Protection ("CBP") is a component agency of DHS that is responsible for, among other things, interdiction and processing of individuals attempting to enter or exit the United States at the U.S. border. CBP agents, including those employed by CBP's component agencies such as U.S. Border Patrol, have been involved in making stops and arrests of individuals for civil immigration violations in Illinois pursuant to the immigration sweeps since January 20, 2025.

24.     Defendant Rodney S. Scott is the Commissioner of CBP and is sued in his official capacity. As Commissioner of CBP, he has direct authority over all CBP policies, procedures, and practices related to stops, arrests, detention, and use of force.

25.     Defendant U.S. Border Patrol ("USBP" or "Border Patrol") is a component agency of CBP and is responsible for interdiction and processing of individuals attempting to enter or exit the United States at the U.S. border. Border Patrol agents have made stops and arrests for civil immigration violations in Illinois pursuant to the immigration sweeps since January 20, 2025.

26.     Defendant Michael W. Banks is Chief of USBP and is sued in his official capacity. As Chief of USBP, Defendant Banks has direct authority over all USBP policies, procedures, and practices related to stops, arrests, detention, and use of force.

27.     Defendant Gregory Bovino, a DHS senior officer, is the tactical commander of DHS agents engaged in tactical sweeps in Illinois and is sued in his official capacity. As tactical commander, Bovino has directed, implemented, and approved the unlawful policies, procedures and practices at issue in Illinois as alleged below.

## ALLEGATIONS

### I.     President Trump's Campaign of Coercion.

28.     In 2017, Illinois passed the TRUST Act, 5 ILCS 805/15, which sets a "[p]rohibition on enforcing federal civil immigration laws." It was signed into law by Bruce Rauner, then-

Governor of Illinois, a Republican. Ill. Pub. Act 100-463 (eff. Aug. 28, 2017). In 2021, Illinois enacted amendments to the TRUST Act, known as the Way Forward Act, that expanded the limits on participation by state and local law enforcement in federal civil immigration enforcement. Ill. Pub. Act 102-234 (eff. Aug. 2, 2021)

29.     Chicago's Welcoming City Ordinance states that Chicago employees shall not "participate in civil immigration enforcement operations or assist the civil enforcement of federal immigration law." Mun. Code of Chi. ("MCC") § 2-173-020(a).

30.     Nothing in these laws prevent state and local police from enforcing state and local criminal laws against anyone, undocumented or not.

31.     Plaintiffs' laws seek to build trust between police and immigrant communities, thereby encouraging cooperation with law enforcement and promoting public safety. To fight crime effectively, police must have open lines of communication with all communities, including undocumented residents. Chicago's police department pursues a community policing strategy, and it depends on officers establishing trust with residents in every neighborhood. When those bonds are formed, residents are willing to provide vital information to solve crimes and prevent violence. But the system breaks down if residents fear that speaking to the police will lead to them or their loved ones being deported.

32.     Plaintiffs allocate substantial resources to suppressing violent crime, vindicating victims and holding accountable those who violate the law. Plaintiffs' laws ensure that resources are spent on these critical public safety activities rather than civil immigration enforcement.

33.     President Trump vehemently disagrees with Plaintiffs' choice to invest their resources in deterring and solving crime rather than assisting in enforcement of federal civil immigration law. One of President Trump's first acts of this presidential term was to sign an

executive order aimed at Illinois and other state and local governments that prioritize criminal law enforcement over enforcement of federal civil immigration law. This executive order instructed Defendant DHS to target these states and cities "to the maximum extent possible under the law." Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025).

34.     President Trump and members of his administration have long directed threatening and derogatory statements towards jurisdictions that do not invest in enforcing federal immigration law, including the State of Illinois and the City of Chicago. For example, in a Truth Social post on April 10, 2025, President Trump falsely claimed "sanctuary" jurisdictions protect criminals and described them as "Death Traps."



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> No more Sanctuary Cities! They protect the Criminals, not the Victims. They are disgracing our Country, and are being mocked all over the World. Working on papers to withhold all Federal Funding for any City or State that allows these Death Traps to exist!!!

35.     On April 18, 2025, in a press briefing, the Deputy White House Chief of Staff and Homeland Security Advisor, Stephen Miller, ranted that "these cities are engaged in systemic criminal violations" and that they are "engaged in a scheme to nullify and obstruct the duly enacted laws of the United States of America." He has referred to Chicago as a "bloody killing field" and has specifically cited Chicago, along with Los Angeles and Boston, as cities that were "waging war against the very idea of nationhood."

36.     In April, President Trump signed Executive Order 14,287, which doubled down on these baseless accusations, asserting that jurisdictions with policies of not contributing state

8

personnel or resources to federal immigration enforcement are engaged in a "lawless insurrection against the supremacy of Federal law." Exec. Order No. 14,287, 90 Fed. Reg. 18761 (Apr. 28, 2025). In the same order, the President instructed Defendant Noem and Attorney General Bondi to publish a list of so-called "sanctuary jurisdictions." *Id.* Both Illinois and Chicago were included on the list. Attorney General Bondi sent letters to both the Mayor of Chicago and the Governor of Illinois demanding they adopt the Trump administration's preferred immigration policies. She later said, "If they don't comply with us . . . we're going to work with our other agencies to cut off their federal funding. We are going to send in law enforcement just like we did during the LA riots, just like we're doing here in Washington D.C."

37.     The administration accompanied its inflammatory rhetoric with escalating attacks.

38.     First, the federal government sued Illinois and Chicago, seeking to nullify the Illinois TRUST Act and Chicago's Welcoming Ordinance and compel the State and City to invest resources and personnel in enforcing federal immigration law. This effort failed and resulted in the district court expressly rejecting the administration's repeated contention that Plaintiffs obstructed or interfered with federal law. "[T]he United States's assertion is unsupported. No allegations in the complaint support the contention that [Illinois or Chicago's] policies 'affirmatively thwart[]' immigration laws." *United States v. Illinois*, 796 F. Supp. 3d 494, 530 n. 19 (N.D. Ill. 2025).

39.     Unable to force Illinois and Chicago through legal challenges to alter their policies, the federal government attempted to coerce the same result by unlawfully withholding federal funds. Defendant Noem issued a directive to cease federal funding to "sanctuary" jurisdictions. The federal government then withheld millions of dollars in funds wholly unrelated to immigration— including homeland security and disaster relief funds—and promised to continue withholding funds unless and until Illinois diverted resources from the investigation and

9

suppression of violent crime to federal immigration enforcement. Federal courts have barred the administration from implementing these illegal actions. *See, e.g., Illinois v. FEMA*, No. CV 25-206 WES, 2025 WL 2716277 (D.R.I. Sept. 24, 2025); *see also City & Cnty. of San Francisco v. Trump*, 25-CV-01350-WHO, 2025 WL 2426858, at *2 (N.D. Cal. Aug. 22, 2025); *Martin Luther King, Jr. Cnty. v. Turner*, 798 F. Supp. 3d 1224, 1255 (W.D. Wash. 2025) (barring federal government from requiring Chicago to enforce federal immigration policies as a condition of receiving public safety, transportation and health grants).

40.     Angered by his inability to force Illinois and Chicago to adopt his policies, President Trump threatened to unleash a military assault upon them. On September 6, 2025, the President shared on social media an image of himself dressed as a military officer from the film Apocalypse Now, rebranded as, "Chipocalypse Now." The post riffed on a line from the film in which a character celebrated using napalm on a Vietnamese village, writing "I love the smell of deportations in the morning..." Referring to the announcement by Trump and Secretary of Defense Peter Hegseth a day earlier that they would rebrand the Department of Defense as the "Department of War," the post also threatened that "Chicago about to find out why it's called the Department of WAR."

10



**Donald J. Trump** ✅ ➕
@realDonaldTrump

'I love the smell of deportations in the morning...'

Chicago about to find out why it's called the Department of WAR 🚁🚁🚁



41.     Following this threat, President Trump federalized the Illinois National Guard over the objection of the Governor of Illinois and deployed the Texas National Guard and California National Guard into Illinois. Illinois and Chicago sought relief in federal court. The district court granted temporary injunctive relief upon concluding the President's order likely to be unlawful. *Illinois v. Trump*, 2025 WL 2886645 (N.D. Ill. Oct. 10, 2025). The defendants in that case sought a stay of that order, but the Seventh Circuit denied that request as to deployment, 155 F.4th 929 (7th Cir. 2025), and the United States Supreme Court denied the Trump administration's application for an emergency stay concluding that "the Government has failed to identify a source

of authority that would allow the military to execute the laws in Illinois." *Trump v. Illinois*, No. 25A443, 2025 WL 3715211, slip op. at 2 (U.S. Dec. 23, 2025).

42.     In September 2025, the federal government initiated the latest retaliatory attack against Illinois and Chicago. In accordance with President Trump's executive order directing the government to target sanctuary jurisdictions "to the maximum extent possible under the law," Exec. Order No. 14, 159, 90 Fed. Reg. 8443 (Jan. 20, 2025), DHS deployed quasi-military personnel from Border Patrol to Illinois to initiate a program of violence and control targeted at Plaintiffs and their residents to sow fear among Chicagoans and other Illinoisans and punish Plaintiffs for their lawful policies.

43.     The deployment into Illinois of Border Patrol, a quasi-military force, pursuing a coordinated campaign of violence and intimidation against the people of the State is, for President Trump, another tactic with the same goal—to punish Illinois and Chicago for refusing to adopt his administration's policies, and to coerce them to change course.

## II.     The Unauthorized And Reckless Deployment of Border Patrol To Chicago With Catastrophic Results.

### A.     Border Patrol Is Not Authorized Or Trained For Large-Scale Removal Enforcement In The Interior of the United States.

44.     ICE and Border Patrol are separate branches of DHS. Border Patrol "is responsible for determining the admissibility of aliens and securing the country's borders," while ICE "conducts criminal investigations involving enforcement of immigration related statutes." *Arizona v. United States*, 567 U.S. 387, 397 (2012).

45.     Border Patrol's purpose is to guard the ports of entry and the areas between the ports at the northern and southern border. Its primary mission is to deter, prevent, detect, respond to, and interdict the unlawful movement and illegal entry into the United States of terrorists, drug

smugglers, human traffickers, and migrants who may undermine the security of the United States. Border Patrol conducts "such activities as are customary or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c). It operates principally at the Mexican and Canadian borders and in coastal waters.

46.     The duties that Congress specifically directed Border Patrol to undertake are tied to the border, including (A) "interdicting persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a designated port of entry;" and (B) "deter[ring] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband." 6 U.S.C. § 211(e)(3)(A)–(B).

47.     The tasks involved in finding individuals within the United States who lack authorization to remain and initiating removal proceedings are different from the tasks involved in preventing individuals from entering or detaining those who have recently crossed the border into the United States.

48.     ICE has an operational arm, Enforcement and Removal Operations (ERO), which runs removal operations in the interior of the country. ERO identifies, targets, apprehends, and repatriates non-citizens without lawful status.

49.     As part of removal operations, immigration officers may arrest and detain a noncitizen discovered within the country pursuant to a warrant. 8 U.S.C. § 1226(a).

50.     Absent a warrant, immigration officers may arrest someone already in the United States only with probable cause to believe that the person "is in the United States in violation of" the law *and* that the suspect *"*is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see, e.g.*, *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975).

51. Generally, immigration officers may not detain a person already in the United States and question them about immigration status unless the officers can identify "specific articulable facts" that support "reasonable suspicion" the person is in the United States unlawfully. 8 C.F.R. § 287.8(b)(2).

52. Thus, immigration enforcement operations are governed by strict statutory and administrative procedures that turn on individualized evidence.

53. Because of the purpose of border security (to prevent entry into the United States of smugglers, contraband, and undocumented immigrants) and the realities of border security (including rugged terrain where backup is often miles away and radio equipment frequently fails), Border Patrol agents operating at or near the border may engage in enforcement tactics that are not permissible for removal enforcement in the interior, like warrantless searches of vehicles within a reasonable distance of the border and trespass on private property. CBP officers also may collect the biometric information of all noncitizens entering and leaving the United States, whereas such biometrics collection is only authorized in narrow, limited circumstances when effectuating removals. *Compare* 6 U.S.C. § 211(c)(10) (requiring Commissioner of Customs and Border Protection to "deploy technology to collect the data necessary for the Secretary to administer the biometric entry and exit data system"), *and* 8 U.S.C. § 1365b (addressing the creation of a biometric entry and exit data system), *with* 8 U.S.C. § 1357(f) (authorizing collection of biometric information from immigrants "14 years of age or older against whom a [removal] proceeding is commenced under section 1229a of this title").

54. With exceptions for people who intend to apply for asylum or claim a fear of persecution, Border Patrol agents may without a warrant immediately detain and remove persons determined to be inadmissible who are attempting to enter the United States. 8 U.S.C. § 1225(b).

14

55.     Border Patrol has specialized use of force policies specific to the circumstances that arise at the border, such as preparing for and addressing mass entry events.

56.     As James Tomscheck, a former Border Patrol internal affairs official, revealed back in 2014, "The Border Patrol has a self-identity of a paramilitary border security force and not that of a law enforcement organization."

57.     Border Patrol has a tactical unit called the Border Patrol Tactical Unit ("BORTAC"). BORTAC is a SWAT team trained to operate as a quasi-military arm of federal law enforcement; it is the arm of Border Patrol trained to respond to civil unrest and terrorist threats.

58.     Border Patrol agents are not trained to conduct removal operations in urban environments in the interior such as Chicago, and they lack experience carrying out removal operations in the interior of the country.

59.     Border patrol and removal operations have different purposes. The activities are governed by different statutory provisions and conducted by different agencies operating under different policies and using different practices. Border security and removal operations present distinct challenges and require different training and skills.

**B.     Border Patrol's Occupation of Chicago.**

60.     Distinct from ICE, which frequently operates in the interior of the United States, Border Patrol lacks the training and experience to engage in removal operations in Illinois. Nevertheless, in mid-2025, Defendants deployed over 200 Border Patrol agents away from border security to Illinois. Among the agents deployed to Illinois were members of the quasi-military BORTAC unit.

15

61.     Prior to deploying to Chicago, Border Patrol agents were not properly delegated authority to conduct removal operations outside their operational area at the border and did not receive appropriate additional training for interior removal operations.

62.     Defendants have implemented an illegal policy of deploying Border Patrol to the interior of the United States, including the Chicagoland area. On October 30, 2025, Defendant Noem stated she was "thrilled with all the work that ICE and Border Patrol are doing to help clean up our streets . . . I would say that we actually are using our ICE officers and our CBP officers everywhere."

63.     Border Patrol has employed tactics in Chicago and other locations in Illinois that are unauthorized, unprecedented, and ineffective for removal operations. These tactics include:

> a.  patrolling the Chicago River with masked personnel in tactical gear carrying semi-automatic rifles and questioning residents they encounter about their immigration status.

16



    b.  congregating in large numbers wearing military gear and brandishing military weapons in crowded areas of Chicago, including the Loop, Magnificent Mile, and Millenium Park, and interrogating people without belief the person was an alien or unlawfully in the country.



c. conducting a military-style raid on a Chicago apartment building, seizing its residents and searching the premises. Agents rappelled from a Black Hawk helicopter into a South Shore, Chicago apartment building, and arrested and detained without warrant dozens of people, including multiple United States citizens, some of whom were children. Agents pulled people from their beds in the dead of night, zip-tied their hands and detained them in buses or vans. Agents also ransacked residents' apartments, kicked down doors, emptied bookshelves, and overturned mattresses.

d. Capturing biometric information from Illinois and Chicago residents without consent and retaining that information in government databases for fifteen years;

e. arresting or detaining hundreds of people without a warrant or sufficient cause, and seemingly based solely on race or ethnicity;

f. indiscriminately releasing tear gas in urban neighborhoods among civilian populations,

18







g.  conducting raids in or near courthouses, domestic violence shelters, hospitals and schools, arresting parents and separating them from their children, dragging teachers out of their classrooms, and preventing victims of violent crime from seeking judicial relief.

64.     The chaos and violence that Border Patrol's tactics have unleashed on Plaintiffs has resulted in two shootings by immigration officers, one of them fatal.

65.     On September 12, in suburban Franklin Park, Illinois, an ICE officer shot and killed Silverio Villegas-Gonzalez, a 38-year-old father of two as he was driving home from dropping his three-year-old son off at daycare. Videos of the incident did not corroborate DHS's assertion that the shooting officer was "seriously injured" by a "criminal illegal alien."

66.     On October 4, in Chicago's Brighton Park neighborhood, Border Patrol agent Charles Exum shot Chicago resident Marimar Martinez, a U.S. citizen, five times—a fact he later bragged about in a Signal group chat with other federal agents, texting: "I fired 5 rounds and she had 7 holes. Put that in your book, boys." Federal authorities initially claimed that Exum opened fire on Ms. Martinez only after she rammed into his vehicle—but the federal criminal case against Ms. Martinez was dismissed after body worn camera footage captured another CBP agent with his hands on his assault rifle, saying "Do something, bitch," just before Exum fired five shots into Ms. Martinez.

67.     Hundreds of residents have been injured by Border Patrol's widespread use of tear gas in residential neighborhoods, including children, the elderly, and first responders.

68.     The deployment of Border Patrol and its militarized violent tactics to other locations in the interior has had similar violent and deadly results. On January 7, 2026, a woman in Minneapolis who had just dropped off her six-year-old child at school was shot and killed by an immigration agent who fired multiple times at her vehicle at close range. On January 8, 2026, in

21

Portland, Oregon, near a hospital, Border Patrol agents shot and injured the driver and passenger of a vehicle whom they sought to question about their immigration status.

69.     Defendant Bovino is the tactical commander of agents in Illinois. Bovino has personally deployed tear gas against innocent civilians in and around Chicago without warning or cause and has lied about doing so repeatedly. *Chicago Headline Club v. Noem*, No. 25 C 12173, 2025 WL 3240782, at *6 (N.D. Ill. Nov. 20, 2025).

70.     Border Patrol's incursion into Illinois and its unlawful, unauthorized, violent, and arbitrary conduct is intended to intimidate and frighten Plaintiffs' residents by disregarding their privacy, ignoring the security of their homes and property, and threatening their freedom and physical well-being.

71.     Border Patrol's incursion into Chicago and the surrounding areas has caused widespread trauma to Chicagoans and other Illinoisans and has profoundly disrupted Plaintiffs' abilities to enforce their laws, implement their policies, and for the State to function as a sovereign government. Illinois residents reasonably fear they cannot safely attend work and school. Nor can they attend worship services, participate in court appearances or seek public benefits without fear of arbitrary interrogation, invasions of privacy, detention or injury. This has had devastating effects on Plaintiffs' ability to serve the people's needs.

### III.     Defendants Adopted and Implemented Unlawful Policies.

72.     Since Defendants' incursion into Illinois, DHS has cast aside longstanding policies governing interior immigration enforcement, instead adopting new, unlawful policies that are contrary to law and arbitrary and capricious.

73.     Each of Defendants' actions have caused sovereign and proprietary injuries to Plaintiffs. Plaintiffs allege below unlawful agency actions and certain of the resulting injuries. The

intensity, violence and interrelatedness of Defendants' conduct was intended to, and did, exacerbate Plaintiffs' injuries.

      **A.**      **Roving Patrol Policy.**

              *1.*    *Roving Patrols and Indiscriminate Questioning.*

74.    In 2017, Tom Homan, then-Acting Director of ICE, explained that ICE "conducts targeted immigration enforcement actions" based on "a lot of investigatory and intelligence work developing leads on where we may locate the target of the arrest," with a focus on "specific individuals with a criminal history." Homan further explained that ICE "do[es] not conduct neighborhood raids or sweeps; instead, our officers go to a specific location to locate a specific individual."

75.    To meet ever-increasing arrest quotas established by the White House, Defendants abandoned ICE's investigatory, targeted removal procedures. Instead, they implemented a new— and illegal—policy of interrogating residents they encounter about their citizenship and immigration status, without any basis to believe they are unlawfully present in the United States ("Roving Patrol Policy").

76.    U.S. citizens are not required to carry, much less produce upon request, documentation establishing their citizenship or otherwise prove their citizenship while going about their day.

77.    The Roving Patrol Policy sought to boost arrest numbers in response to quotas established by the Trump Administration. For example, on a call in January 2025, immigration officers were told that each field office should make 75 arrests per day, totaling more than 1,800 daily arrests nationwide, and that managers would be held accountable for missing those targets.

78.     The arrest quota subsequently increased to 3,000 daily nationwide in May 2025. White House Deputy Chief of Staff Stephen Miller promised that the administration was "going to keep pushing to get that number up higher each and every day."

79.     On December 31, 2025, DHS posted its goal of removing *100 million residents* from the United States. Achieving this goal will require Defendants use highly aggressive and illegal methods to remove U.S. citizens, permanent residents, and many others with lawful immigration status.



80.     To meet the administration's arrest quotas, federal immigration agents stopped developing target lists of immigrants subject to removal and instead started raiding stores such as

Home Depot or 7-Eleven to make arrests. DHS agents no longer focused on targeting removable immigrants with criminal histories but instead took a broader approach of questioning anyone they encounter.

81.    This change in practice is borne out by the record: in June 2025, Marco Charles, the Acting Executive Associate Director of ERO, told agents to "turn up the creative knob up to 11 and push the envelope."

82.    In addition to "turning up the creative knob" with neighborhood raids and sweeps, Defendants have made it their mission to question and arrest as many "collateral" individuals as possible during the course of targeted enforcement operations. "Collaterals" are other persons an immigration officer happens to encounter when seeking to arrest a specific person identified in a warrant. Charles directed that "All collaterals encounter[ed] need to be interviewed and anyone that is found to be amenable to removal needs to be arrested."

83.    According to DHS, nearly half the arrests in the initial two weeks of the incursion into Illinois were untargeted, warrantless "collateral" arrests. DHS's policy is to increase collateral arrests in Chicago and other cities, which it aims to accomplish through the Roving Patrol Policy of demanding that any resident answer questions about their citizenship or immigration status.

84.    Commander-in-charge Bovino has acknowledged and affirmed the Roving Patrol Policy in stating to a reporter named Priscilla Alvarez: "I can question anyone anywhere in the United States as to their citizenship. Priscilla, what's your citizenship? See I just did it now, and I can do that anywhere in the United States, and our border patrol agents are trained to do that."

       *2.*    *Defendants Implemented the Roving Patrol Policy in Illinois.*

85.    Defendants have repeatedly implemented the Roving Patrol Policy in Illinois.

86.     In September, federal agents detained a family on their way to pick up supplies at Home Depot for the family's celebration of their son's 10-year-old birthday, purportedly on the basis of an alleged illegal U-turn. Agents demanded identification from everyone in the car and repeatedly asked questions about the citizenship status of each family member while two children sobbed in the background. The parents were taken away, and two children were left with their nineteen-year-old sibling on the side of the road.

87.     On September 28, federal agents in military-style fatigues with their faces masked and carrying long guns roamed Chicago's Downtown, River North, and Gold Coast neighborhoods, questioning individuals they encountered without any factual basis and taking people into custody. Defendant Bovino acknowledged that agents were conducting roving patrols without an identified target and with the express intent to "target . . . anyone who is here illegally."

88.     On October 24, agents wound through Chicago's Wicker Park and West Town neighborhoods, stopping and questioning residents they encountered regarding the residents' citizenship status. At one point, agents surrounded a driver and asked for identification seemingly based on nothing more than his proximity to rideshare drivers.

89.     On November 6, federal immigration agents, including Defendant Bovino, led a caravan across Chicago's Southwest Side, stopping and questioning random residents about their immigration status.

- Defendant Bovino and other agents stopped a group of men working on a vehicle in the 4500 block of South Richmond Street in Brighton Park and asked about their immigration status.

- Less than thirty minutes later, Defendant Bovino and other agents stopped another man at his vehicle and demanded documentation of citizenship.

- Defendant Bovino and the other agents also entered a Shell gas station near 53rd Street and Kedzie Avenue, where Bovino interrogated patrons about their citizenship and asked a gas station clerk about the gas station's immigration hiring policy.

90.     Federal agents targeted the ride-share lots at O'Hare airport on several occasions between October 10 and November 4, approaching drivers and asking them if they were U.S. citizens.

*3.      The Roving Patrol Policy Has Injured Plaintiffs.*

91.     "Freedom of movement is basic in our scheme of values." *Kent v. Dulles*, 357 U.S. 116, 126 (1958). Police interrogation undermines this freedom of movement, and Illinois residents have long had a right to personal security and privacy that includes freedom from such interference. *See* Ill. Const. Art. I, § 6; *Brown v. Texas*, 443 U.S. 47, 52 (1979). In line with basic American values, Congress gave immigration officers authority to question people only in certain circumstances, and not just "anyone anywhere in the United States" as claimed by Bovino. 8 U.S.C. § 1357(a).

92.     The inability of Illinois residents to go about their daily lives free from Defendants' intrusions and demands for information diminishes the freedom and security of Illinois residents and deprives them of rights secured under the Illinois Constitution and federal law.

93.     The President announced on his social media platform, Truth Social, that he was calling on federal immigration officials "to do all in their power" to effect "the single largest Mass Deportation Program in History" in "Democratic Power Center[s]" "such as Chicago." Defendant Noem has echoed this goal. Defendants have implemented the Roving Patrol Policy to increase the number subject to deportation.

94.     The Roving Patrol Policy causes chaos and disruptions on State- and City-managed property, roads, and sidewalks, requires the State and the City to divert resources, and it increases distrust between law enforcement and communities, which interferes with the State and City's law enforcement priorities.

27

95.    Under the Roving Patrol Policy, federal agents are questioning individuals in Illinois, far from the border, without the required belief that the person lacks the lawful right to reside in the country.

96.    This policy change from targeted immigration enforcement based on specific investigations to roving patrols subjecting any resident to questioning about their citizenship and immigration status is arbitrary, capricious, and contrary to federal law that limits federal agents to question only those they have reason to believe are non-citizens. 8 U.S.C. § 1357(a).

**B.    Biometric Scanning Policy.**

97.    Congress has limited DHS's authority to collect or store biometric information. Congress authorized DHS to secure biometric information only in certain narrow circumstances, including from visa applicants and at entry and exit points. 8 U.S.C. §§ 1201(b), 1365b(a), 1365b(c)(2), 1365b(d), 1731(a).

98.    Outside of the border, Congress authorized DHS to secure biometric information from immigrants only after a removal proceeding is initiated. 8 U.S.C. § 1357(f); 8 C.F.R § 236.5.

*1.    Capture and Retention of Biometric Information*

99.    CBP developed biometric technology to implement Congress' direction that DHS create a biometric entry and exit data system. 8 U.S.C. § 1365b(a). After several years of testing and pilots, CBP operationalized and deployed facial recognition technology, known as the Traveler Verification Service (TVS), to support biometric entry and exit procedures at air, land, and sea ports of entry into the United States.

100.    CBP used TVS facial recognition technology to match photographs taken of arriving or departing travelers with biometric templates generated from pre-existing photographs maintained by CBP, including photographs captured by CBP during previous entry inspection, photographs from U.S. passports and visas, and photographs from other DHS encounters.

101. U.S. citizens could decline to have their photographs taken as part of the biometric entry-exit program. For U.S. citizens who consented to participate in the biometric entry-exit program, CBP retained facial photographs only until their identities were verified.

102. CBP recognized that "the collection of biometrics is a privacy-sensitive practice." Accordingly, CBP issued Privacy Impact Assessments (PIAs) documenting each new phase of TVS testing and deployment, culminating in a comprehensive, 49-page Privacy Impact Assessment issued on November 14, 2018 (the "November 2018 TVS Privacy Impact Assessment") to provide a "consolidated privacy risk assessment" for the technology.

103. The biometric entry-exit program and the rules governing the retention of biometric information have been the subject of formal rulemaking in recent years.

104. In September 2023, DHS issued Directive 026-11, instituting what DHS described as "the most extensive requirements of any Federal agency" to ensure that facial recognition and capture technologies ("FR/FC technologies") were "used properly" "to support critical law enforcement investigations, while protecting privacy and individual rights."

105. DHS Directive 026-11, "Use of Face Recognition and Face Capture Technologies," included requirements that:

    a. All uses of FR/FC technologies be thoroughly tested to ensure there is no unintended bias or disparate impact in accordance with national standards;

    b. U.S. citizens be afforded the right to opt out of face recognition for non-law enforcement uses unless otherwise authorized or required, and that FR/FC not be used as the sole basis of any law or civil enforcement related action; and

    c. Department oversight offices including the Privacy Office, the Office for Civil Rights and Civil Liberties (CRCL), and the Office of the Chief Information Officer review all new and existing uses of FR/FC technologies.

106. DHS rescinded DHS Directive 026-11 sometime on or before February 14, 2025.

29

107.    CBP developed a mobile application called Mobile Fortify that scans fingerprints and performs facial recognition. The application then compares the collected data to biometric information stored in a number of DHS databases, including TVS, Border Patrol's Seizure and Apprehension Workflow, and DHS's Office of Biometric Identity Management's ("OBIM") Automated Biometric Identification System ("IDENT"), which holds immigration history information.

108.    DHS launched Mobile Fortify on or around June 2025.

109.    DHS has used Mobile Fortify in the field over 100,000 times since the application's launch.

110.    Unlike TVS, DHS does not limit Mobile Fortify to use at ports of entry and exit. DHS does not restrict when, where, from whom, or the circumstances under which immigration agents may take biometric information using Mobile Fortify. According to a February 2025 DHS Privacy Threshold Analysis, immigration officers may use Mobile Fortify to take biometric information "[w]hen ICE agents or officers encounter an individual or associates of that individual."

111.    The February 2025 DHS Privacy Threshold Analysis states that "ICE agents do not know an individual's citizenship at the time of initial encounter and will use the Mobile Fortify mobile application to determine or verify the individual's identity." It states that "the intended purpose of the Mobile Fortify Application is to identify aliens who are removable from the United States," but expressly authorizes agents to "use Mobile Fortify to collect information in identifiable form about individuals regardless of citizenship or immigration status." DHS acknowledges that a "photo taken by an agent using the Mobile Fortify mobile application could be that of someone other than an alien, including US. citizens or lawful permanent residents."

30

112.    ICE and Border Patrol do not provide the opportunity for individuals to decline or consent to the collection and use of face photographs and fingerprint scans, and DHS has not identified any policies, practices or procedures limiting, or governing its use of Mobile Fortify. Prior PIAs and Privacy Act system of records notices ("SORNs") were seemingly developed with respect to other technologies that differ from Mobile Fortify in terms of functionality, purpose, and scope of use.

113.    DHS retains all biometric information (both face photographs and fingerprints) taken using the Mobile Fortify app, including that of U.S. citizens, for 15 years.

114.    The policy to use Mobile Fortify for interior removal investigations, retain for 15 years all face photographs taken using the Mobile Fortify app, regardless of an individual's citizenship, and not allow U.S. citizens to opt out of facial scanning likewise represent significant departures from the Border Patrol's TVS system entry-exit program.

2.    *Defendants Implemented the Biometric Scanning Policy In Illinois*

115.    Border Patrol and ICE are using Mobile Fortify to scan the fingerprints and faces of people in Illinois who were neither entering nor exiting the United States; were not present at a port of entry or inspection area; and were not in a removal proceeding.

116.    On information and belief, in Chicago, U.S. citizen Jesus Gutierrez was walking home from the gym when two federal immigration agents pulled over and began questioning him. Mr. Gutierrez told them he was a U.S. citizen, but he had no identification on him. The agents put him into their car, a gray Cadillac SUV with no license plates, and handcuffed him. Agents then used Mobile Fortify to scan Mr. Gutierrez's face, after which they acknowledged that he was a U.S. citizen as he had told them.

117.    On or about October 10, 2025, masked Border Patrol agents stopped two teenagers riding bikes on the sidewalk near East Aurora High School in Aurora, Illinois. Asked by the agents

about their citizenship and to show ID, one of the teenagers said that he was 16 years old and a U.S. citizen. The teenager told one of the agents he had a school ID but did not have it on him. One of the agents asked the other "Can you do facial?" and the agent pointed a cell phone at the teenager, appearing to take a photo of his face.

118.    On or about October 27, 2025, masked immigration agents pulled over a man on his way to work. After the man told them he is an American citizen, one of the agents took a photo of him with a cell phone and asked him to take his hat off to be able to "run" his information.

*3.    The Biometric Scanning Policy Has Injured Plaintiffs.*

119.    The Illinois Constitution protects the right of the people to be "secure in their persons, . . . against . . . invasions of privacy . . . ." *See* Ill. Const. Art. I, § 6. This Illinois Constitutional right is broader than rights protected by the federal constitution. *See In re May 1991 Will Cnty. Grand Jury*, 152 Ill.2d 381, 391 (1992) (noting that "the Illinois Constitution goes beyond Federal constitutional guarantees"); *People v. Watson*, 214 Ill. 2d 271, 279–80 (2005) (stating that "the Illinois Constitution . . . provides citizens of this state with broader protection from unreasonable intrusions than the Fourth Amendment"). This privacy language was added to Article I, Section 6 of the Illinois Constitution to protect against concerns that "the government might use newly available technology to develop 'a general information bank' that would collect and monitor personal information." *People v. Caballes*, 221 Ill. 2d 282, 317–18 (2006).

120.    Under the privacy clause in the Illinois constitution, absent a warrant, the government can compel a person in Illinois to disclose biometric information only pursuant to a grand jury subpoena supported by a showing that the information sought is "relevant" to a criminal investigation and supported by "individualized suspicion." *See Will Cnty. Grand Jury*, 152 Ill. 2d at 393 ("Some showing of individualized suspicion as well as relevance must be made before

physical evidence of a noninvasive nature, such as an in-person appearance in a lineup or fingerprinting, is demanded of a witness.").

121.     The Illinois General Assembly also has recognized that "biometric identifiers" are pieces of "private information" and that the collection and retention of biometric information pose unique dangers, "the full ramifications" of which are not "fully known." 5 ILCS 140/2(c-5); 740 ILCS 14/5(c), (f). Accordingly, it has sought to protect against the misuse or disclosure of biometric information. "The public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g).

122.     Numerous statutes reflect Illinois' interest in protecting the rights of the people against unwarranted collection and retention of biometric and personal information. *See, e.g.*, 740 ILCS 14/1 *et seq*., (Biometric Information Privacy Act regulating the collection, use, storage, and destruction of biometric data by private companies); 815 ILCS 530/5 *et seq*., 530/30 (Personal Information Protection Act requiring government agencies to dispose of all personal data collected promptly when it is no longer needed, securely and confidentially); 105 ILCS 5/34-18.34 (requiring school districts to adopt policies requiring consent for collection of biometric information, and destruction of biometric information within 30 days after use is discontinued).

123.     It is Illinois policy to promote cooperation, trust, and mutual respect between law enforcement and communities. *See* 5 ILCS 805/1 *et seq*. Illinois has expended considerable resources toward that goal. In support of this policy, as discussed above, Illinois restricts the government's authority to compel residents to disclose biometric information to law enforcement personnel, and by statute restricts the use and disclosure of such information when voluntarily provided.

33

124.    The indiscriminate use of Mobile Fortify to capture and retain biometric data of Illinois residents, including U.S. citizens, negates Illinois' constitutional and statutory protections on the capture, retention, and use of such information, violates Illinois law, interferes with Plaintiffs' ability to administer public program, exceeds DHS's statutory authority on the deployment of this technology, and is arbitrary and capricious.

### C.    Warrantless Arrests.

125.    Immigration officers may only arrest a person if they have a warrant or "reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest" (the "Section 1357 requirements"). 8 U.S.C. § 1357(a)(2). Implementing regulations track the statute. 8 C.F.R. § 287.8(c)(2). "The words of the statute 'reason to believe' are properly taken to signify probable cause." *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975).

126.    To satisfy the Section 1357 requirements for a warrantless arrest, immigration officers must have evidence establishing *both* probable cause to believe the person is present unlawfully *and* an individualized assessment showing probable cause to believe the person is likely to escape.

127.    Probable cause to arrest exists only "if the totality of the circumstances known to the officer at the time of the arrest would warrant a reasonable person in believing that the arrestee" had violated an immigration law for which he was subject to arrest. *See Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). Reasonable suspicion is a lower standard than probable cause. *Id*. at 1013–14.

128.    Federal law also allows DHS to issue so-called I-200 arrest warrants, but only when there is a pending charging document, called a Notice to Appear. 8 U.S.C. § 1226(a); 8 C.F.R.

34

§§ 236.1(b), 1236.1(b). Officers are not allowed to issue a warrant to a "collateral" person identified during an enforcement action when no related charging document is pending. *Castañon Nava v. Dep't of Homeland Sec.*, No. 18-cv-3757, 2025 WL 2842146, at *14–*17 (N.D. Ill. October 7, 2025).

   *1. Warrantless Arrests Without Probable Cause or Individualized Assessment of Flight Risk.*

129. In accordance with the Section 1357 requirements, ICE agents historically targeted specific individuals for arrest. ICE's longstanding practice required immigration agents to complete a "Field Operations Worksheet" (FOW) by providing details about their target—listing on a worksheet the targeted person's name, appearance, home, and occupation, and cataloging their criminal history—and then submitting the completed form to a supervisor for specific approval prior to conducting any operation to arrest an immigrant. Former officers have explained that the specificity required by the FOW and the need for supervisory approval helped ensure that ICE officers were operating within their legal bounds.

130. In 2022, ICE disseminated a Statement of Policy that articulated the standards for how ICE officers are to conduct warrantless arrests in a manner consistent with the Section 1357 Requirements.

131. Under ICE's longstanding policy and practice as reflected in the 2022 Statement of Policy, and prior to this incursion, the FOW was used in almost every arrest made by the Enforcement and Removal Operations division of ICE. DHS abrogated its longstanding practice of requiring immigration agents to complete a FOW. The abrogation of the FOW practice occurred without explanation or announcement.

132. Since abandoning the use of FOWs, which ensured that officers met the warrant and probable cause requirements before making an arrest, DHS repeatedly has disclosed that it is

35

making civil immigration arrests without a warrant and without probable cause to believe those arrested have violated the law and present a flight risk ("Warrantless Arrest Policy"). As one former ICE official said, "It's hard to fill out a worksheet that just says, 'Meet in the Home Depot parking lot.'"

133.    On September 25, 2025, DHS's official social media account, @DHSgov, posted on X that DHS "uses 'reasonable suspicion'" to make civil immigration arrests and that "[t]he Supreme Court recently vindicated us on this question."

134.    On October 6, 2025, DHS issued another press release on its official website, again confirming that "DHS law enforcement uses 'reasonable suspicion' to make arrests," as "vindicated" by the Supreme Court.

135.    Defendant Bovino, the tactical commander of Border Patrol forces in Illinois, confirmed he is implementing DHS's warrantless arrest policy. "We need reasonable suspicion to make an immigration arrest . . . . You notice I did not say probable cause, nor did I say I need a warrant. We need reasonable suspicion . . ." Defendants are wrong, and their policy is illegal.

136.    As part of the Warrantless Arrest Policy, DHS also directed its agents to carry blank forms on roving patrols, instructing them to prepare and sign them—so called I-200 "field warrants"—as an arrest was made. DHS trained its officers to use these blank forms in the field to avoid the requirement of individualized escape risk required by Section 1357.

2.    *Defendants Implemented the Warrantless Arrest Policy in Illinois*

137.    Federal agents have unlawfully arrested dozens of U.S. citizens across the country under this illegal policy.

138.    Since September 8, 2025, federal agents have reportedly arrested over 2,800 individuals in Illinois as part of Operation Midway Blitz. Of the nearly 550 arrests made during the first two weeks of Operation Midway Blitz, almost half were "collateral arrests," meaning

36

arrests of people who ICE had not been specifically targeting. The vast majority of such collateral arrests were likely made without a warrant.

139.    At least fifteen Illinois residents have been arrested pursuant to blank I-200 forms filled out and signed by agents in the field.

140.    The court in *Castañon Nava*, 2025 WL 2842146, at *8, identified approximately a dozen Illinois residents who federal agents arrested without conducting the required individualized assessment of flight risk. The court later identified another approximately 442 people potentially arrested in violation of the Section 1357 requirement and for whom individual determinations as to those potential violations are ongoing.

141.    On January 27, 2025, at least ten armed officers broke down the doors to a house, handcuffed a resident, and took him to the front of the residence. *Castañon Nava*, 2025 WL 2842146, at *10. When he asked why he was handcuffed, he was told that the agents were looking for someone who the individual later understood to be his roommate. *Id.* Agents did not ask him questions to establish he was a flight risk. *Id.* Had they asked, they would have learned that he is a business owner with a fiancé in Chicago. *Id.*

142.    On September 12, 2025, federal agents arrested a father and son in Cicero. The duo was headed to work at the construction company they had founded. The father had been in the United States for 20 years. There was no warrant issued for their arrest and given their longstanding ties in the United States, no individualized reason to believe they were at risk of flight.

143.    On October 18, Ruben Torres Maldonado was arrested without explanation in the parking lot of the Home Depot in Niles after immigration agents threatened Mr. Torres Maldonado with a gun and told him to get out of his vehicle. Mr. Torres Maldonado had stable employment

and no criminal record, and his sixteen-year-old daughter is fighting Stage 4 cancer. He has deep ties to the community and was not a flight risk.

144.    Pursuant to the Warrantless Arrest Policy, on October 21, federal agents handcuffed a landscaper in Evanston until he proved his citizenship, and in late September, slammed a young, Hispanic U.S. citizen against a car, who thought he was being robbed, on the Southwest Side of Chicago.

145.    In another example, on September 16, in a predawn operation personally overseen by Defendant Noem, federal agents laid siege to a home in Elgin, Illinois, with heavily armored vehicles, a helicopter, officers in military-style tactical gear with high-powered rifles, and flash-bang grenades. The raid resulted in the unlawful detention and warrantless arrests of two U.S. citizens.

146.    On September 30, federal agents conducted a military-style raid on an apartment complex in the South Shore neighborhood. After rappelling from a Blackhawk helicopter on to the building, agents kicked down doors and detained numerous U.S. citizens, zip-tied their hands, and held them outside their home for an extended time period.

147.    On October 24, near Belmont and Broadway in Chicago, agents jumped out of several unmarked SUVs, and questioned, restrained and arrested a U.S. citizen.

148.    On October 25, federal immigration agents were parked in an unmarked vehicle in a staff parking lot at Allen Elementary School in Aurora, Illinois. When approached by Ruben Morales, one of the agents in the car yelled at Morales to move away. As Mr. Morales was walking away, an agent approached him from behind, pepper sprayed the back of his head, tackled him to the ground, and handcuffed him. Jessi Olazaba, an Aurora resident who witnessed Mr. Morales' assault, attempted to record the license plate of the agents' vehicle. According to reports, an agent

without warning knocked off Ms. Olazaba's glasses, pepper sprayed her, and pushed her backwards so that she hit her head on a curb, requiring medical attention. Both Mr. Morales and Ms. Olazaba were taken to the FBI's Chicago office and then later released.

149. On December 2, 2025, a federal district judge in Washington, D.C., found that DHS had "implement[ed] . . . a new policy of conducting warrantless civil immigration arrests based on a lower standard than probable cause" in violation of the Section 1357 requirement. *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. CV 25-3417 (BAH), 2025 WL 3465518, *22 (D.D.C. Dec. 2, 2025). The court found that federal agents had arrested at least 40 people and "likely many more than that" without a warrant and without satisfying the requirement to establish escape risk. *Id.* at *33.

150. On November 25, 2025, a federal district judge in Colorado concluded "that ICE is routinely conducting warrantless arrests in Colorado without making the statutorily required individualized assessment of flight risk." *Ramirez Ovando v. Noem*, No. 1:25-CV-03183-RBJ, 2025 WL 3293467, at *10 (D. Colo. Nov. 25, 2025).

            *3.    The Warrantless Arrest Policy Injured Plaintiffs.*

151. The principal targets of the Warrantless Arrest Policy are Latino. Immigrants and people of color have suffered disproportionately from Defendants' Warrantless Arrest Policy. The vast majority of immigrants in Illinois are citizens or lawful permanent residents.

152. Immigrants are the life-blood of communities in Chicago and throughout Illinois. They contribute to the vitality of these communities and power the economic engines that have made the City and State economic successes. About 15% of Illinois's residents are foreign-born, and more than 18% of the workforce in Illinois is foreign-born. They account for over one-quarter of entrepreneurs and about one-third of STEM workers. These immigrant entrepreneurs generate

almost $3 billion in business income. Immigrants play a large part in maintaining the role of Illinois and Chicago as leading innovation.

153.     In the healthcare field, over 18% percent of nurses in Illinois are foreign-born and almost two-thirds of home care workers—caregivers who allow older adults to remain in their homes and reduce hospital admissions—are not U.S. citizens. Overall, immigrants in Illinois have almost $100 billion in household income that translates to more than $50 billion in total spending power—all of which not only drives the State's economic activity but also contributes more than $10 billion in state and local taxes. As neighbors, business owners, taxpayers, and workers, immigrants are an integral part of Illinois's diverse and thriving communities and make extensive contributions that benefit all.

154.     Through the Mayor's Office of Immigrant, Migrant and Refugee Rights (IMRR), the City of Chicago provides services to Chicago immigrants. IMRR "serve[s] as a bridge between communities and city government—helping individuals and families connect to programs, understand their rights, and thrive in Chicago." The Warrantless Arrest Policy has led to a substantial diversion of IMRR staff time and resources.

155.     IMRR employees who ordinarily carry out IMRR's regular functions have been redirected to planning and outreach to educate Chicago's immigrants on enforcement operations and provide immigrants, refugees, and their families tools and resources to prepare in case of family separation due to the Warrantless Arrest Policy.

156.     During the fall of 2025, IMRR staff responded to emergencies caused, in part, by the Warrantless Arrest Policy. This included driving to altercation sites to meet with victims, canvassing affected neighborhoods to distribute know-your-rights information, and participating in emergency meetings with community organizers.

157.    Planning and executing these emergency responses requires IMRR to divert time and resources from other programs and initiatives. For instance, IMRR suspended various cultural collaborations and project planning initiatives with community partners because IMRR staff was occupied with responding to the federal government's unlawful policies, which targeted Chicago's Latino population. Similarly, IMRR delayed its plan to revamp the City's language access program because staff resources were redirected.

158.    The Warrantless Arrest Policy also impacts Plaintiffs' ability to protect and to obtain cooperation from its crime victims and witnesses particularly in immigrant communities. For example, victims of crimes have become afraid to report crimes, attend court proceedings, or otherwise cooperate with law enforcement due to concerns about the indiscriminate and unpredictable actions of federal immigration agents.

159.    Many Illinois residents in Chicago and the surrounding areas have become fearful of leaving their homes to attend work or school, take public transportation, or access public services, including medical services, as a result of the Warrantless Arrest Policy.

**D.      Deployment of Riot Control Weapons.**

160.    Riot Control Weapons are weapons that merge the force of kinetic projectiles with chemical irritants, with the projectiles bursting on impact to release a powdered form of the active ingredients in pepper spray. They include tear gas, pepper balls, smoke grenades, rubber bullets, flash bang devices, mace, and pepper spray.

161.    Chemical irritants are indiscriminate by nature, and they may affect innocent bystanders, especially in windy conditions or where people are moving around.

162.    The U.S. Centers for Disease Control and Prevention recognizes that exposure to Riot Control Weapons can impose both immediate and long-term health effects, including

blindness, glaucoma, cataracts, asthma, burns, and respiratory failure possibly resulting in death. Riot Control Weapons cause respiratory distress and pose particular challenges in urban communities and among communities of color, where incidences of respiratory illness are disproportionately high.

163. Tear gas produces sensory irritation and pain in the eyes, skin, and upper respiratory tract and may cause anxiety, panic reactions, and increases in heart rate and blood pressure. Studies have linked tear gas to lasting physical symptoms, including allergic reactions, respiratory damage, mental distress, anxiety, and post-traumatic stress disorder.

164. Illinois law prohibits law enforcement officers from using force as punishment or retaliation and from discharging kinetic impact projectiles indiscriminately into a crowd. 720 ILCS 7-5.5(e)(i); 720 ILCS 7-5(e)(iv).

165. Illinois law also prohibits law enforcement officers from using chemical agents or irritants for crowd control, including pepper spray and tear gas, without issuing an audible dispersal order and allowing time and space to comply with the order, unless there is a risk of death or great bodily harm. 720 ILCS 7-5(e)(v).

166. Chicago Police Department (CPD) policy permits officers to use special weapons that dispense chemical agents against passive resisters that are part of a crowd or group only when the agent is used for chemical saturation and after obtaining authorization from the Superintendent, and only by officers who have received appropriate training in such special weapons. Notably, CPD policy prohibits dispensing chemical agents on a person standing among a group when there is an unreasonable risk that uninvolved people will be significantly subjected to the effects, unless the target is an assailant and other force options are not available or effective.

*1. Statutory and Administrative Limits On Defendants' Use of Force*

167.    Defendants ICE and Border Patrol are required to publish regulations that "prescribe the categories of officers and employees . . . who may use force (including deadly force) and the circumstances under which force may be used." 8 U.S.C. §1357(a)(5).

168.    According to 8 C.F.R. § 287.8(a)(1)(ii), "non-deadly force may be used only when a designated immigration officer . . . has reasonable grounds to believe that such force is necessary."

169.    According to 8 C.F.R § 287.8(a)(1)(iii), an immigration officer "shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner, or assailant."

170.    DHS's written use of force policy provides that immigration officers may use force only when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that is objectively reasonable in light of the facts and circumstances confronting the agent at the time. This standard is an objective one that, in the context of use of force policy and practice, is often referred to as "objective reasonableness." The use of excessive force by DHS employees is strictly prohibited.

171.    The DHS 2023 written use of force policy provides that, when feasible, agents must attempt to identify themselves, issue verbal warnings, and afford reasonable opportunity for compliance before applying force.

172.    A 2021 Border Patrol use of force policy also includes the objective reasonableness standard, as well as requirements that officers identify themselves as law enforcement and issue warnings before using force "when feasible."

43

173.    According to Border Patrol's 2021 written policy, agents may use certain riot control tactics and weapons on those demonstrating "active resistance" and other, more dangerous tactics, on those exhibiting "assaultive resistance." "Active resistance" is a type of resistance "where physical attributes are being used to resist an officer/agent's control efforts" and where "[t]he efforts are not directed toward the officer/agent but rather appear intended to thwart an officer/agent's control efforts." "Assaultive resistance" is "resistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self." This includes a subject's attempts (or apparent intent) to make physical contact in an attempt to control or assault the officer/agent.

174.    Agents may use tear gas either for area saturation or a compliance tool only against subjects who demonstrate, at a minimum, active resistance. CBP agents may use a compressed air launcher as a kinetic impact delivery system and specialty impact munitions only on those demonstrating, at a minimum, assaultive resistance.

175.    Further, under the 2021 ICE Firearms and Use of Force Handbook, agents may launch projectiles containing chemical agents including tear gas in a general area (not targeted at a specific person) only after clear, verbal commands fail to secure compliance. Agents may fire a projectile containing chemical agents at a person only after clear verbal commands and if the use of dispersed chemical agents and physical pressure are ineffective.

176.    The 2021 CBP policy prohibits agents from dispersing chemical agents with a compressed air launcher, and mandates consideration of other force options, "on subjects who are: small children; elderly; visibly pregnant; or operating a conveyance." The 2021 CBP policy prohibits agents from using a less lethal specialty impact/chemical munitions delivery system and mandates consideration of other force options "with respect to subjects who are: small children;

44

elderly; visibly pregnant; near known flammable materials (when using a pyrotechnic device); or operating conveyances." CBP policy prohibits agents from intentionally targeting the head, neck, groin, spine, or female breast.

2. *Defendants Implemented A Policy In Illinois To Deploy Tear Gas Without Warning Against Persons Who Are Not Resisting.*

177. Defendants have adopted and implemented a policy of dispersing tear gas and other noxious chemicals without warning against persons who are not resisting (the "Tear Gas Policy").

178. Over a 90-day period in 2025, Border Patrol agents indiscriminately deployed tear gas at least 49 times at 18 events across the Chicago region. Examples of deployments of chemical munitions without warning against persons who were not resisting include:

179. On October 3, federal immigration agents engaged in enforcement actions in Chicago's Logan Square neighborhood. Residents witnessed a Blackhawk helicopter, along with several marked DHS trucks and other unmarked vehicles, in the area. While stopped outside Rico Fresh Market at West Armitage and North Drake Avenues with other vehicles stopped in front of them, a masked agent—without warning or an order to move or disperse—threw a tear gas canister out the passenger-side window of his unmarked vehicle, subjecting several bystanders to dangerous chemical irritants. As a result of this incident, a nearby daycare center went into lockdown, and Funston Elementary School, half a block away, moved recess indoors.

180. On September 27, Bovino directed an agent to "light 'em up," after which, with no warning, the agent began shooting pepper balls at individuals standing on the sidewalk steps away from the agent.

181. On October 3, in Chicago's Logan Square neighborhood, an agent threw a tear gas canister from a vehicle across the street from Funston Elementary School, a Chicago public school, and the gas dispersed onto school property. As gas filled the streets, students ran inside.

45

182.    On October 4, in Chicago's Brighton Park neighborhood, Border Patrol agent Charles Exum shot Chicago resident Marimar Martinez five times—a fact he later bragged about in a Signal group chat with other federal agents. Federal authorities initially claimed that Exum opened fire on Ms. Martinez only after she rammed into his vehicle. Though Ms. Martinez was charged with forcibly assaulting, impeding and interfering with a federal officer, the case against Ms. Martinez was dismissed.

183.    As word of Ms. Martinez's shooting spread, a crowd of residents and journalists began to gather in Brighton Park. Though the crowd was largely peaceful, additional agents were dispatched to the scene, including agents in an armored tactical vehicle. One agent emerged from the top of the armored vehicle and pointed a gun at the crowd. Masked federal agents began firing pepper balls into the crowd, and, shortly thereafter, indiscriminately deployed tear gas without any warning. Among those affected by this indiscriminate use of tear gas were 27 Chicago Police Department ("CPD") officers, who responded to the scene after receiving a call about the shooting.

184.    On October 12, around North Sawyer Avenue and West Wilson Avenue in Chicago's Albany Park neighborhood, Border Patrol agents stopped a man and a crowd formed. In response, some agents deployed tear gas without any warning, while others provided a warning but no opportunity to comply with their instructions. Although federal agents later claimed a woman threw her bicycle at them, witnesses reported that the agent himself threw the bicycle *after* deploying tear gas.

185.    On October 14, federal agents attempted to question two men sitting in a Ford Escape in East Chicago. The driver of the Ford Escape attempted to drive away and allegedly hit the agents' rental car, prompting the Border Patrol agents to chase the car through a residential neighborhood in East Chicago and then conduct a precision immobilization technique ("PIT")

46

maneuver that caused both cars to crash at the intersection of 105th Street and South Avenue North. The agent who executed the PIT maneuver was not certified to do so. Additional agents responded to the scene of the crash, and residents and journalists began to gather. Although some protesters were yelling at the agents, they were generally peaceful, despite the fact that at least some agents were shouting at and threatening to gas them. As was publicly reported, CPD officers on the scene for crowd control purposes formed a line between residents and the agents as agents prepared to exit the area. Agents began deploying tear gas without audible warning despite a prior request from CPD not to use tear gas. Agents continued deploying gas canisters after the crowd began dispersing, including by throwing them directly at protesters on the sidewalk. Thirteen CPD officers were exposed to tear gas. Body-worn camera footage indicates that agents were looking forward to using the tear gas, making comments like "We're definitely gassing them when we leave. Just start throwing shit." Agents also pointed guns and shot rubber bullets or sponge cartridges directly at peaceful protestors.

186.    On October 23, agents were driving through the Little Village neighborhood of Chicago and surrounded a big box truck, arresting the two U.S. citizens inside based on the agents' assertion that the truck had tried to ram the agents' vehicle.[1] Residents gathered, and though they remained largely peaceful, Defendant Bovino deployed tear gas on the crowd assembled without warning.  Bovino deployed a second canister of tear gas even as the crowd moved away from the agents, and other agents fired pepper ball shots and threw a flashbang grenade. As agents left the area, they encountered additional residents approximately a mile away and deployed additional tear gas. As was publicly reported, CPD officers responded to multiple 911 calls in the area, including a call from federal agents in need of assistance.

---

[1] This assertion is undermined by both video footage of the incident and by testimony of one of the agents themselves.

187.     In an interview with Fox News that evening, Bovino stated that the agents on scene during the October 23 incident "operate with extreme professionalism. They do everything right. I've not seen one instance of something that was out of control or wrong." In a different interview with CBS News that same day, Bovino described agents' uses of force in and around Chicago as "exemplary."

188.     On October 24, in the Lakeview neighborhood of Chicago, two vehicles full of federal agents pulled up outside of a residence in the 3300 block of North Lakewood Avenue, where three construction workers were eating lunch outside the house. Several agents got out of the cars and jumped over the locked fence to apprehend the workers, detaining one while the other two escaped. Neighbors who witnessed or heard about the encounter quickly assembled. Agents threw at least three tear gas canisters from their moving vehicle toward the sidewalk where people were standing. The federal agent driving the vehicle from which the tear gas canisters were thrown was recorded saying to another agent, "Hey, throw it for fun," as the agents deployed the tear gas. Another agent said, "have fun," to protestors as the agents deployed tear gas. A federal judge found that "[w]hile agents claimed that they needed to throw the tear gas to clear the way for egress, . . . video does not indicate that anything blocked egress before they deployed tear gas and agents threw the tear gas in the opposite direction from which they were trying to go." *Chicago Headline Club*, 2025 WL 3240782, at *59.

189.     On October 25, in Old Irving Park, as residents prepared for a Halloween parade, federal agents effectuated an arrest on the lawn of one of the residents' houses. The owner of the house, along with several other neighbors, some already wearing Halloween costumes or still in pajamas, gathered outside. As people objected to the agents' conduct, agents deployed tear gas and shoved and tackled several residents to the ground—including a seventy-year-old man exiting his

48

car, and George Witchek, a man who had come out of his home in a duck costume and flip flops and suffered a traumatic brain injury after being tackled by federal agents without warning or provocation. The Halloween parade was canceled because of the presence of chemical irritants throughout the neighborhood. After reviewing the evidence, according to news sources, a federal judge noted: "Kids dressed in Halloween costumes walking to a parade do not pose an immediate threat" to a law enforcement officer. "Those kids were tear gassed on their way to celebrate Halloween in their local school parking lot."

190.    On October 29, in Aurora, Illinois, federal immigration agents fired pepper ball projectiles at Elizabeth Pineda's car after she unintentionally blocked a federal agent's vehicle in the El Paso Grande grocery store parking lot. Ms. Pineda had two young children—a three-year-old and a one-year-old—in the car at the time, which she told agents repeatedly. No one warned Pineda that agents would deploy projectiles, and agents did not give Pineda time to move her car before they fired the projectiles and removed her from the car. Because her window was down at the time the agent fired the pepper balls, Ms. Pineda and her children were exposed to chemical irritants and sought emergency medical treatment.

191.    On November 8, Bovino and other federal agents were conducting an immigration raid in Chicago's Little Village neighborhood. A group of residents gathered. After agents claimed that shots were fired at them, they deployed multiple tear gas canisters. The same day, in nearby Cicero, agents sprayed pepper spray indiscriminately in a Sam's Club parking lot, which got into a family's car as they were getting groceries, affecting the driver, his wife, and their one-year-old daughter.

192.    On December 6, federal agents were involved in a car crash in suburban Elgin, Illinois. As residents congregated at the scene of the crash, the Elgin Police Department was called

49

approximately 30 times, largely by fearful residents who reported seeing masked agents outside their homes. Agents deployed chemical irritants including pepper spray and tear gas against the crowd, affecting multiple residents, including a 3-year-old girl. At least seven people received treatment from Elgin emergency first responders for exposure to the chemical irritants.

193.    DHS leaders have minimized and celebrated the effects of and have defended and justified the use of the Tear Gas Policy, even though it permits the use of tear gas in circumstances that are not permitted under their own written use of force policy, under the Constitution, or under Illinois law.

194.    When asked whether the force being used by agents in Chicago had "gone too far," President Trump responded, "No. I think they haven't gone far enough because we've been held back by the—by the judges, by the liberal judges that were put in by Biden and by Obama." When further asked, "You're okay with those tactics?" he again responded, "Yeah, because you have to get the people out."

195.    Defendant Bovino described his own use of tear gas and that of those under his command as "justified" and "more than exemplary."

196.    One DHS leadership official testified that tear gas "doesn't harm people" and that "after you leave it, it stops those effects within 10 seconds of after getting out of the affected area." *Chicago Headline Club*, 2025 WL 3240782, at *15.

197.    Defendants have repeatedly justified their indiscriminate use of tear gas and pepper balls and have accused victims of their violence as "siding with vicious cartels, human traffickers, and violent criminals."

198.    Defendants also have indiscriminately deployed tear gas in locations outside of Illinois where Border Patrol has improperly participated in interior removal operations.

199.     In Los Angeles, in June 2025, federal forces fired volleys of tear gas, pepper balls, chemical spray, and rubber bullets indiscriminately into crowds. *Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1073 (C.D. Cal. 2025) (enjoining defendants from "[u]sing crowd control weapons (including kinetic impact projectiles ("KIP"s), chemical irritants, batons, and flash-bang grenades) on members of the press, legal observers, and protesters who are not themselves posing a threat of imminent harm to a law enforcement officer or another person.").

200.     During the same time that federal agents were deploying the Tear Gas Policy in Illinois, they also were indiscriminately using chemical agents on crowds in Portland, Oregon.

201.     On November 16, 2025, in Charlotte, North Carolina, agents from CBP were recorded threatening to deploy tear gas on residents merely because they were following agents. One agent held up a gas canister and shouted, "This is tear gas! Stop following us!"

202.     On information and belief, no Border Patrol or ICE agents have been disciplined in connection with their decisions to deploy chemical weapons against Illinois residents.

    3.    *The Tear Gas Policy Injured Plaintiffs.*

203.     Clouds of tear gas and other noxious chemicals have sickened Chicago and Illinois residents, caused emotional distress, and rendered residents unable to breathe or access State and City services.

204.     In response, Illinois and Chicago law enforcement and first responders have had their ordinary duties unduly increased or usurped by the need to respond to Defendants' chaotic enforcement tactics. Paramedics and other public medical personnel have expended resources providing care to individuals injured by federal agents since Border Patrol's incursion into Illinois. Personnel from IMRR, discussed above, have responded to aid those impacted by Defendants' indiscriminate use of tear gas.

51

205.    Further, law enforcement officers in Illinois across a variety of departments, including municipal, county, and state police, have been forced to respond to Defendants' multiple deployments of tear gas, and have suffered physical injuries themselves from exposure to tear gas deployed without provocation or warning. Over two dozen Chicago police officers have reported injuries from exposure to tear gas deployed by Border Patrol. When CPD officers are injured while on duty and seek medical attention for their injuries, Chicago has a procedure in place that allows for the payment of the injured officers' medical expenses.

206.    Not only have Chicago police officers been injured by Defendants' deployment of tear gas, but the need for the police to respond to Defendants' violent conduct threatens to undermine the "relationship of trust with . . . undocumented persons and lawful immigrants" that Chicago has spent years developing. *City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018). The resulting decrease in trust between immigrant communities and local law enforcement "[will] not easily be restored," "impeding the community relationships necessary to identify and solve crimes." *Sessions*, 888 F.3d at 282, 291.

E.    **Arbitrary Enforcement Policy at Sensitive Locations.**

1.    *The Longstanding Sensitive Locations Policy.*

207.    For decades, federal policy has restricted immigration enforcement in or near certain protected areas, including schools, health care facilities, and places of worship. Longstanding practice and policy have similarly restricted civil immigration enforcement at or near courthouses.

208.    In 2011 and 2013, ICE and Border Patrol issued policy memos generally prohibiting immigration enforcement at or near schools, places of worship, and hospitals, absent exigent circumstances or prior approval. The policy memos discouraged immigration enforcement

involving "any organization assisting children, pregnant women, victims of crime or abuse, or individuals with significant mental or physical disabilities."

209.    In 2015, ICE issued a "Guidance Update" regarding "Enforcement Actions at or Near Courthouses." The guidance generally prohibited enforcement actions at or near courthouses and only allowed such enforcement actions in narrow circumstances, such as against convicted felons and truly dangerous criminals. Even in these narrow circumstances, the policy limited the enforcement to the "specific, targeted aliens, rather than individuals who may be 'collaterally' present, such as family members or friends who may accompany the target alien to court appearances or functions."

210.    Congress funded removal operations with the understanding that they generally would not occur at or near sensitive locations. The House Committee on Appropriations issued a report accompanying Fiscal Year 2020 appropriations for DHS (Public Law 116-93) that recognized ICE's policy "that enforcement actions at or near sensitive locations—identified by ICE as schools, health care facilities, places of worship, religious or civil ceremonies or observances, and public demonstrations—should generally be avoided, and require either prior approval from an appropriate supervisory official for [sic] exigent circumstances necessitating immediate action."[2] The Committee further directed ICE to broaden the scope of the sensitive locations category to include courthouses and "other locations where community impacts should be better balanced against ICE law enforcement requirements" and to report to Congress details of each enforcement action at a sensitive location. It also increased funding for the DHS Inspector General for monitoring and oversight of "ICE and CBP enforcement activities at or near sensitive locations."[3] Similarly, the Senate report accompanying the appropriations bill directed ICE to

_____

[2] H.R. Rep. No. 116-180, at 35 (2019).
[3] *Id.* at 16.

provide monthly notifications to the Senate Committee on Appropriations on enforcement actions in or near sensitive locations, including courthouses.[4] The Senate report accompanying Fiscal Year 2024 appropriations, the last fiscal year for which regular appropriations were enacted, continued this notification requirement; it also directed ICE to continue its limitations as to sensitive locations and expand the list of sensitive locations "to minimize any effect that immigration enforcement may have on the willingness and ability of victims and witnesses to pursue justice."[5]

211.    In 2021, DHS superseded the 2011 and 2013 memos. The 2021 memorandum prohibited, "to the fullest extent possible," enforcement action in or near protected areas to avoid "restrain[ing] people's access to essential services or engagement in essential activities," and identified a non-exhaustive list of protected areas that included schools, healthcare facilities, places of worship, and places where children gather, among others. The policy also identified a non-exhaustive list of "limited" exceptions to this prohibition, such as national security threats or imminent risk of death or violence, among others. Absent "exigent circumstances," officers were required to obtain approval from headquarters to conduct enforcement in or near protected areas under the limited exceptions. The memo recognized that, by chilling access to vital services, enforcement at these sensitive locations could have a negative "impact on other people and broader societal interests." DHS could accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more."

212.    DHS also issued a 2021 memorandum that prohibited civil immigration enforcement actions at or near courthouses except in "limited circumstances" listed in the memo, such as those involving national security threats or imminent risk of death or violence. The memo

---

[4] S. Rep. 116-125, at 52 (2019).
[5] S. Rep. 118-85, at 62–63 (2023).

also defined "near" as those areas "in the close vicinity of the courthouse," recognizing that, absent exigent circumstances, such actions "may chill individuals' access to courthouses and, as a result, impair the fair administration of justice" and were forbidden except in very limited circumstances "so as not to unnecessarily impinge upon the core principle of preserving access to justice."

213.     The 2021 memoranda are referred to herein as the "Prior Sensitive Locations Policy."

> 2.     *DHS Abrogated the Sensitive Locations Policy and Replaced it With a Policy of Arbitrary Enforcement.*

214.     In January 2025, through a half-page memo, DHS rescinded the Prior Sensitive Locations Policy with a policy of arbitrary enforcement at or near sensitive locations (the "Arbitrary Enforcement Policy").

215.     The memo, dated January 20, 2025, rescinded the "bright line rules" of the Prior Sensitive Locations Policy "regarding where our immigration laws are permitted to be enforced" and instead directed officers "to use [] discretion along with a healthy dose of common sense." The memo provided no further guidance to officers. The memo's explanation for the change was that officers "put their lives on the line every day" and "frequently apply enforcement discretion." It did not otherwise address the reasoning in the 2021 memos.

216.     The Acting Director of ICE subsequently issued a memo, which indicated it was being issued pursuant to the January 20 memo, concerning immigration enforcement actions in or near courthouses. This memo by the Acting Director was superseded four months later by a memo by a different ICE Acting Director.

217.     Under the Arbitrary Enforcement Policy, there are no limitations on immigration enforcement actions at any non-courthouse sensitive location.

218. Under the Arbitrary Enforcement Policy, there are effectively no limitations on immigration raids at courthouses. "Generally," raids at courthouses will occur when immigration officers "have credible information that leads them to believe the targeted alien(s) is or will be present at a specific location." Targeted immigrants include, "but [are] not limited to," those who pose national security or other public safety threats, gang members, and those with criminal convictions. But the Arbitrary Enforcement Policy also expressly allows immigration agents to arrest any removable noncitizen at or near a courthouse, including nontargeted individuals they encounter "such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding." And though officers should "generally avoid enforcement actions in or near courthouses, or areas within courthouses that are wholly dedicated to non-criminal proceedings (e.g., family court, small claims court)," the Arbitrary Enforcement Policy rescinded the prohibitions against such actions in the prior policy.

       *3.*    *Defendants Have Implemented the Arbitrary Enforcement Policy in Illinois.*

219. Illinois—and the Chicago area in particular—has experienced a proliferation of immigration enforcement activity at and near sensitive locations including courthouses, daycares and preschools, K-12 schools, community colleges, healthcare facilities, homeless shelters, and domestic violence shelters.

       (i)    Courthouses

220. The Cook County Domestic Violence Courthouse in Chicago is where victims of domestic violence seek orders of protection. On or around September 2, 2025, immigration agents arrested a man outside the courthouse after he attended a hearing.

56

221.    On September 3, 2025, immigration agents arrested a woman outside of the same Domestic Violence Courthouse as she arrived for her court case. She missed her court hearing, during which her misdemeanor case was subsequently dismissed.

222.    On September 15, 2025, a branded ICE vehicle was parked prominently outside the front of the same Domestic Violence Courthouse. CPD responded to the courthouse after someone reported seeing a plainclothes individual holding an "assault-style rifle" in the car.

223.    On September 23, 2025, immigration agents arrested a party to a criminal proceeding as the individual attempted to enter the Circuit Court of Cook County on 111th Street in Chicago.

(ii)    Schools

224.    On September 15, 2025, in south suburban Dixmoor, Illinois, immigration agents wearing tactical gear and masks detained a resident near Rosa Parks Middle School as students were walking to school.

225.    On September 18, 2025, immigration agents arrested an Elgin Community College student in the school parking lot.

226.    On October 6, 2025, immigration agents arrested a community college student outside College of Lake County's Lakeshore Campus in Waukegan, Illinois, as the student was exiting a campus building. Students and staff in the building at the time expressed fear of walking out to their cars and faculty were asked to support students who were afraid to attend classes in person.

227.    On October 8, 2025, federal immigration agents forcibly pulled two women from an SUV in front of a West Loop elementary school pickup line and arrested them.

228.    On October 21, 2025, in the middle of the school day, immigration agents approached and detained a landscaper employed by a Chicago Public Schools (CPS) landscaping

vendor doing landscaping work on CPS property at Decatur Classical School, an elementary school in the West Ridge neighborhood. A school administrator confronted the agents, telling them that they were on school property, children were present, and they needed to leave immediately. By this time, agents had already placed one of the CPS landscaping vendor's employees in handcuffs. The school administrator asked if the agents had a warrant and was told by agents that they did not need one. The immigration agents then placed the employee in their SUV and drove away. An email sent to the Decatur Classical School community later in the day acknowledged that the situation "has created many fears and concerns" and reiterated that school staff "is well-versed in the proper protocols for keeping our students and the school community safe in any event involving federal law enforcement."

229.    On October 24, 2025, students inside a preschool and music school near the intersection of Milwaukee and Western Avenues in Chicago's Bucktown neighborhood witnessed federal immigration agents detaining two individuals right outside their windows; students can be heard crying in the background of video footage of the arrests.

230.    Also on October 24, several Chicago Public Schools in the Wicker Park, Lincoln Park, Lake View, West Town, and Bucktown neighborhoods went on soft lockdown or took other safety precautions, including allowing students to stay after dismissal, after reports of nearby federal immigration enforcement activity. These schools included A.N. Pritzker Elementary, LaSalle II Elementary, Mitchell Elementary, Francis W. Parker School, Lincoln Park High School, Lane Tech College Prep, Pulaski International, and Rauner College Prep.

231.    On October 31, 2025, masked immigration agents conducted enforcement activity near Lincolnwood Elementary School in Evanston, Illinois. Near Chute Middle School, also in Evanston, federal agents violently tackled multiple community members to the ground, repeatedly

slamming one young man's head against the pavement. One agent pulled out his gun and pointed it directly at an Evanston resident, threatening to shoot him.

232.    As a result of this violence, on October 31, road exams at the Secretary of State facility at the nearby Levy Senior Center in Evanston, Illinois were suspended because immigration enforcement activity was "making it [un]safe and inaccessible for staff and customers."

233.    Also on October 31, 2025, in Chicago's Albany Park neighborhood, immigration agents arrested a woman outside Alessandro Volta Elementary School right after she dropped a child off at school.

234.    On November 5, 2025, armed immigration agents chased a woman into Rayito de Sol, the North Center daycare center where she worked as a teacher and dragged her out of the building while children and parents looked on. In a video of the incident, the teacher can be heard screaming and telling the agents that she has papers. Agents subsequently reentered the daycare, searching rooms—including rooms where children were present—and interrogating other staff as to their immigration status. The daycare center closed for the remainder of the week as a result of this incident.

(iii)    Social Service Organizations

235.    On September 23, 2025, immigration agents conducted an enforcement action at the MWRD family shelter on Foster Avenue in Chicago. They questioned a minor resident outside the shelter and detained two residents.

236.    On October 1, 2025, immigration agents conducted an enforcement action outside a homeless shelter run by Bright Star Community Development Corporation, a shelter that is part of a City-State collaboration called the One System Initiative. Between twenty-five and thirty agents jumped out of seven unmarked vans and questioned five shelter residents, arresting

59

approximately four of the residents, including at least one who documented a pending asylum application.

237. On October 2, 2025, federal immigration agents stopped two teenagers directly in front of the administrative office of a homeless shelter on Pulaski Avenue in Chicago.

238. On October 8, 2025, federal immigration enforcement agents detained a man right outside of a City-funded senior center. This disrupted the provision of services to the seniors at the center.

239. On November 3, 2025, federal immigration enforcement agents drove into the parking lot of a City-funded Senior Center, questioned two men who were doing landscaping work and pushed them. The agents did not detain the men.

(iv)    Medical Facilities

240. On October 3, masked plainclothes agents brought a man with a broken leg to Humboldt Park Health's emergency room. Though they refused to confirm that he was in their custody, the agents attempted to accompany the man to the operating room. At the request of hospital staff, 26th Ward Chicago Alderperson Jessie Fuentes arrived at Humboldt Park Health and asked if the agents had a warrant. The agents refused to provide their names to Fuentes and shoved, handcuffed, and briefly detained her after she identified herself as an elected City official.

241. On or about October 6, 2025, immigration agents attempted to conduct an enforcement activity at Rush Oak Park Hospital, departing only after discovering that their intended target was a U.S. citizen.

242. On October 24, 2025, immigration agents in camouflage gear approached man in a car outside Erie Family Health Center in West Town, Chicago, a community resource center and daycare. The agents smashed his car window and dragged him out while his partner, who was eight months pregnant and standing inside the center, and other community members yelled in protest

and asked to see a warrant. Several children in the day care also watched the altercation through the center's windows.

### 4. The Arbitrary Enforcement Policy Has Injured Plaintiffs.

243. A state's right to manage its "judicial systems for the decision of legal controversies" is a core feature of its inherent sovereignty. *Atl. Coast Line R.R. v. Brotherhood. of Locomotive Eng'rs*, 398 U.S. 281, 285, 287 (1970) (explaining that states reserved power to maintain "judicial systems for the decision of legal controversies" and referring to "the fundamental constitutional independence of the States and their courts"). Similarly, the sovereign right of the State to direct and control its system of education is among "the most traditional areas of state concern." *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 169 F.3d 820, 843 (4th Cir. 1999), *aff'd sub nom. United States v. Morrison*, 529 U.S. 598 (2000); *see also Barbier v. Connolly*, 113 U.S. 27, 31 (1884) (describing the inherent "power of the state, sometimes termed its police power, to prescribe regulations to promote the . . . education . . . of the people.").

244. The Illinois Constitution expressly guarantees "[e]very person" the right to "obtain justice by law, freely, completely, and promptly." Ill. Const. Art. I, § 12. It further provides that "a fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities." Ill. Const., Art. X.

245. Illinois manages and administers its judicial systems and enforces its laws through county courthouses and other courthouses. These systems only work—and Illinois' sovereign right to establish and enforce a judicial system is only vindicated—when Illinois residents can safely utilize these resources.

246. The Arbitrary Enforcement Policy at or near courthouses has impeded Illinois' effort to administer justice. It violates Illinois common law and statutory directives and it jeopardizes Illinois' ability to prosecute offenders and operate its judicial system.

247.     In response to previous enforcement programs, the Chief Justice of the Illinois Supreme Court stated that "[d]isruption of state court proceedings by ICE agents . . . not only threatens the rights and interests of the participants in state legal proceedings, [but] also raises fundamental questions regarding the boundaries of state and federal sovereignty."

248.     On October 14, 2025, the Chief Judge of the Circuit Court of Cook County entered an order confirming the "continued application" of "the common law privilege against civil arrest while attending court," as "essential to [the Court's] authority and function." The Chief Judge explained that "[a]ccess to justice depends on every individual's ability to appear in court without fear or obstruction."

249.     On December 9, 2025, Governor Pritzker signed into law the Court Access, Safety, and Participation Act, 705 ILCS 96/ *et seq.*, which prohibits courthouse arrests. In support of the law, the Illinois General Assembly made the following findings:

> Victims and witnesses are increasingly reluctant to attend and participate in court proceedings, or otherwise access the justice system of this State, out of fear of civil arrests when going to, remaining at, or returning from a court proceeding.

> Illinois courts and court staff bear increased burdens and costs to their operations, through adjournments, delays, and postponements caused by witnesses' or parties' failure to appear out of fear of civil arrests at courthouses or its environs.

> The civil arrest of individuals at a courthouse or its environs or while going to, remaining at, or returning from a court proceeding threatens the functioning of the court system and the fair administration of justice by deterring litigants, witnesses, and others participating in State court proceedings, jeopardizing the State courts' and parties' access to evidence that may be critical to fact-finding.

250.     These legislative findings are borne out: The wife of a murder victim refused to attend trial because she feared being arrested by immigration enforcement agents; parents of minor victims of sexual assault have refused to bring their children to the State's Attorney's offices

located in the courthouse because of ICE presence outside; victims of domestic violence have stopped cooperating with state prosecutors due to fear of immigration enforcement at and near courthouses.

251.    The State's ability to run an education system has suffered similar effects. For example, the State requires that each student receive a specific number of days of instruction per school year, that each school provide a particular number of instructional hours per day, and more. *See, e.g.*, 105 ILCS 5/10-19, 5/10-19.05. Defendants' implementation of the Arbitrary Enforcement Policy at schools has injured students and discouraged attendance by causing students and parents to fear that they may encounter immigration enforcement agents during the school day or while being dropped off, or picked up from school, undermining Illinois express policy and Constitutional imperative, and interfering with the state's core sovereign interests in providing for the education of its residents. *See Kentucky v. Biden*, 23 F.4th 585, 598–99 (6th Cir. 2022) (finding that states "have sovereign interests to sue when they believe that the federal government has intruded upon areas traditionally within states' control"); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 592 (6th Cir. 2024) (finding that states had standing to "protect their sovereign interest in regulating education within their borders").

252.    Chicago and Illinois School district leaders have had to direct their attention away from pedagogy and toward the physical and emotional protection of their students. Leaders of Chicago Public Schools began meeting at least twice a day to respond to the increased presence of enforcement agents, and have developed protocols, trainings, command centers, plans for school lockdowns, and other resource diversions.

253.    Defendants' illegal enforcement activities near schools have significantly interrupted CPS's operations, and CPS has had to spend critical funding in responding to these

activities. For example, Chicago schools have requested and been provided with additional security during drop-off and dismissal times to protect children and their families, at a cost to CPS. CPS's Chief of Safety & Security and many other CPS staff have been deployed on multiple occasions to assist with chaotic scenes at or near schools caused by Defendants. CPS has spent resources responding to students stranded because parents or caregivers suddenly were arrested or detained by immigration officers. On a daily basis, CPS staff are coordinating internally and with community members in responding to defendants' actions.

254.    CPS has long dedicated personnel and resources to ensuring that as many students as possible attend school regularly, yet CPS has seen drops in school attendance, particularly in areas targeted by Defendants' enforcement actions. These actions also have created a crisis of social-emotional well-being for staff and students, resulting in absences and other harms. CPS's primary mission is to educate the children of Chicago. Defendants' actions have distracted CPS from this core mission, and students' daily educational experience is negatively impacted.

255.    A well-educated student population is critical to the economic success of Chicago and Illinois. Due to the fear caused by the Warrantless Arrest and the Arbitrary Enforcement Policies and in direct response to the deployment of tear gas in close proximity to schools when children were present, schools have gone on lockdown status, preventing free movement throughout the school campus. Some schools have cancelled extracurricular activities, like homecoming dances and heritage festivals.

256.    Defendants' tactics have increased fear and anxiety among students, with more students experiencing difficulty focusing, physical symptoms like stomach aches and headaches, and lack of energy, requiring additional resources from State and local governments.

257.    State and City public health safety-net programs have reported a bleak medical situation as a result of the incursion, with missed appointments skyrocketing, and some communities afraid to seek care even for deadly health conditions.

258.    The Chicago Department of Public Health (CDPH) operates mental health centers, immunization clinics, clinics that provide testing and treatment for sexually transmitted infections, and at-home and in-field health programs. Immigrants in Chicago, who are more than twice as likely to be uninsured and experience several barriers in accessing care, frequently rely upon these clinics and services across the City.

259.    The surge of federal immigration enforcement in Chicago has led to widespread reluctance to access clinics and services. Since September 2025, CDPH has experienced a steep decline in use of its immunization clinics and attendance in neighborhood vaccination events among Latino residents. Decreases in vaccination for influenza and COVID-19 puts vulnerable Chicagoans at risk and leads to increased emergency department visits and hospitalizations due to respiratory illness, with ripple effects on families, schools, workplaces, and local communities. Furthermore, places where immigrants may seek services as part of daily life, including hospitals, clinics, schools, local businesses, libraries, and community partners have reported steep declines in people accessing help—patients not showing for medical appointments nor retrieving medication, parents withdrawing supports for their children, survivors hesitant to receive counseling, and families afraid to shop at their neighborhood grocery store.

260.    Residents too afraid to access public health services, moreover, are likely to delay essential visits—including preventative screenings, primary care appointments, and recommended treatments—until conditions worsen and emergency care and hospital services are needed. This

creates real costs for Chicago. As just one example, the Chicago Fire Department provides ambulance transportation services to its residents, including its uninsured and underinsured residents, and regardless of income and insurance status. Chicago generally seeks reimbursement for ambulance services from the patient or, if applicable, the patient's insurer. However, Chicago usually does not receive full reimbursement for ambulance services from its uninsured and underinsured residents, which leads to a loss of millions of dollars. Fear-based disenrollment from public benefits and reluctance to access public health services in Chicago would only further exacerbate these losses.

261. Chicago runs six Community Service Centers located around the city where residents can go to apply for public benefits, get referrals to shelter, food assistance, and employment services, and connect with social workers. For example, during September, October, and November 2025, attendance at the community service center in Humboldt Park/Hermosa, a neighborhood targeted by ICE and Border Patrol, was less than half the attendance of the previous year.

262. Chicago also funds early learning community centers around the City. Attendance at two early learning community centers in Belmont Cragin, a neighborhood targeted by ICE and Border Patrol, has decreased since Border Patrol's incursion into the city. Decreased attendance at early learning community centers has a direct impact on funding for programs offered by Chicago.

263. Defendants repeatedly have engaged in enforcement tactics at domestic violence and homeless shelters funded and overseen by the State, targeting some of Plaintiffs' most vulnerable residents and resulting in increased investment in outreach efforts and a shift to virtual services, when possible.

66

F.     **Concealing License Plates.**

       *1.*    *Defendants Hide, Remove, and Swap License Plates in Violation of State and Federal Law.*

264.     DHS has adopted an unlawful and arbitrary policy allowing immigration agents to conceal, remove, or swap legally required license plates when engaged in enforcement activities in Illinois (the "Conceal Plates Policy").

265.     Under state law, a federal vehicle registered in Illinois is exempt from Illinois requirements to display license plates only if it is "owned and operated by the federal government and externally displays evidence of federal ownership." 625 ILCS 5/3-402(A)(6).

266.     Motor vehicles that the federal government owns, leases commercially, or leases through the General Services Administration Fleet generally must use U.S. Government license plates, unless an exception applies. 41 C.F.R. §§ 102-34.5(a), 102-34.90.

267.     Federal regulations include an exemption for "[m]otor vehicles used primarily for investigative, law enforcement, intelligence, or security duties . . . when identifying these motor vehicles would interfere with those duties." 41 C.F.R. § 102-34.155(a).

268.     When a federal government vehicle is exempt from the requirement to display U.S. Government plates, it must instead "display the regular license plates of the State, Commonwealth, territory or possession of the United States, or the District of Columbia, where the motor vehicle is principally operated." 41 C.F.R. § 102.34.155(b). Exempt vehicles also "must be registered and inspected in accordance with the laws of the jurisdiction where the motor vehicle is regularly operated." 41 C.F.R. § 102-34.120.

269.     Illinois law requires vehicles registered in Illinois to display both front and back license plates. 625 ILCS 5/3-413(a). Illinois drivers must maintain their license plates "in a condition to be clearly legible, free from any materials that would obstruct the visibility of the

67

plate." 625 ILCS 5/3-413(b). Vehicles must display their assigned license plates; plate switching, which obscures the true plate of a particular vehicle, is not allowed, regardless of the reason for doing so. 625 ILCS 5/3-413(a)-(b). Covering a license plate or concealing or obstructing the registration on a license plate is also strictly prohibited. 625 ILCS 5/3-413(g), 5/3-413(j).

2.      *Defendants Have Implemented the Conceal Plates Policy in Illinois.*

270.    The Illinois Secretary of State's Office ("Illinois SOS") issues license plates to vehicles registered in Illinois. In October 2025, Illinois SOS began receiving reports of vehicles seemingly operated by DHS unlawfully failing to display accurate license plates, swapping license plates, and purposefully obscuring license plates.

271.    In response to these reports, on October 22, Illinois SOS launched "Plate Watch," a hotline for the public to report instances of license plate tampering or swapping.

272.    Following the launch of Plate Watch, Illinois SOS received hundreds of reports of violations of state law governing the display of accurate license plates by vehicles which were, upon information and belief, operated by federal immigration agents.

273.    During the first ten weeks of the Plate Watch program, Illinois SOS received credible reports of at least thirty-five distinct license plates being swapped or used on more than one federal vehicle operated by Defendants Border Patrol and ICE.

274.    In addition, according to reports received through the Plate Watch program, dozens of distinct vehicles operated by federal immigration officials displayed inaccurate license plates by displaying license plates that were not the license plates registered to a particular vehicle.

275.    On numerous occasions, federal agents removed the front and/or rear plates from their vehicles. For example, on October 2, a black Chevrolet Express van without any license plates left a gated federal immigration facility in Broadview and drove through the western suburbs.

68

276.    Likewise, on October 12, federal immigration agents exited a Chevrolet pick-up truck with no rear license plate, and a second vehicle transported immigration agents with no front license plate.

277.    On October 14, a federal agent executed a "PIT" maneuver that resulted in a vehicle crash. The car the federal agent was driving did not have a front license plate.

278.    In another example, Illinois SOS received reports that, in the seven-day period between October 22 and October 27, one license plate was used on at least six separate vehicles that were, upon information and belief, engaged in immigration enforcement.

279.    In yet another example, an additional license plate properly registered to a commercial van was used on three different vehicles reportedly used by immigration agents between October 21 and October 31.

280.    On October 23, 2025, in a letter to Defendant Lyons, the Illinois Secretary of State Alexi Giannoulias notified ICE and Border Patrol that swapping and obscuring license plates on Illinois registered vehicles is unlawful and demanded they revise their policy of doing so. DHS did not respond to the letter. However, as noted above, despite the letter, DHS continued to implement the Conceal Plates Policy.

281.    DHS officials and agents have confirmed they are concealing, swapping, and obscuring license plates on vehicles used during immigration enforcement actions under the Conceal Plates Policy. One federal immigration agent was recorded taunting a resident seeking to record his license plate number by stating: "You can record all you want. We change the plates out every day."

282.    In a statement to the press responding to allegations of misuse of license plates, DHS confirmed the Conceal Plates Policy. DHS Assistant Secretary Tricia McLaughlin

acknowledged that "DHS is not going to confirm our vehicles" because doing so would put a "target on our officers' backs." She also incorrectly asserted that federal vehicles "meet federal regulations for law enforcement."

283.    Upon information and belief, since January 2025, no DHS officer has been disciplined for concealing, omitting, or switching license plates.

3.      *The Conceal Plates Policy Injured Plaintiffs.*

284.    Obscuring, removing, or swapping license plates has allowed officers, who are often also masking their appearances, to avoid accountability for abuses. It also has created dangerous situations where Illinois residents cannot tell the difference between immigration officers engaged in enforcement activities and civilians posing as immigration officers to engage in criminal activity.

285.    The State of Illinois maintains a license plate program as a critical part of motor vehicle administration and to support roadway safety, traffic and parking enforcement, and toll and revenue collection. Illinois state and local law enforcement agencies rely on compliance with federal and state laws requiring the display of accurate license plate numbers for vehicle identification and ownership verification, crime solving and prevention, traffic law enforcement, and ensuring public safety.

286.    License plates are particularly important in preventing and solving violations of state law that involve vehicles, including hit-and-run incidents, theft, abductions, and carjackings. Accurate license plates also allow state and local law enforcement agencies to track and record violations of state traffic laws, to locate stolen vehicles, and to identify vehicles involved in criminal activities.

287.    Defendants' Conceal Plates Policy impedes Illinois from enforcing violations of state law that involve vehicles, including hit-and-run incidents, theft, abductions, and carjackings,

and prevents state and local law enforcement agencies from tracking and recording violations of state traffic laws, locating stolen vehicles, and identifying vehicles involved in criminal activities.

### G. Private Trespass.

288.    "[A]bsent exigent circumstances or consent, an entry into a private dwelling to conduct a search or effect an arrest is unreasonable without a warrant." *Steagald v. United States*, 451 U.S. 204, 214 n.7 (1981). Law enforcement, including immigration enforcement agents, *U.S. v. Romero-Bustamente*, 337 F.3d 1104, 1109–10 (9th Cir. 2003), can enter private property to search for a person only based upon a judge determining that a "legitimate object of a search is located in the third party's home." *Id.* This principle applies to private commercial property. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 474 (1986) (noting that "absent exigent circumstances, the Fourth Amendment prohibits police from searching an individual's home or business without a search warrant even to execute an arrest warrant for a third person").

289.    "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. State of Florida*, 385 U.S. 39, 47 (1966). Therefore, it may prohibit unauthorized trespass. *Id.*

290.    "[T]he owner of property has the exclusive right to use of the property and an automatic right to an injunction against a trespasser." *Okaw Drainage Dist. of Champaign & Douglas Cnty., v. Nat'l Distillers & Chem. Corp.,* 882 F.2d 1241, 1248 (7th Cir. 1989). Property owners, including states, are protected from federal government intrusion and control over their property. *Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 212–14 (5th Cir. 2024). Federal agents may not intrude on those rights merely because they purport to be doing so under the authority to enforce immigration laws. *Id.* at 213 (noting that the public interest in "clear protections for property rights from government intrusion and control" is "protected by ensuring

71

that . . . actions taken by federal agents to enforce immigration law do not unnecessarily intrude into the rights of countless property owners").

291.    When immigration officers lack consent or a warrant, they may "access . . . private lands, but not dwellings," but only within twenty-five miles of the border and "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3). Illinois is not within twenty-five miles of the territorial border of the United States, and immigration officers are not patrolling the border while in Illinois.

### 1.    Trespass on Private Property

292.    Defendants have implemented an illegal policy of engaging in unauthorized trespass to conduct immigration enforcement ("Illegal Trespass Policy"). Examples include:

293.    On October 7, federal agents who were denied entry to a private Christian cemetery in suburban Forest Park, cut the lock with bolt cutters, incapacitated four employees (all U.S. citizens) with zip ties, pepper spray and pepper balls, and entered the property.

294.    On October 16, in Chicago's Back of the Yards neighborhood, agents entered an open-air flea market. The agents ignored specific notice that the market was private property, entered anyway, and made several arrests.

295.    On October 19, in Mount Prospect, agents went around a chain link fence to enter without a warrant the private backyard of Kim Fisher, ignoring directions from Ms. Fisher to leave the property. Agents entered the property of multiple other Mount Prospect residents as well.

296.    Agents entered two private yards in Oak Park, Illinois, on October 22 and November 8 without a judicial warrant or consent from the property owners.

297.    On October 24, in the Lakeview neighborhood of Chicago, federal agents jumped a locked fence, trespassed on private property at the 3300 block of North Lakewood Avenue,

ignored the owner's request to leave, and attempted to detain four individuals working on the premises.

298.    On October 25, masked immigration agents arrested a man on the lawn of a home on North Kildare Avenue in Chicago's Old Irving Park neighborhood, ignoring the homeowners' direction to leave the property.

299.    On or around December 19, uniformed immigration agents entered the backyard of a private residence on Belden Avenue in the Lincoln Park neighborhood. The yard was hidden from view and the alleged reason for the trespass was the proximity of a landscaping truck to the residence. The owner asked the agents if they had a warrant, but the agents did not respond or produce one.

2.    *Trespass on City Property*

300.    Since September 2025, immigration officers have repeatedly used parking lots and other school areas operated by CPS, some of which had signs prohibiting use for immigration enforcement, to conduct civil immigration enforcement operations, including as staging areas for such operations. These areas are CPS-owned property, and immigration officers did not have authority to use them for their enforcement operations. Beginning in approximately October 2025, CPS installed signs (at a cost to CPS) at additional properties indicating that use of its property for immigration enforcement was prohibited. Yet, immigration officers have continued to use these properties for immigration enforcement. In fact, use of some of these properties has increased after signage was installed.

301.    On October 6, 2025, Chicago Mayor Brandon Johnson signed an executive order prohibiting the use of city-owned or controlled parking lots, vacant lots, and garages for certain civil immigration enforcement activity.

302.    The City owns two rideshare parking lots at O'Hare International Airport. These lots are not meant for use by the general public, but are designated as staging areas for rideshare drivers.

303.    Following reports of ICE activity targeting rideshare drivers at O'Hare, and after Chicago Mayor Brandon Johnson signed the October 6, 2025 executive order, the City posted signs in and around the rideshare lots to clearly notify that they are City-owned property and that certain civil federal immigration enforcement actions were prohibited.

304.    On October 10, federal agents raided a rideshare parking lot, trespassing on City property, to interrogate ride-share drivers.

305.    On October 18, federal agents again raided an O'Hare International Airport city-owned rideshare parking lot, trespassed on City property, and arrested eleven people.

306.    On October 23, federal agents again targeted rideshare drivers at O'Hare International Airport and made multiple arrests, ignoring new signage in and around the parking lot indicating it was City-owned property, and that certain immigration enforcement actions were prohibited.

307.    In short, federal agents have targeted the O'Hare rideshare lots on several occasions between October 10 and November 4, including when the lots had signage indicating that such actions were prohibited.

308.    The Illegal Trespass Policy has caused injury to Chicago and Illinois. Ownership of private property includes the right to exclude others. A core function of the State of Illinois is the regulation and protection of property. *Munn v. Illinois*, 94 U.S. 113, 124–28 (1876). In exercise of this core sovereign power, Illinois has enacted laws against trespassing on property, including

some with criminal penalties. *See* 720 Ill. Comp. Stat. 5/21-3. Defendants have injured Illinois's ability to protect property within its borders.

**IV.     Border Patrol's Incursion Has Not Concluded, and Its Unlawful and Violent Tactics Are Likely To Recur.**

309.     For sixty-four days from early September through late December 2025, Defendants deployed over 200 Border Patrol agents to the Chicagoland area. Approximately 100 Border Patrol agents currently are deployed to Illinois, and Defendants have repeatedly made clear that their operations in the Chicago area continue.

310.     On November 11, 2025, Homeland Security Assistant Secretary Tricia McLaughlin stated, "We aren't leaving Chicago."

311.     U.S. Representative Lauren Underwood has reported her understanding from DHS officials that they "have not received any instruction around an end date" for increased operations in Chicago.

312.     On December 4, a U.S. Department of Justice attorney also told U.S. District Judge Sara Ellis that enforcement operations that commenced with Border Patrol's incursion into Illinois has not ended.

313.     On December 6, Gregory Bovino posted on X about an arrest conducted by DHS agents in Chicago, stating "Chicago might be cold, but Operation Midway Blitz is still heating things up."

314.     On December 30, as Bovino arrived with agents to Chicago, he posted "If you think we're done with Chicago, you'd better check yourself before you wreck yourself. Don't call it a comeback; we're gonna be here for years."

315.    In November 2025, an unnamed DHS source informed the Chicago Sun-Times newspaper that 1,000 federal agents could come back and hit the streets in March, four times the approximately 250 agents that participated in the Border Patrol incursion.

**CLAIMS FOR RELIEF**

**First Claim for Relief**
**Violation of the Tenth Amendment of the U.S. Constitution**

316.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

317.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

318.    The Constitution delegated to the federal government "few and defined" powers, while "[t]he powers reserved to the several States . . . extend[ed] to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (quoting *The Federalist No. 45*, pp. 292–293 (C. Rossiter ed. 1961)).

319.    The Tenth Amendment protects against the danger of federal overreach. "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond*, 564 U.S. at 222. As explained in the Federalist Papers, a purpose of dual sovereignty is that "the State Governments will, in all possible contingencies, afford complete security against invasions of the public liberty by the National authority." *The Federalist No. 28*, at 177 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

320. Where "[t]he public policy of the [state], enacted in its capacity as sovereign, has been displaced by that of the National Government," *Bond*, 564 U.S. at 224, there is an injury under the Tenth Amendment.

321. Illinois is a sovereign state. As such, it has authority to enact laws that govern and protect its people and the authority to enforce those laws.

322. Chicago, as a home rule unit under the Illinois Constitution, has sovereign authority to enact laws that govern and protect its people and the authority to enforce those laws.

323. Illinois and Chicago sovereign interests include regulating public health, establishing and implementing a system of education for Illinois residents, defending the state's economy, providing public safety and administering a judicial system, protecting property within its borders, enforcing state statutes implementing state programs, and ensuring that Illinois residents receive the full benefits of state and federal law.

324. "Impermissible interference with state sovereignty is not within the enumerated powers of the National Government." *Id.*

325. Defendants' incursion into Illinois, and their unlawful and violent tactics, have disrupted the lives and undermined the liberties and property rights of the people, injuring Illinois' and Chicago's sovereign and proprietary interests.

326. Defendants infringed Plaintiffs' ability to maintain its public spaces for the use and enjoyment of its residents without fear of being questioned, compelled to disclose biometric information, subject to warrantless arrest, or injured by chemical weapons.

327. They undermined Plaintiffs' ability to attract immigrants by transforming the State from a welcoming and desirable destination to a foreboding and dangerous place where immigrants may be subject to questioning, arrest or injury by federal agents.

328.    By imposing a climate of fear and danger, Defendants have dissuaded Illinois residents from availing themselves of public health and family support benefits provided by Illinois and Chicago.

329.    Defendants' unlawful conduct jeopardizes Illinois' ability to pursue core sovereign functions, such as administering its judicial system, educating its residents, and providing public benefits to those in need.

330.    Defendants also caused concrete financial harm to Plaintiffs by negatively impacting tourism, damaging local economies, requiring Plaintiffs to divert resources in response to Defendants' unlawful conduct, and creating novel public health and safety concerns for Plaintiffs' employees.

331.    Tourism and hospitality are key components of Plaintiffs' economies. Tourism and foot traffic in communities highly populated by immigrants has declined and unlawful uses of force by federal agents have made other neighborhoods unsafe and unappealing to tourists.

332.    Local businesses and economies have suffered. Defendants' raids have forced restaurants to shutter, dine-in sales to plummet, and retail sales to decline precipitously. Many businesses have laid off staff. Declining sales are most pronounced in areas where federal agents have deployed tear gas and engaged in other unlawful conduct. Declining sales have led to losses in tax revenues.

333.    Defendants are infringing Plaintiffs' sovereign authority and causing them financial harm in order to punish Plaintiffs for refusing to accede to President Trump's demand that Plaintiffs allocate resources to aid the federal government's civil immigration enforcement, and to coerce Illinois to alter its policies.

334.    By acting in a manner that "exceeds the National Government's enumerated powers," for the purpose of punishing Illinois for exercising its sovereign powers, Defendants have "undermine[d] the sovereign interests" of Plaintiffs, *Bond*, 564 U.S. at 225, in violation of the Tenth Amendment.

**Second Claim for Relief**
***Ultra Vires* Agency Action Not Authorized by Congress**
**Deployment of Border Patrol for Removal Enforcement in Illinois**

335.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

336.    An executive agency "has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

337.    Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (noting that federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*").

338.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

339.    Congress established the CBP and assigned it duties directed at safeguarding the borders of the United States. 6 U.S.C § 211(a)-(c).

340.    The Border Patrol is the "law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a

79

designated port of entry; and to deter and prevent the illegal entry of terrorists, terrorist weapons, persons, and contraband." 6 U.S.C. § 211(e)(3)(A)–(B).

341.     Border Patrol conducts "such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c). It operates principally at the Mexican and Canadian borders and in coastal waters.

342.     Finding individuals within the interior of the United States who lack authorization to remain and initiating removal proceedings are not duties that Congress authorized Border Patrol to undertake.

343.     Defendants acted without statutory authorization when they deployed over 200 Border Patrol agents to engage in removal operations in Illinois and Chicago. The continued deployment of Border Patrol for removal enforcement in Illinois and Chicago is ultra vires executive action.

344.     The Border Patrol deployment is causing continuing harm to Plaintiffs and their residents.

### Third Claim for Relief
### Violation of the Administrative Procedure Act
### Agency Action Exceeds Statutory Authority, 5 U.S.C. § 706(2)(C)
### Roving Patrols Policy

345.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

346.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

347.     The Administrative Procedure Act ("APA") requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

348.     Defendants' authority to interrogate persons comes from 8 U.S.C. § 1357(a), which authorizes interrogation only of "any alien or person believed to be an alien," not any person. *United States v. Cantu*, 519 F.2d 494, 496–97 (7th Cir. 1975).

349.     No statutory provision authorizes immigration officers to ask any individual they encounter about their citizenship or immigration status. The statutes governing DHS enforcement authority allow for the interrogation of individuals only when there are articulable reasons to believe the person questioned is subject to removal.

350.     Defendants' Roving Patrol Policy is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

351.     Defendants' policy of directing immigration agents to question any individual about their immigration status exceeds statutory authority. The Roving Patrol Policy therefore must be set aside under the APA as it is in excess of statutory authority.

**Fourth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action Not In Accordance With Law,**
**5 U.S.C. § 706(2)(A)**
**Roving Patrols Policy**

352.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

353.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

354.     Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must

81

provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025). Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

355.    Defendants implemented a new policy of indiscriminately interrogating residents about their immigration status.

356.    Defendants' Roving Patrol Policy is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

357.    Defendants have not provided an adequate explanation for adopting and implementing the Roving Patrol Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

358.    The previous DHS policy, under which officers did not indiscriminately question residents, had engendered significant reliance interests. The State of Illinois and City of Chicago justifiably relied on that policy to ensure that their residents could go about their daily lives, engage in economic activities, and secure public benefits without fear of being subject to interrogation or demands for documentation of lawful immigration status.

359.     Defendants failed to consider the adverse impact on the safety and security of the State of Illinois and the City of Chicago of their Roving Patrol Policy.

**Fifth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Agency Action Exceeds Statutory Authority, 5 U.S.C. § 706(2)(C)**
**Biometric Scanning Policy**

360.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

361.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

362.     The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

363.     Congress has authorized Defendant DHS to collect biometric information at points of entry into the United States, 8 U.S.C. §§ 1365a(d), 1365b(c)(2).

364.     Congress has authorized Defendant DHS to collect biometric information of non-citizen residents in the interior only after removal proceedings have commenced, 8 U.S.C. § 1357(f).

365.     Defendants' use of Mobile Fortify to scan biometric information of Illinois residents without consent, without individualized suspicion, and to retain that information for fifteen years is not authorized by statute.

366.     Defendants' unrestricted use of Mobile Fortify to scan biometric information of Illinois residents is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

367.    In imposing the Biometric Scanning Policy, Defendants exceeded the statutory authority granted by Congress. Biometric Scanning Policy therefore must be set aside under the APA as it is in excess of statutory authority.

**Sixth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action Not in Accordance with Law**
**5 U.S.C. § 706(2)(A)**
**Biometric Scanning Policy**

368.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

369.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

370.    The APA requires that a court set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

371.    Defendant CBP departed from its prior policy of limited biometric scanning of non-citizens at ports of entry or of citizens at ports of entry with consent.

372.    Defendant ICE departed from its prior policy of biometric scanning of enforcement targets in removal proceedings.

373.    Defendants' policy of unrestricted use of biometric scanning of Illinois residents is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

374.    Defendants have not provided an adequate explanation for adopting and implementing the Biometric Scanning Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

84

375.     The prior policy had engendered significant reliance interests. The State of Illinois and City of Chicago justifiably relied on that policy to ensure that their residents could go about their daily lives without fear of being subject to the capture and retention of their sensitive biometric information, and the risk of its disclosure.

376.     Defendants failed to consider the adverse impact on the safety and security of the State of Illinois and the City of Chicago of their Biometric Scanning Policy.

**Seventh Claim for Relief**
**Violation of the Administrative Procedure Act**
**Agency Action Exceeds Statutory Authority, 5 U.S.C. § 706(2)(C)**
**Warrantless Arrests Policy**

377.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

378.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

379.     The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

380.     Under 8 U.S.C. § 1357(a)(2), immigration officers may only arrest a person if they have a warrant or "reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest."

381.     Defendants' policy of making civil immigration arrests without a warrant, without probable cause that the subject is unlawfully in the United States and presents a flight risk, and through field warrants without an accompanying charging document is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

382.    Defendants' Warrantless Arrest Policy exceeds the authority granted it under Section 1357(a)(2). The Warrantless Arrest Policy therefore must be set aside under the APA as it is in excess of statutory authority.

**Eighth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action Not in Accordance With Law**
**5 U.S.C. § 706(2)(A)**
**Warrantless Arrests Policy**

383.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

384.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

385.    The APA requires that a court set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

386.    The APA requires that a court set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).Defendants implemented a new policy of effectuating civil immigration arrests without a warrant, without probable cause that the subject is unlawfully in the United States and presents a flight risk and through field warrants without an accompanying charging document.

387.    Defendants' new policy is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

388.    Defendants have not provided an adequate explanation for adopting and implementing the Warrantless Arrests Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

389. Defendants failed to consider fully the foreseeable harms and/or costs of the policies and did not consider the reliance interests of the State of Illinois and City of Chicago in protecting the liberty of their residents to freely and openly go about their daily lives, engage in economic activities, and secure the benefits of public services without fear of unwarranted and unlawful arrest.

**Ninth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Agency Action Not In Accordance With Law, 5 U.S.C. § 706(2)(A)**
**Tear Gas Policy**

390. Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

391. Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

392. The APA requires that a court set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law." 5 U.S.C. § 706(2)(A).

393. Border Patrol policy provides that agents may disperse tear gas and other chemical weapons only when there are objectively reasonable grounds to believe the targets are engaged in active resistance. Before dispersing tear gas or other chemical weapons, immigration officers must provide clear, verbal commands and allow the subjects an opportunity to comply.

394. Since September 2025, Border Patrol regularly dispersed tear gas in Illinois without warning, in circumstances where they faced no active resistance, subjecting innocent bystanders including children and law enforcement personnel to injury from noxious gas and targeted projectiles.

395. Defendants have affirmed the use of tear gas as "exemplary" and failed to discipline agents in connection with the use of tear gas.

396.     Defendants' regular dispersal of tear gas without warning and in the absence of active resistance constitutes a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

397.     Defendants' Tear Gas Policy exceeds their authorization to use force under 8 C.F.R. § 287.8(a) and the Fourth Amendment to the Constitution. The Tear Gas Policy therefore must be set aside under the APA as it is not in accordance of law.

**Tenth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action Not in Accordance with Law**
**5 U.S.C. § 706(2)(A)**
**Tear Gas Policy**

398.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

399.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

400.     The APA requires that a court set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

401.     The APA requires that a court set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).Defendants implemented a new policy of dispersal of tear gas without warning and in the absence of active resistance.

402.     This new policy is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177-78.

403. Defendants have not provided an adequate explanation for adopting and implementing the Tear Gas Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

404. Defendants failed to consider fully the foreseeable harms and costs of the policy, and failed to consider the reliance interests of the State of Illinois and City of Chicago in protecting the liberty of its residents to freely and openly go about their daily lives, engage in economic activities, and secure the benefits of public services without fear of being subjected to deployment of tear gas.

**Eleventh Claim for Relief**
**Violation of the Administrative Procedure Act**
**Agency Action Exceeds Statutory Authority, 5 U.S.C. § 706(2)(C)**
**Arbitrary Enforcement Policy as to Courthouses**

405. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

406. Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

407. The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

408. There exists a longstanding common-law privilege against civil arrest of witnesses, parties, and others attending court on official business recognized by both federal and state courts. Illinois courts have long affirmed the existence of a state common law privilege against civil courthouse arrests "for the sake of public justice." *See Greer v. Young*, 120 Ill. 184, 188–89 (1887).

409. When Congress authorized immigration enforcement, it did so against the backdrop of this longstanding common law privilege. Immigration law incorporates the limitations of this privilege, so enforcement actions at courthouses are not authorized by statute. The statutory authorization to DHS to conduct civil arrests did not abrogate the well-settled common law

89

privilege. Rather, Congress retained this privilege when authorizing DHS to conduct civil immigration arrests. *See* 8 U.S.C. §§ 1226(a), 1357(a). Thus, the power Congress granted to DHS to conduct civil arrests contains this common-law limitation on civil arrests.

410. In 2025, Defendants rescinded their longstanding policy regarding civil immigration arrests at sensitive locations, including courthouses, and replaced it with a policy broadly authorizing arrests at or near courthouses.

411. Defendants' new policy of broadly authorizing the arrest of immigrants at or near courthouses is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

412. Defendants' action authorizing the arrest of immigrants at or near courthouses exceeds statutory authority and is contrary to law. The Arbitrary Enforcement Policy therefore must be set aside under the APA as it is in excess of statutory authority and is contrary to law.

**Twelfth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action Not in Accordance With Law**
**5 U.S.C. § 706(2)(A)**
**Arbitrary Enforcement Policy**

413. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

414. Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

415. In 2025, Defendants rescinded their longstanding policy regarding civil immigration arrests at sensitive locations and replaced it with a policy broadly authorizing enforcement actions at or near sensitive locations.

416. Defendants' policy of authorizing enforcement actions at or near sensitive locations is a final agency action because it marks the consummation of Defendants' decisionmaking process

and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

417.     Defendants have not provided an adequate explanation for adopting and implementing the Arbitrary Enforcement Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

418.     Defendants failed to consider fully the foreseeable harms and/or costs of the policies and did not consider the reliance interests of the State of Illinois and City of Chicago in maintaining open access to courthouses, the judicial system, healthcare facilities, educational institutions, social services locations, and other sensitive locations and do not adequately justify the change from Defendants' prior policies.

**Thirteenth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Agency Action Exceeds Statutory Authority, 5 U.S.C. § 706(2)(C)**
**Conceal Plates Policy**

419.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

420.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

421.     The Administrative Procedure Act ("APA") requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

422.     Motor vehicles that the federal government owns or leases must use U.S. Government license plates or comply with the vehicle registration and inspection laws of the jurisdiction in which the vehicles are principally operated. 41 C.F.R. §§ 102-34.5(a), 102-34.90, 102-34.155(a)–(b), 102-34.120.

423.    Motor vehicles operated and used by ICE and Border Patrol in Illinois since September 2025 generally have not displayed federal U.S. Government license plates and have failed to comply with the registration and inspection laws of Illinois. Federal officials have regularly removed or obstructed Illinois license plates and/or illegally swapped Illinois license plates on their vehicles.

424.    Defendants' policy of removing, obscuring, or swapping Illinois license plates on motor vehicles used by ICE and Border Patrol in Illinois is contrary to federal regulations and is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

425.    Defendants' policy of removing, obscuring, or swapping Illinois license plates on motor vehicles used by ICE and Border Patrol in Illinois exceeds statutory authority. The Conceal Pates Policy therefore must be set aside under the APA as it is in excess of statutory authority.

**Fourteenth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action Not in Accordance with Law**
**5 U.S.C. § 706(2)(A)**
**Conceal Plates Policy**

426.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

427.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

428.    The APA requires that a court set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

429.    Defendants implemented a new policy of removing, obscuring, or swapping Illinois license plates on motor vehicles used by ICE and Border Patrol in Illinois.

430.     This new policy is contrary to federal regulations and is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

431.     Defendants have not provided an adequate explanation for adopting and implementing the Conceal Plates Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

432.     Defendants failed to consider the adverse impact on the safety and security of the State from their policy of concealing license plates or consider the reliance interests of the State of Illinois and City of Chicago in supporting roadway safety, traffic and parking enforcement, and toll and revenue collection.

### Fifteenth Claim for Relief
### Violation of the Administrative Procedure Act
### Agency Action Exceeds Statutory Authority, 5 U.S.C. § 706(2)(C)
### Private Trespass Policy

433.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

434.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

435.     The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

436.     Congress has authorized Border Patrol agents to access private lands only within twenty-five miles of the border "for the purpose of patrolling the border to prevent illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3).

437.    Defendants' policy of entering private property in Illinois without a warrant or the consent of the owner purportedly to search for immigrants unlawfully in the United States is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

438.    Defendants' policy of entering into private property in Illinois without a warrant to look for immigrants subject to removal exceeds the statutory authority granted by Congress. The Private Trespass Policy therefore must be set aside under the APA as it is in excess of statutory authority.

**Sixteenth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action Not in Accordance with Law**
**5 U.S.C. § 706(2)(A)**
**Private Trespass Policy**

439.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

440.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

441.    The APA requires that a court set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

442.    The APA requires that a court set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).Defendants' policy of entering private property in Illinois without a warrant or the consent of the owner purportedly to search for immigrants unlawfully in the United States is a final agency action because it marks the consummation of Defendants' decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

443.    Defendants departed from their prior policy of accessing private property only within twenty-five miles from the border for the purpose of preventing illegal entry of immigrants into the United States.

444.    Defendants have not provided an adequate explanation for adopting and implementing the Private Trespass Policy, have failed to provide a reasoned explanation for the departures from prior policy, have offered pretextual reasons, and have failed to consider alternatives.

445.    Defendants' prior policies had engendered significant reliance interests. Plaintiffs State of Illinois and City of Chicago justifiably relied on that policy to ensure that their residents could be safe and secure in their homes and businesses from incursion by federal law enforcement officers.

446.    Defendants failed to consider the adverse impact on the safety and security of the State from their Private Trespass Policy.

**Seventeenth Claim for Relief**
**Violation of the Administrative Procedure Act**
**Agency Action In Violation of Constitutional Right, 5 U.S.C. § 706(2)(B)**
**Private Trespass Policy**

447.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

448.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

449.    The APA requires that a court set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

450.    Defendants' policy of entering private property in Illinois without a warrant or the consent of the owner purportedly to search for immigrants unlawfully in the United States is a final agency action because it marks the consummation of Defendants' decisionmaking process and

95

determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

451. Under the Fourth Amendment to the United States Constitution, absent a judicial warrant, immigration agents may enter onto private premises only with consent of the owner or when faced with exigent circumstances.

452. Under the Private Trespass Policy, Defendants' agents have been entering the private premises of Illinois residents without a warrant, without seeking consent, and in the absence of exigent circumstances.

453. The Private Trespass Policy violates the Fourth Amendment to the United States Constitution and should be set aside.

**Eighteenth Claim for Relief**
***Ultra Vires* Agency Action Not Authorized by Congress**

454. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

455. An executive agency "has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

456. Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (noting that federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*").

457. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief

against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

458.    Defendants Roving Patrol Policy, Biometric Scanning Policy, Warrantless Arrest Policy, Tear Gas Policy, Arbitrary Enforcement Policy, Conceal Plates Policy, and Private Trespass Policy were adopted and implemented by Defendants without authority conferred by statute. No provision of DHS's authorizing statutes conferred on it the power to adopt and implement the policies alleged above.

459.    Each of the final agency actions challenged above are *ultra vires*.

**Nineteenth Claim for Relief**
**Declaratory Judgment, 28 U.S.C. § 2201**

460.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

461.    The Declaratory Judgment Act authorizes a court to, in any "actual controversy within its jurisdiction, . . . declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a); *see Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191 (2014).

462.    An actual and substantial controversy exists between Plaintiffs and the Defendants about whether the Roving Patrol Policy, the Biometric Scanning Policy, the Warrantless Arrest Policy, the Tear Gas Policy, the Arbitrary Enforcement Policy, the Conceal Plates Policy, and the Private Trespass Policy, are unlawful.

463.    This action is presently justiciable because Defendants are implementing these policies and likely to continue their use unless enjoined from doing so.

464.    Declaratory relief will clarify the rights and obligations of the parties and, therefore, pursuant to 28 U.S.C. § 2201, is appropriate to resolve this controversy.

## PRAYER FOR RELIEF

Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants lack authority to impose the Roving Patrol Policy, the Biometric Scanning Policy, the Warrantless Arrest Policy, the Tear Gas Policy, the Arbitrary Enforcement Policy, the Private Trespass Policy, and the Conceal Plates Policy, vacatur of those policies, and an injunction barring Defendants from conducting themselves in accordance with those policies.

WHEREFORE, Plaintiffs request that the Court enter judgment against Defendants and award the following relief:

    a. Absent express Congressional authorization, enjoin Defendant CBP from conducting civil immigration enforcement in Illinois;

    b. Declare that the Roving Patrol, Biometric Scanning, Warrantless Arrest, Tear Gas, Arbitrary Enforcement, Conceal Plates, and Private Trespass policies violate the APA as set forth above;

    c. Declare that Defendants have violated the Tenth Amendment to the United States Constitution as set forth above;

    d. Vacate the Roving Patrol, Biometric Scanning, Warrantless Arrest, Tear Gas, Arbitrary Enforcement, Conceal Plates, and Private Trespass policies;

    e. Enjoin Defendants from implementing or enforcing the Roving Patrol, Biometric Scanning, Warrantless Arrest, Tear Gas, Arbitrary Enforcement, Conceal Plates, and Private Trespass policies, or engaging in such conduct that comprises the policies;

    f. Award Plaintiffs their reasonable fees, costs and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

g.   Award any such additional relief as this Court may deem just and proper.


Dated this 12th Day of January, 2026.

KWAME RAOUL
*Attorney General of Illinois*

by: */s/ Paul Berks*

CARA HENDRICKSON
Executive Deputy Attorney General
PAUL BERKS
VIKAS DIDWANIA
Complex Litigation Counsels
MARY GRIEB
ELIZABETH H. JORDAN
EMILY HIRSCH
ALEXANDRA L. REED
CHRISTINA M. BEELER*
R. HENRY WEAVER
Assistant Attorneys General
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov

*Counsel for the State of Illinois*

*Admission pending

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of Chicago

By: */s/ Stephen Kane*
Stephen Kane
John Hendricks
Rebecca Hirsch
Chelsey Metcalf
Rachel Zemke
Psalm Brown
John Kauffman
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
312-744-6934
stephen.kane@cityofchicago.org

*Counsel for the City of Chicago*

100