**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT COURT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF ILLINOIS, *et al.*, | ) | |
| | ) | No. 26-cv-321 |
| *Plaintiffs,* | ) | |
| | ) | Hon. Sara L. Ellis, |
| v. | ) | District Judge |
| | ) | |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

**<u>DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND...................................................... 1

LEGAL STANDARD........................................................................................................ 3

ARGUMENT ..................................................................................................................... 4

I.     The Court should dismiss almost all of Plaintiffs' claims for a lack of standing. .............. 4

II.    Plaintiffs fail to plausibly allege standing to challenge the deployment of Border Patrol. ............................................................................................................................. 5

III.   Plaintiffs fail to plausibly allege standing to challenge the Roving Patrols Policy. ........... 6

IV.   Plaintiffs fail to plausibly allege standing to challenge the Biometric Scanning Policy. ............................................................................................................................. 10

V.    Plaintiffs lack standing to challenge the Warrantless Arrest Policy. ............................... 11

VI.   Plaintiffs lack standing to sue concerning the Tear Gas Policy....................................... 12

VII.  Plaintiffs lack standing to challenge the recission of the Sensitive Locations Policy. ............................................................................................................................. 13

VIII. Plaintiffs lack standing to sue over the Alleged Concealed Plates Policy....................... 16

IX.   Plaintiffs lack standing with respect to the Trespass Policy. ........................................... 17

X.    Plaintiffs lack standing to pursue their ultra vires claim and their request for a declaratory judgment. ..................................................................................................... 18

XI.   Plaintiffs fail to state a Tenth Amendment claim. .......................................................... 18

XII.  Plaintiffs fail to plausibly allege any impermissible interference with state sovereignty....................................................................................................................... 19

XIII. Plaintiffs fail to state an anticommandeering or coercion claim...................................... 20

XIV. Count II Should Be Dismissed Because CBP Is Authorized to Enforce Federal Immigration Law Nationwide.......................................................................................... 27

XV.  Plaintiffs' APA claims are not justiciable........................................................................ 29

       A.    The Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, and Seventeenth Claims for Relief fail to plausibly allege a discrete agency action. ................................................................... 29

i

B.      Counts XI and XII fail to plausibly allege final agency action............................ 35

C.      The Eleventh and Twelfth Claims for Relief challenge actions that are committed to agency discretion. ........................................................... 38

D.      Plaintiffs' Claims Sounding in Trespass Should Be Dismissed ........................... 43

E.      Plaintiffs Ultra Vires Claim Should Be Dismissed................................................ 46

F.      Plaintiffs Declaratory Judgment Claim Should Be Dismissed. ........................... 47

XVI.    This Court Lacks Jurisdiction to Issue Injunctive Relief…………………………...47

CONCLUSION................................................................................................................. 48

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Adderley v. State of Florida*,
385 U.S. 39 (1966).........................................................................................44, 45

*Al Otro Lado, Inc. v. McAleenan*,
394 F. Supp. 3d 1168 (S.D. Cal. 2019)..................................................................33

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982)...............................................................................................5

*Alsaidi v. U.S. Dep't of State*,
292 F. Supp. 3d. 320 (D.D.C. 2018).....................................................................32

*Am. Tort Reform Ass'n v. OSHA*,
738 F.3d 387 (D.C. Cir. 2013)..............................................................................36

*Andrew v. Consol. Rail Corp.*,
831 F.2d 678 (7th Cir. 1987) ..............................................................38-39, 40, 41

*Apex Digit., Inc. v. Sears, Roebuck & Co.*,
572 F.3d 440 (7th Cir. 2009) .................................................................................3

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ..........................................................................*passim*

*Arizona v. United States*,
567 U.S. 387 (2012)........................................................................................*passim*

*Arnow v. U.S. Nuclear Regul. Comm'n*,
868 F.2d 223 (7th Cir. 1989) ................................................................................41

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................... 4, 5, 31

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015)........................................................................36, 37

*Bark v. U.S. Forest Serv.*,
37 F. Supp. 3d 41 (D.D.C. 2014)...........................................................................32

*Bd. of Governors, FRS v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991).................................................................................................... 46

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).......................................................................................... 3, 4, 31

*Biden v. Texas*,
   597 U.S. 785 (2022).............................................................................................. 29, 31

*Boim v. Am. Muslims for Palestine*,
   9 F.4th 545 (7th Cir. 2021) ........................................................................................ 3

*Boire v. Greyhound Corp.*,
   376 U.S. 473 (1964).................................................................................................... 46

*California v. Texas*,
   593 U.S. 659 (2021).................................................................................................... 15

*Charles v. Verhagen*,
   348 F.3d 601 (7th Cir. 2003) .................................................................................... 20

*Chicago Headline Club v. Noem*,
   --- F.4th ----, 2026 WL 622677 (7th Cir. Mar. 5, 2026) ..................................... 2, 8, 25

*City of Chicago v. Barr*,
   961 F.3d 882 (7th Cir. 2020) .................................................................................... 20

*City of Los Angeles v. Barr*,
   929 F.3d 1163 (9th Cir. 2019) .................................................................................. 26

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)..................................................................................................... 6, 7

*City of N. Miami v. Fed. Aviation Admin.*,
   47 F.4th 1257 (11th Cir. 2022) ................................................................................... 5

*City of New York v. DOD*,
   913 F.3d 423 (4th Cir. 2019) .................................................................................... 30

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)......................................................................................... 6, 14, 18

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006) ........................................................................ 32, 33-34

*Comm. on Judiciary of U.S. House of Representatives v. Miers*,
542 F.3d 909 (D.C. Cir. 2008) ........................................................................... 25

*Comm'n v. Texas*,
605 U.S. 665 (2025) ........................................................................................... 46

*Corner Post, Inc v. Bd. of Govs. of Fed. Reserve Sys.*,
603 U.S. 799 (2024) ............................................................................... 30, 35, 38

*Daines v. IRS*,
2025 WL 2694788 (E.D. Wisc. Sept. 22, 2025) ................................................ 32

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................................................................... 24

*Dep't of Educ. v. Brown*,
600 U.S. 551 (2023) ........................................................................................... 15

*Dhakal v. Sessions*,
895 F.3d 532 (7th Cir. 2018) ....................................................................... 35, 36

*Diedrich v. Ocwen Loan Servicing, LLC*,
839 F.3d 583 (7th Cir. 2016) ............................................................................... 6

*Dinerstein v. Google, LLC*,
73 F.4th 502 (7th Cir. 2023) ................................................................... 7, 10, 12

*Fed. Election Comm'n v. Cruz*,
596 U.S. 289 (2022) ............................................................................................. 4

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ........................................................................... 47

*Fernandez v. Wiener*,
326 U.S. 340 (1945) ............................................................................... 18, 20, 22

*Florida. v. Jardines*,
569 U.S. 1 (2013) ............................................................................................... 44

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ................................................................................. 8, 11, 15

*Friends of the Earth, Inc. v. Laidlaw Envt Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........................................................................................... 16

v

*Geinosky v. City of Chicago*,
  675 F.3d 743 (7th Cir. 2012) ................................................................. 4

*Genesis Healthcare Corp. v. Symczyk*,
  569 U.S. 66 (2013).................................................................................. 9

*Greer v. Chao*,
  492 F.3d 678 (7th Cir. 1987) ............................................................... 40

*Haaland v. Brackeen*,
  599 U.S. 255 (2023)................................................................... 5, 17, 25

*Harrison v. Jefferson Par. Sch. Bd.*,
  78 F.4th 765 (5th Cir. 2023) ............................................................... 10

*Heckler v. Chaney*,
  470 U.S. 821 (1985)............................................................ 38, 39, 40, 41

*Hunter v. Underwood*,
  471 U.S. 222 (1985)............................................................................. 25

*ICC v. Bhd. of Locomotive Eng'rs*,
  482 U.S. 270 (1987).................................................................... 38, 39

*Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n*,
  721 F.3d 764 (7th Cir. 2013) ............................................................... 22

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004)...................................................... 29, 35

*Iowa Migrant Movement for Just. v. Bird*,
  157 F.4th 904 (8th Cir. 2025) .............................................................. 42

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) .......................................................... 14, 15

*L.A. Press Club v. Noem*,
  --- F. Supp. 3d ----, 2026 WL 103972 (C.D. Cal. Jan. 8, 2026) ...................................... 32, 33

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)...................................................................... 39, 41

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................. 15

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .................................................................................... 29, 30, 32, 33

*Malukas v. Barr*,
  940 F.3d 968 (7th Cir. 2019) ...................................................................................... 39

*Maryland v. U.S. Dep't of Agric.*,
  151 F.4th 197 (4th Cir. 2025) ....................................................................................... 8

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ..................................................................................................... 18

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ....................................................................................................... 5

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ...................................................................................................... 20

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
  778 F. Supp. 3d 1 (D.D.C. 2025) ............................................................................... 15

*Menominee Indian Tribe of Wis. v. EPA*,
  947 F.3d 1065 (7th Cir. 2020) .............................................................................. 35, 41

*Minnesota ex rel. Ellison v. Noem*,
  --- F. Supp. 3d ----, 2026 WL 253619 (D. Minn. Jan. 31, 2026) ...................................... *passim*

*Moher v. United States*,
  875 F. Supp. 2d 739 (W.D. Mich. 2012) ................................................................... 44

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ............................................................................. 19, 20-21, 21-22

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ................................................................................................. 13, 17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .................................................................................. 19, 24, 25, 26

*New England Synod v. DHS*,
  2026 WL 412329 (D. Mass. Feb. 13, 2026) ......................................................... 35, 36, 37, 38

*New York v. Dep't of Just.*,
  951 F.3d 84 (2d Cir. 2020) ......................................................................................... 26

*New York v. United States*,
505 U.S. 144 (1992) .......................................................................................... 21

*New York v. Yellen*,
15 F.4th 569 (2d Cir. 2021) ............................................................................. 27

*Norton v. S. Utah Wilderness All.*, ("SUWA"),
542 U.S. 55 (2004) ...................................................................................... 29, 34

*Oliver v. United States*,
466 U.S. 170 (1984) .......................................................................................... 44

*Ophthalmic Mut. Ins. Co. v. Musser*,
143 F.3d 1062 (7th Cir. 1998) ......................................................................... 19

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .......................................................................................... 12

*Patterson v. Howe*,
96 F.4th 992 (7th Cir. 2024) .............................................................................. 9

*People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*,
60 F. Supp. 3d 14 (D.D.C. 2014) ..................................................................... 32

*Perez v. Campbell*,
402 U.S. 637 (1971) .......................................................................................... 45

*Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*,
2026 WL 280089 (D. Md. Feb. 3, 2026) .......................................................... 35

*Pierre v. Midland Credit Mgmt., Inc.*,
29 F.4th 934 (7th Cir. 2022) .......................................................................... 9, 12

*Precision Shooting Equip. Co. v. Allen*,
646 F.2d 313 (7th Cir. 1981) ........................................................................... 47

*Printz v. United States*,
521 U.S. 898 (1997) .......................................................................................... 21

*Pucillo v. Nat'l Credit Sys., Inc.*,
66 F.4th 634 (7th Cir. 2023) .......................................................................... 9, 12

*Railway Clerks v. Assoc. for Benefit of Noncontract Emps.*,
380 U.S. 650 (1965) .......................................................................................... 46

*Rakas v. Illinois*,
439 U.S. 128 (1978)............................................................................................. 45

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999)............................................................................................. 42

*Reno v. Condon*,
528 U.S. 141 (2000)............................................................................................. 22

*Rodriguez v. U.S. Dep't of the Air Force*,
387 F. Supp. 3d 130 (D.D.C. 2019)..................................................................... 32

*Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*,
946 F.3d 951 (6th Cir. 2020) .................................................................. 10, 16, 17

*Scalise v. Thornburgh*,
891 F.2d 640 (7th Cir. 1989) ....................................................................... 39, 40

*Scruggs v. McAleenan*,
2019 WL 4034622 (N.D. Ill. Aug. 27, 2019) ..................................................... 32

*Sec'y of Labor v. Twentymile Coal Co.*,
456 F.3d 151 (D.C. Cir. 2006)............................................................................. 40

*Sierra Club v. U.S. Army Corps of Eng'rs*,
446 F.3d 808 (8th Cir. 2006) .............................................................................. 29

*Singh v. Moyer*,
867 F.2d 1035 (7th Cir. 1989) ............................................................................ 40

*Sorreda Transport, LLC v. DOT*,
980 F.3d 1 (1st Cir. 2020)................................................................................... 41

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966)............................................................................................. 17

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)............................................................................................... 4

*Swanigan v. City of Chicago*,
881 F.3d 577 (7th Cir. 2018) .............................................................................. 12

*Taha v. Int'l Bhd. of Teamsters, Loc. 781*,
947 F.3d 464 (7th Cir. 2020) .............................................................................. 31

*Tennessee v. Dep't of Educ.*,
   104 F.4th 577 (6th Cir. 2024) ............................................................................... 14

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ................................................................................. 10

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ...................................................................................... *passim*

*Trump v. Hawaii*,
   585 U.S. 667 (2018) .............................................................................................. 25

*Trump v. Vance*,
   591 U.S. 786 (2020) ....................................................................................... 10, 20

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ................................................................................. 56, 37, 38

*United States v. Alexander*,
   888 F.3d 628 (2d Cir. 2018) ................................................................................. 44

*United States v. Darby*,
   312 U.S. 100 (1941) .............................................................................................. 18

*United States v. Jones*,
   565 U.S. 400 (2012) .............................................................................................. 44

*United States v. Sweeney*,
   821 F.3d 893 (7th Cir. 2016) ............................................................................... 43

*United States v. Texas*,
   599 U.S. 670 (2023) ...................................................................................... *passim*

*United States v. Walton*,
   763 F.3d 655 (7th Cir. 2014) ............................................................................... 44

*United States v. Washington*,
   596 U.S. 832 (2022) .............................................................................................. 16

*Vigil v. FEMA*,
   2024 WL 2404487 (D.N.M. May 23, 2024) ........................................................ 32

*Virginia ex rel. Cuccinelli v. Sebelius*,
   656 F.3d 253 (4th Cir. 2011) ......................................................................... 11, 16

x

*Washington v. U.S. Food & Drug Admin.*,
  108 F.4th 1163 (9th Cir. 2024) ................................................................................ 7

*Wis. Voter All. v. Millis*,
  166 F.4th 627 (7th Cir. 2026) ............................................................................ 9, 11

## STATUTES

5 U.S.C. § 551(13) ................................................................................. 29, 30, 32, 34

5 U.S.C. § 701(a)(2) ........................................................................................... 38

5 U.S.C. § 704 ..................................................................................................... 29

5 U.S.C. § 706 ....................................................................................................... 2

6 U.S.C. § 211 ..................................................................................................... 27

8 U.S.C. § 1101(a) ............................................................................................... 27

8 U.S.C. § 1226 .............................................................................................. 28, 40

8 U.S.C. § 1357 ............................................................................................... *passim*

## FEDERAL RULE

Fed. R. Civ. P. 12(b) .............................................................................................. 3

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

8 C.F.R. § 287.1 ............................................................................................... 28, 43

8 C.F.R. § 287.5 ........................................................................................... 27, 28, 43

## OTHER AUTHORITIES

Ann Woolhandler & Michael G. Collins, *State Standing*,
  81 Va. L. Rev. 387 (1995) ................................................................................ 10

**INTRODUCTION**

In September 2025, the Department of Homeland Security began an immigration enforcement operation in Chicago called Operation Midway Blitz. In January 2026, and after many of the agents involved in OMB were redeployed to other areas of the country, Plaintiffs filed their Complaint, alleging constitutional and statutory violations related to Midway Blitz.

Defendants now move to dismiss the Complaint. Plaintiffs lack standing to bring most of their claims when they filed their Complaint, and even if the Court disagrees with either proposition, Plaintiffs' problems do not end there. Plaintiffs fail to plausibly allege that Defendants violated the Constitution by prioritizing immigration enforcement efforts in Chicago. Plaintiffs also fail to plausibly allege that Defendants obviously exceeded their statutory authority in using Border Patrol Agents in removal operations. And Plaintiffs' APA claims suffer from a lack of final agency action, a lack of reviewability, and a lack of legal merit, or some combination of the three. Accordingly, the Court should dismiss the Complaint in full.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Court has extensive familiarity with the facts and circumstances of the recent immigration enforcement activity in Chicago from the other litigation this Court designated as related to this one, *see Chicago Headline Club v. Noem*, No. 25-cv-12173 (SLE) (N.D. Ill.). Defendants therefore provide only a brief summary of the background relevant to this motion.

In September 2025, the Department of Homeland Security (DHS) launched Operation Midway Blitz (OMB) to address the dangers arising from the presence of illegal aliens in the Chicago area, including members of gangs who have engaged in violent crimes and drug trafficking. Illinois and Chicago have sanctuary laws and policies that limit the cooperation of state and local officials with federal immigration officials, which has hindered the federal

government's ability to enforce immigration laws in Illinois and Chicago, and has exacerbated the dangers posed by certain illegal aliens. OMB led to the successful arrest and subsequent deportation of illegal aliens including murderers, child abusers, kidnappers, gang members, and armed robbers. In late 2025, the surge of DHS personnel deployed to the Chicago area demobilized and OMB ended. *See* Pls.' Mot. to Dismiss, *Chicago Headline Club v. Noem*, No. 25-cv-12173 (SLE) (N.D. Ill. Dec. 2, 2025) (ECF No. 295) (Plaintiffs' motion to dismiss Complaint noting ending of OMB and departure of DHS personnel from Northern District of Illinois); *accord Chicago Headline Club v. Noem*, --- F.4th ----, 2026 WL 622677, at \*1, \*3 (7th Cir. Mar. 5, 2026) (noting wind-down of OMB).

On January 12, 2026, Plaintiffs filed this action seeking injunctive and declaratory relief to challenge all aspects of DHS's immigration enforcement operations within the Northern District of Illinois. Shortly thereafter, in response to Plaintiffs' request, this Court designated this litigation to be a related case to *Chicago Headline Club*. Notification of Dkt. Entry, ECF No. 30.

Plaintiffs' Complaint (ECF No. 1) ("Compl."), which spans over 100 pages, contains 19 claims for relief. Count 1 alleges that Defendants' actions violate the Tenth Amendment of the United States Constitution (Compl. ¶¶ 316-34). Count 2 alleges that the Customs and Border Protection's (CBP) operations in the interior of the United States exceed its authority, which Plaintiffs claim is confined to areas near the nation's border (Compl. ¶¶ 335-44). Claims 3-17 allege various violations of the Administrative Procedure Act (APA), 5 U.S.C. § 706. These 15 claims collectively challenge seven of Defendants' alleged immigration enforcement-related practices or policies: (i) roving patrols (Counts 3 & 4) ( *id.* at ¶¶ 345-59); (ii) biometric scanning (Counts 5 & 6) ( *id.* at ¶¶ 360-76); (iii) warrantless arrests (Counts 7 & 8) ( *id.* at ¶¶ 377-89); (iv) tear gas (Counts 9 & 10) ( *id.* at ¶¶ 390-404); (v) enforcement operations "at or near sensitive

locations," including courthouses (Counts 11 & 12) ( *id.* at ¶¶ 405-18); (vi) concealing of license plates on motor vehicles used by Defendants in immigration enforcement operations (Counts 13 & 14) ( *id.* at ¶¶ 419-32); and (vii) unlawfully trespassing on private property in connection with immigration-related enforcement operations (Counts 15-17) (*id.* at ¶¶ 433-53). Counts 18 and 19 are catch-all claims seeking injunctive and declaratory relief, respectively, against the alleged policies noted above. (*id.* at ¶¶ 454-64).

Defendants move to dismiss Plaintiffs' Complaint in its entirety.

## **LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Because federal courts possess limited jurisdiction, and jurisdiction is power to declare the law, the first step in any federal lawsuit is ensuring the district court possesses authority to adjudicate the dispute—in short, that it has jurisdiction over the subject matter." *Boim v. Am. Muslims for Palestine,* 9 F.4th 545, 550 (7th Cir. 2021) (citation modified). Attacks on subject-matter jurisdiction under Rule 12(b)(1) come in two forms, namely "facial" and "factual" attacks. In a facial attack, a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction. *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). In a factual challenge, "the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction." *Id.* at 444 (citation omitted). In a factual challenge, the court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (citation omitted).

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint that fails to state a claim upon which relief can be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

3

(2007). Although a court must construe the complaint in the Plaintiffs' favor, conclusory allegations are not entitled to an assumption of truth, and even allegations pleaded with factual support need only be accepted insofar as "they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). This plausibility showing "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" and it "asks for more than a sheer possibility that [the] defendant has acted unlawfully." *Id.* at 678. Legal conclusions, "'naked assertion[s]' devoid of 'further factual enhancement,'" and "a formulaic recitation of the elements of a cause of action" are legally insufficient to state a plausible claim. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). For Rule 12(b)(6) purposes, a court may consider not only the complaint itself, but also "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## **ARGUMENT**

### I.     **The Court should dismiss almost all of Plaintiffs' claims for a lack of standing.**

Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To have standing, a plaintiff "must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022). At the pleading stage, a plaintiff must "clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation modified).

Plaintiffs lack standing to pursue almost all their claims.

## II. Plaintiffs fail to plausibly allege standing to challenge the deployment of Border Patrol.

In Count II, Plaintiffs challenge Defendants' use of Border Patrol agents in removal operations and request an injunction forbidding "CBP from conducting civil immigration enforcement in Illinois" absent Congressional authorization. Compl. ¶¶ 335-44 & Prayer for Relief ¶ a. To justify this request, Plaintiffs mostly assert the interests of their residents. *See id.* ¶ 71. This move fails as a matter of law. A state does not have standing to "enforce [its citizens] rights in respect of their relations with the federal government." *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923); *see Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) ("[A] State does not have standing as *parens patriae* to bring an action against the Federal Government." (citation omitted)). Indeed, the Supreme Court has left no doubt about the inability of a State to bring such an action, describing this issue as "open and shut." *Brackeen*, 599 U.S. at 295. And the same is true for a municipality, which "derive[s] [its] existence from the state and function[s] as [a] political subdivision[] of the state." *City of N. Miami v. Fed. Aviation Admin.*, 47 F.4th 1257, 1277 (11th Cir. 2022) (citation omitted); *see* Compl. ¶ 17 (alleging that Chicago is "a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois").

Beyond alleged injuries to their residents, Plaintiffs claim a "profound[] disrupt[ion]" to their "abilities to enforce their laws, implement their policies, and for the State to function as a sovereign government." Compl. ¶ 71. Certain sovereign injuries are sometimes cognizable injuries in fact for Article III purposes, *see, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982), but Plaintiffs provide only a threadbare conclusory sentence without "sufficient factual matter" to support the claim. *Iqbal*, 556 U.S. at 678. Further, because Plaintiffs seek an injunction, they must plead facts demonstrating that any such injury is "certainly

5

impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013); *see also Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 588 (7th Cir. 2016) ("In order to survive dismissal for lack of standing, the plaintiffs' complaint must contain sufficient factual allegations of an injury resulting from the defendants' conduct, accepted as true, to state a claim for relief that is plausible on its face."). As the Seventh Circuit reiterated in staying the preliminary injunction in *Chicago Headline Club*, plaintiffs must show "that the past harm they allegedly faced is likely to imminently happen to them in the future." Order at 2, *Chicago Headline Club. v. Noem,* No. 25-3023 (7th Cir. Nov. 19, 2025) ("*Chicago Headline Club* Stay Order") (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983)). "A fear that such harm will recur is insufficient, on its own, to show standing for injunctive relief." *Id.* The Seventh Circuit also noted that changed circumstances in Chicago several months before this lawsuit was filed indicate that the "enhanced immigration enforcement initiative may have lessened or ceased," thus affecting "both the justiciability of this case and the propriety of injunctive relief." *Id.*

In the Complaint, no allegations of likely imminent injury accompany Plaintiffs' conclusory allegation of harm. Nor do Plaintiffs even acknowledge the end of OMB and its impact on their alleged injuries. Accordingly, the Court should dismiss Count II for a lack of jurisdiction.

**III.     Plaintiffs fail to plausibly allege standing to challenge the Roving Patrols Policy.**

In Counts III and IV, Plaintiffs challenge Defendants' alleged Roving Patrols Policy. Compl. ¶¶ 345-59. Plaintiffs claim that this alleged Policy requires a diversion of resources, increases distrust between law enforcement and communities, and interferes with Plaintiffs' law enforcement priorities. *Id.* ¶ 94.

These allegations do not suffice. First, as a global matter, Plaintiffs do not plausibly allege any harm that is "certainly impending" as a result of the alleged Policy. *Clapper*, 568 U.S. at 401.

6

Instead, Plaintiffs merely cite events that happened months before they filed the Complaint. *See* Compl. ¶¶ 86-90. Although past events may have predictive value, events from months ago do not plausibly allege imminent harm. *See Dinerstein v. Google, LLC*, 73 F.4th 502, 512 (7th Cir. 2023). In other words, even when Plaintiffs' allegations of past harm are taken as true, Plaintiffs' allegations provide "no more than conjecture" that the alleged Policy is soon to inflict such harms again. *Lyons*, 461 U.S. at 108.

A lack of imminence is only the beginning of Plaintiffs' problems. Plaintiffs' alleged diversion of resources is exactly the kind of "indirect effect[]" on "state [and local] spending" that is insufficient to generate an Article III case or controversy. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

Recent caselaw confirms as much. In *Texas*, the district court concluded that the plaintiffs, two states, "would incur additional costs" because of the federal government's alleged under enforcement of federal immigration laws. *Id.* at 676. This case presents the mirror image, as Plaintiffs contend Defendants' alleged over enforcement of federal immigration law has imposed downstream costs on Plaintiffs. But even with a finding of monetary harm, the Supreme Court held that the states in *Texas* lacked standing because their asserted injury—which, again, stemmed from enforcement decisions—was not "traditionally redressable in federal court." *Id.*; *see id.* at 681 ("The States' novel standing argument, if accepted, would entail expansive judicial direction of the Department's arrest policies."). This holding is not an outlier. In *Arizona v. Biden*, the Sixth Circuit was deeply skeptical of a challenge by a group of States to a policy that did "not impose any direct costs on the States or threaten the loss of any federal funding." 40 F.4th 375, 386 (6th Cir. 2022); *accord Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1174-76 (9th Cir. 2024). And, although not a state standing case, in *Food & Drug Administration v. Alliance for*

*Hippocratic Medicine*, the Supreme Court rejected the proposition that an organization would have standing to challenge federal policies "provided they spend a single dollar opposing those policies." 602 U.S. 367, 395 (2024). Just as "[t]eachers in border states" may not "sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms," neither may Plaintiffs sue the federal government whenever they allege that aggressive federal immigration enforcement policies, even indirectly, cause downstream impacts on state or city resources. *See id.* at 391-92.

Following from the above cases, the Court should conclude that Plaintiffs' financial injury—allegedly caused by a purported enforcement policy aimed at third parties, *see* Compl. ¶¶ 94, 330—is insufficient. Because "[m]ost regulations have costs," *Arizona*, 40 F.4th at 386, Plaintiffs' proposed standing rule would "make a mockery of the constitutional requirement of case or controversy," *id.* (citation modified), with the "only limit" being the "willingness to sue," *Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 210 (4th Cir. 2025). Additionally, Plaintiffs' rule would, in this context, allow for a state or locality to conscript a federal court to review the ins and outs of federal enforcement efforts. History and precedent confirm that such a result would transgress limits on Article III authority. *See Texas*, 599 U.S. at 678-80; *see also Chicago Headline Club*, 2026 WL 622677, at *5.

Plaintiffs' other alleged harms—an increased distrust between law enforcement and communities and an interference with enforcement priorities, *see* Compl. ¶ 94—do not fare any better. Article III requires that a plaintiff's injury in fact be "concrete," or, in other words, "real, and not abstract." *TransUnion LLC*, 594 U.S. at 424 (citation omitted). This requirement is "essential to the Constitution's separation of powers." *Id.* at 429. To determine whether an intangible harm is sufficiently concrete, courts consider whether the injury has a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American

8

courts," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425; *see Wis. Voter All. v. Millis*, 166 F.4th 627, 632 (7th Cir. 2026) ("Intangible harms can also be concrete if they have a 'historical or common-law analog' that is 'tortious.'" (citation omitted)). "The relationship between a[n] [intangible harm] and a common-law counterpart need not be exact: the resemblance must exist only 'in kind, not degree.'" *Patterson v. Howe*, 96 F.4th 992, 996 (7th Cir. 2024) (citation omitted). Courts also consider whether Congress "elevate[d] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *TransUnion LLC*, 594 U.S. at 425 (citation omitted).

The intangible injuries Plaintiffs allege are "insufficiently concrete under the applicable caselaw to satisfy the first element of standing." *Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 638 (7th Cir. 2023). This is because an increased distrust in law enforcement and a resulting shuffling of law enforcement priorities are not "closely related to an injury that our legal tradition recognizes as providing a basis for a lawsuit." *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 939 (7th Cir. 2022). Even though Plaintiffs do not have to plead the "precise" common law analog, Plaintiffs are obliged to plead allegations that line up with a "theory of injury" that common law courts considered redressable. *Pucillo*, 66 F.4th at 640. Because no such allegations appear in the Complaint regarding Counts III and IV, adjudicating these claims would take the Court beyond its "constitutionally limited role of adjudicating actual and concrete disputes." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013). Dismissal is therefore required.

Finally, to the extent that Plaintiffs attempt to rely on alleged harms to their residents, that *parens patriae* theory fails for the reasons above. *See supra* at 5.

IV.  **Plaintiffs fail to plausibly allege standing to challenge the Biometric Scanning Policy.**

In Counts V and VI, Plaintiffs challenge the alleged Biometric Scanning Policy.  Compl. ¶¶ 360-76.  Plaintiffs claim that the Policy violates residents' rights under state and local law, violates state law, and "interferes with Plaintiffs' ability to administer public program."  *Id.* ¶ 124. Plaintiffs' allegations do not meet Article III's "concreteness and imminence requirements." *Dinerstein*, 73 F.4th at 511.

First, as has been explained, Plaintiffs lack standing to assert their residents' rights in a suit against the federal government.  *See supra* at 4-9.

Second, the provisions of state law that Plaintiffs cite likely do not apply to federal law enforcement operations.  *See Trump v. Vance*, 591 U.S. 786, 801 (2020) (explaining that States "lack the power to impede the President's execution of" "constitutional laws enacted by Congress" (citation omitted)).  In any case, a violation of state or local law "does not by itself injure the government in an Article III way."  *Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 956 (6th Cir. 2020); *see* Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 393 (1995) (explaining that, as an historical matter, states could not "seek to enforce their own legislation" in an Article III court).  Instead, a state or locality must show "some tangible interference with its authority to regulate or to enforce its laws."  *Saginaw Cnty.*, 946 F.3d at 957. Or, in other words, a state or locality must be "hindered from enforcing its laws."  *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 770 (5th Cir. 2023).  This may occur, for example, in the light of "federal assertions of authority to regulate matters they believe they control."  *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

In the Complaint, Plaintiffs do not allege with plausibility any such hindrance.  Instead, Plaintiffs allege that Defendants are violating state law during immigration enforcement efforts—

10

which is not sufficient for Article III standing purposes—and interfering with the administration of public programs—which, on its own, does not provide enough facts to conclude that an imminent injury to Plaintiffs' sovereign interests is plausible. *Cf. Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 270 (4th Cir. 2011) ("[T]he VHCFA reflects no exercise of 'sovereign power,' for Virginia lacks the sovereign authority to nullify federal law."). Accordingly, the Court should dismiss Counts V and VI.

**V. Plaintiffs lack standing to challenge the Warrantless Arrest Policy.**

Plaintiffs allege that the Warrantless Arrest Policy has injured their residents, led to a diversion of time and resources for Chicago's Office of Immigrant, Migrant, and Refugee Rights (IMRR), and impacted Plaintiffs' "ability to protect and to obtain cooperation from its crime victims and witnesses particularly in immigrant communities." Compl. ¶¶ 151-59. Like above, Plaintiffs' attempt to litigate its residents' claims is barred by precedent. And the other alleged injuries are equally meritless. The Supreme Court recently rejected the argument that standing exists when a plaintiff "diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. Instead, the governmental action at issue must "directly affect[] and interfere[]" with the organization's "core" activities. *Id.* Plaintiffs have not alleged that Defendants "directly" interfered with IMRR's initiatives. Instead, they allege only an indirect interference by way of IMRR's decisions in response to the alleged Warrantless Arrest Policy. *See* Compl. ¶ 157. This is not good enough. *Cf. Wis. Voter All.*, 166 F.4th at 637 ("Organizations must point to more evidence of concrete disruptions to mission-critical business operations."). Otherwise, any state or city would have standing to sue over any state or federal policy so long as it divert a single hour, or a single dollar, to an act in opposition. The Supreme Court rejected that boundless theory of standing in *Alliance for Hippocratic Medicine*, 602 U.S. at 395. Finally,

11

Plaintiffs allege an abstract injury to their "ability to protect and to obtain cooperation from its crime victims and witnesses particularly in immigrant communities." Compl. ¶ 158. But like the intangible harms alleged above, these alleged injuries are "insufficiently concrete under the applicable caselaw to satisfy the first element of standing." *Pucillo*, 66 F.4th at 638.

Beyond all of this, Plaintiffs fail to plausibly allege the imminence necessary for forward-looking relief. *See Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018). The alleged unlawful arrests pre-date the Complaint by months and IMRR's diversion of time and resources is backward-looking. Compl. ¶¶ 137-57. On these allegations, it is not plausible that Plaintiffs are facing imminent harm given the wind down of OMB. *Dinerstein*, 73 F.4th at 511. Accordingly, the Court should dismiss Counts VII and VIII.

## VI. Plaintiffs lack standing to sue concerning the Tear Gas Policy.

Plaintiffs claim that the alleged Tear Gas Policy injured their residents, their employees, their fisc, and their relationship with immigrant communities. Compl. ¶¶ 203-06. The first harm is yet another unsuccessful stab at *parens patriae* standing. The fourth alleged harm is entirely abstract and possesses no tie to any "injury that our legal tradition recognizes as providing a basis for a lawsuit." *Pierre*, 29 F.4th at 939. And even if the Court concludes that there is a sufficient causal chain between the alleged Tear Gas Policy and Plaintiffs' past expenditures, such downstream costs attributable to immigration enforcement actions are not cognizable Article III injuries under *United States v. Texas*, 599 U.S. at 680 & n.3. Further, there is no allegation that Plaintiffs face "a real and immediate threat of repeated injury" attributable to the alleged Tear Gas Policy. *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). Indeed, all of Plaintiffs' alleged incidents are from over a month before Plaintiffs filed the Complaint, with most occurring in October 2025. Compl. ¶¶ 177-201. Even though past injuries are relevant for "their predictive value," the

backward-looking injuries alleged do not provide reason to conclude that Plaintiffs are currently, or imminently, facing any similar injury. *Murthy v. Missouri*, 603 U.S. 43, 59 (2024); *see Chicago Headline Club,* 2026 WL 622677. Accordingly, the Court should dismiss Counts IX and X.

**VII.    Plaintiffs lack standing to challenge the recission of the Sensitive Locations Policy.**

Plaintiffs challenge DHS's decision to rescind and replace an internal sensitive locations policy governing where, when, and under what circumstances federal officers can enforce federal immigration law. *See* Compl. ¶¶ 214-17. On January 20, 2025, DHS issued new, superseding internal guidance (the Huffman Memorandum) advising immigration officers to exercise their "common sense" and "discretion" when conducting enforcement operations near sensitive locations, such as places of worship. *See* Mem. from Benjamine C. Huffman, Acting Sec'y, ICE, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) ("Huffman Memo"), attached hereto as Ex. 1 at 1. Plaintiffs claim that this decision impedes "Illinois' effort to administer justice," violates Illinois law, interferes with Plaintiffs' ability to run their education system, harms their residents, and leads to a reluctance to access public health facilities, which increases public costs. *Id.* ¶¶ 245-63.

For several reasons, Plaintiffs fail to plausibly allege standing.

First, like in *Texas*, Plaintiffs here "point[] to no case or historical practice" supporting the proposition that federal courts have the authority to oversee the "Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute." 599 U.S. at 677. Although this case is the mirror image of *Texas*—here, Plaintiffs seek an order directing the Executive Branch to make fewer arrests, there, the states sought an order directing the Executive Branch to make more—the offense to Article II is the exact same. *See id.* at 679 ("The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States."). Accordingly, even if the Court concludes that Plaintiffs have plausibly alleged that Defendants' arrest policy has

13

caused financial harm,[1] the Supreme Court's holding in *Texas*—that the states lacked standing to challenge federal enforcement policy—applies equally here and requires dismissal for a lack of jurisdiction.

Second, even assuming *Texas* does not apply, Plaintiffs fail to plausibly allege injury to their sovereign interests. Plaintiffs rely on cases holding that a state has standing to sue the federal government when it believes that "the federal government has intruded upon areas traditionally within [the state's] control." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022). Courts have found standing on this basis in certain contexts. *See id.* at 599 (federal vaccine mandate); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 584, 593 (6th Cir. 2024) (federal policy stating that the federal government will "enforce Title IX to prohibit sexual orientation and gender identity discrimination in education programs and activities receiving federal financial assistance"). Even assuming those cases were right to find state standing, Plaintiffs plead no analogous intrusion here. Plaintiffs do not plead that Defendants have asserted authority to regulate an area within the domain of the state or local judiciary, nor do Plaintiffs allege that Defendants have attempted to regulate an issue within the ambit of the state's power to direct and control its education system. Instead, Plaintiffs merely allege that Defendants' efforts to enforce federal law have indirectly affected Plaintiffs' ability to manage and control their judicial and education systems. *See* Compl. ¶¶ 250-51. Accordingly, even if a viable theory of state standing, Plaintiffs have not "plausibly

---

[1] At least some of Plaintiffs' allegations are far too attenuated. For example, Plaintiffs allege that the enforcement policy has led to a "steep decline" in the use of public health services, which could result in an increased use of ambulance services. *See* Compl. ¶¶ 259-60. In turn, because "Chicago usually does not receive full reimbursement for ambulance services from its uninsured and underinsured residents," Plaintiffs allege that this could lead to financial losses. *Id.* ¶ 260. This chain of speculation is insufficient for standing purposes. *See Clapper*, 568 U.S. at 414 n.5.

alleged that the federal government has intruded upon an area traditionally left to the states." *Kentucky*, 23 F.4th at 599; *see All. for Hippocratic Med.*, 602 U.S. at 392.

Third, to the extent that Plaintiffs' attempt to rely on alleged injuries to individual residents—such as any resulting harms from residents' refusal to access health clinics—this again is barred by precedent. *See supra* at 4-9. And fourth, like the other claims, Plaintiffs rely on incidents that occurred months before the filing of the Complaint. *See* Compl. ¶¶ 220-42. Without more, Plaintiffs have not met Article III's requirement of an imminent injury caused by the challenged policy. *See Chicago Headline Club* Stay Order.

In addition to the lack of a cognizable injury-in-fact in Count VII, Plaintiffs also have not carried their burden as to traceability and redressability. This is for two reasons. *First*, Plaintiffs' alleged injury turns on the actions of third parties, which makes both traceability and redressability more difficult to establish. *See California v. Texas*, 593 U.S. 659, 675 (2021); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Second, because the previous policy did not *prohibit* enforcement actions in or near sensitive locations, *see generally* Ex. 1, the challenged enforcement actions cannot be meaningfully connected to the rescission decisions, *see Dep't of Educ. v. Brown*, 600 U.S. 551, 568 (2023) (finding no traceability when plaintiffs failed to "meaningfully connect" their injury with the challenged action), and any remedy nullifying DHS's revocation decision would not affect federal agents' ability to initiate enforcement actions in or near sensitive locations, *cf. Texas*, 599 U.S. at 691-92 (Gorsuch, J., concurring in the judgment). Third and finally, as other courts have found, the enforcement actions allegedly taking place in or near sensitive locations could just as plausibly have arisen from the administration's broader immigration agenda rather than the Huffman Memo's minor changes. *See, e.g.*, *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 10-12 (D.D.C. 2025). For these reasons, Plaintiffs fail to

15

plausibly allege all three elements of the standing test, and the Court should therefore dismiss Counts XI and XII.

**VIII.    Plaintiffs lack standing to sue over the Alleged Concealed Plates Policy.**

Plaintiffs allege the Defendants' alleged Concealed Plates Policy "impedes Illinois from enforcing violations of state law that involve vehicles, including hit-and-run incidents, theft, abductions, and carjackings" and "prevents state and local law enforcement agencies from tracking and recording violations of state traffic laws, locating stolen vehicles, and identifying vehicles involved in criminal activities." Compl. ¶ 287. Like above, the cited state laws likely do not apply to the federal agents engaged in the enforcement of federal law. *See supra* at 10-11; *United States v. Washington*, 596 U.S. 832, 838 (2022) (explaining that the Constitution prohibits "States from interfering with or controlling the operations of the Federal Government").

Regardless, Plaintiffs' alleged injuries are abstract and conjectural, and accordingly, even if true, insufficient to vest Plaintiffs with standing to seek forward-looking relief. As for the former, Plaintiffs do not plead any facts that, if true, support the conclusion that the Policy is tangibly interfering with their authority to enforce their laws. *Saginaw Cnty.*, 946 F.3d at 957. Instead, the only pleaded facts concern the alleged violation of state and local law during federal immigration efforts, Compl. ¶¶ 270-82, which is insufficient for standing purposes. *See Saginaw Cnty.*, 946 F.3d at 957; *cf. Virginia*, 656 F.3d at 270. Also, Plaintiffs do not plead any facts supporting the claim that any of these alleged harms are "certainly impending" due to the alleged Policy. *Friends of the Earth, Inc. v. Laidlaw Envt Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). Standing is therefore lacking, and this Court should dismiss Counts XIII and XIV.

16

### IX. Plaintiffs lack standing with respect to the Trespass Policy.

Plaintiffs allege in Counts XV-XVII that Defendants have trespassed on both private property and city property. Compl. ¶¶ 292-307. In the process, Plaintiffs claim that Defendants have "injured Illinois's ability to protect property within its borders." *Id.* ¶ 308. These allegations are insufficient. First, Plaintiffs lack standing to raise the injuries of private parties in a suit against the federal government. *See supra* at 4-9. And Plaintiffs cannot end-run this limitation by claiming an injury to their ability to protect private property. Indeed, the Supreme Court has refused to countenance States' "thinly veiled attempt[s] to circumvent the limits on *parens patriae* standing," *Brackeen*, 599 U.S. at 295 n.11, by asserting derivative injuries from the alleged violations of individuals' rights. For example, in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), South Carolina lacked standing to claim that a federal statute violated its citizens' due-process rights because a State has no due process rights of its own and also could not invoke its citizens' rights "against the Federal Government." *Id.* at 323-24. Similarly, in *Brackeen*, 599 U.S. 255, Texas lacked standing to claim that a federal statute violated its citizens' equal-protection rights because Texas "ha[d] no equal protection rights of its own" and could not "assert third-party standing" to bring such a suit. *Id.* at 294-95, 295 n.11. And in *Murthy v. Missouri*, 603 U.S. 43 (2024), Missouri lacked standing to claim that the federal government had violated the Free Speech Clause by censoring the speech of its citizens whose views Missouri was allegedly prevented from hearing. *Id.* at 76. These precedents control here.

Plaintiffs' allegation turns into another way to predicate standing on the mere violation of state or local law. But the federal government is not subject to such laws, *see supra* at 10, and even if it was, such a violation is not enough for standing purposes, *see Saginaw Cnty.*, 946 F.3d at 956 ("That someone violates a law . . . does not by itself injure the government in an Article III

17

way."). And even if Chicago has standing to sue to vindicate its own property rights, *see, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 522 (2007), Plaintiffs do not allege any facts that, if true, demonstrate that any future trespass is a certainty rather than a mere possibility, *see Clapper*, 568 U.S. at 409. Accordingly, Plaintiffs lack standing to seek the requisite forward-looking relief and the Court should dismiss Counts XV, XVI, and XVII.

## X. Plaintiffs lack standing to pursue their ultra vires claim and their request for a declaratory judgment.

In Counts XVIII, Plaintiffs claim that the alleged policies they challenge are ultra vires of agency authority. Compl. ¶¶ 454-59. And in Count XIX, Plaintiffs seek a declaratory judgment that these policies are unlawful. *Id.* ¶¶ 460-64. Because Plaintiffs lack standing to challenge each alleged policy, they also lack standing to pursue an *ultra vires* claim and a declaratory judgment essentially restating those same claims. The Court should therefore dismiss these counts.

\* \* \*

For the above reasons, the Court should dismiss Count II through XIX for a lack of jurisdiction.

## XI. Plaintiffs fail to state a Tenth Amendment claim.

The Tenth Amendment states a "truism"—all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X; *see United States v. Darby*, 312 U.S. 100, 124 (1941). For those powers delegated to the federal government—which includes the "power over the subject of immigration and the status of aliens," *Arizona v. United States*, 567 U.S. 387, 394 (2012)—the Tenth Amendment provides no source of limitation. *See Fernandez v. Wiener*, 326 U.S. 340, 362 (1945) ("The Tenth Amendment does not operate as a limitation upon the powers, express or implied, delegated to the national government."). Instead, the Tenth Amendment—and the

doctrines that emanate from it—serves to ensure that the federal government exercises only its delegated powers.

As relevant here, one power the Constitution does not delegate to the federal government "is the power to issue direct orders to the governments of the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018). This principle is known as the "anticommandeering doctrine." *Id.* Relatedly, the Supreme Court has held that Congress cannot use its power of the purse to coerce the States to regulate in a certain way. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577, 585 (2012) (*NFIB*).

Plaintiffs allege that Defendants have infringed on Plaintiffs' police powers and engaged in coercion. Compl. ¶¶ 316-34. Another district court recently rejected an identical Tenth Amendment claim brought by the State of Minnesota. *See Minnesota ex rel. Ellison v. Noem*, --- F. Supp. 3d ---, 2026 WL 253619 (D. Minn. Jan. 31, 2026). This Court should dismiss Plaintiffs' claims for the same reasons.

## XII. Plaintiffs fail to plausibly allege any impermissible interference with state sovereignty.

Plaintiffs' first theory is that Defendants' immigration enforcement efforts in Chicago constitute an "[i]mpermissible interference" with state and local sovereignty. Compl. ¶ 324 (citation omitted). For example, Plaintiffs claim that Defendants' conduct "jeopardizes Illinois' ability to pursue core sovereign functions, such as administering its judicial system, educating its residents, and providing public benefits to those in need." *Id.* ¶ 329. Missing from these allegations, though, is any such infringement. To be sure, the Constitution leaves "police powers" to the States. *Ophthalmic Mut. Ins. Co. v. Musser*, 143 F.3d 1062, 1066 (7th Cir. 1998). But here, Plaintiffs have not alleged that Defendants have exercised any such powers. Plaintiffs do not allege that Defendants are enforcing local law, administering local courts, or running local schools.

19

Instead, Plaintiffs merely claim that Defendants' enforcement of *federal* immigration law in Illinois has made it more difficult for Plaintiffs to exercise their police powers and has caused financial harm in the process. *See* Compl. ¶¶ 325-29.

This is not a cognizable Tenth Amendment theory. The Constitution delegates to the federal government the power over immigration. *See Arizona*, 567 U.S. at 394 ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *City of Chicago v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020) ("The executive branch has significant powers over immigration matters."). And when acting pursuant to a delegated power, the federal government, as a definitional matter, cannot "[i]mpermissibl[y] interfere[] with state sovereignty." Compl. ¶ 324 (citation omitted). *See Fernandez*, 326 U.S. at 362; *cf. Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003) ("[W]hen Congress engages in a constitutional use of its delegated Article I powers, the Tenth Amendment does not reserve that power to the States."). If, as Plaintiffs believe, downstream effects of federal action justified a Tenth Amendment claim, *see* Compl. ¶¶ 330-32, then there would be no federal action to speak of. Such a result would run contrary to Supreme Court precedent. *See Trump*, 591 U.S. at 800 ("[T]he Constitution guarantees 'the entire independence of the General Government from any control by the respective States.'" (citation omitted)); *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819) ("[T]he states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the [federal] government."). The Court therefore should dismiss this portion of Count I.

## XIII. Plaintiffs fail to state an anticommandeering or coercion claim.

Although the Constitution vested the immigration power in the federal government, it "with[e]ld from [the federal government] the power to issue orders directly to the States." *Murphy*,

584 U.S. at 470. Plaintiffs allege that Defendants' efforts to enforce federal law are designed to coerce Illinois and Chicago to alter their immigration policies and thus exceed Defendants' constitutional authority. Compl. ¶¶ 324, 333-34; *see id.* ¶¶ 3, 12, 43. Plaintiffs fail to state a cognizable anticommandeering or coercion claim. This conclusion is apparent after comparing the alleged facts here with the facts in cases in which the Supreme Court has found a constitutional violation based on commandeering or coercion.

Start with the anticommandeering cases. In *New York v. United States*, the Supreme Court considered provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985. 505 U.S. 144, 152-54 (1992). One provision offered the States a choice: regulate in accord with Congress's wishes or "tak[e] title to and possession of the low level radioactive waste generated within their borders and becom[e] liable for all damages waste generators suffer as a result of the States' failure to do so promptly." *Id.* at 174-75. Both options, the Supreme Court concluded, were unconstitutionally coercive; either way, a State was required to "implement[] legislation enacted by Congress." *Id.* at 177. In *Printz v. United States*, the Supreme Court considered the constitutionality of a federal statute that imposed on state law enforcement officers the temporary obligation "to perform background checks on prospective handgun purchasers." 521 U.S. 898, 904, 933 (1997). The Supreme Court concluded that this legislation—which operated to "conscript[]" State officers to execute federal law—was "fundamentally incompatible with our constitutional system of dual sovereignty." *Id.* at 904-35; *see also id.* at 925 ("[Federal] laws conscripting state officers violate state sovereignty and are thus not in accord with the Constitution."). And in *Murphy*, the Supreme Court ruled that a provision of the Professional and Amateur Sports Protection Act—which prohibited a State from "authoriz[ing]" sports gambling—

21

ran afoul of the anticommandeering doctrine because it "dictate[d] what a state legislature may and may not do." 584 U.S. at 474.

The facts here are inapposite from the above precedents. *See Minnesota*, 2026 WL 253619, at *9 (agreeing, in a case like this one, that none of the anticommandeering cases "even come close"). Plaintiffs do not allege that Defendants have "require[d] [Plaintiffs] to enact any laws or regulations," or that Defendants have "require[d] [Plaintiffs] to assist in the enforcement of federal statutes regulating private individuals." *Reno v. Condon*, 528 U.S. 141, 151 (2000) (concluding that Driver's Privacy Protection Act of 1994 did not violate anticommandeering principle because it lacked these features). In other words, Plaintiffs do not allege that the federal government has "conscript[ed] a state [or local] government into federal service." *Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n*, 721 F.3d 764, 773 (7th Cir. 2013). Instead, Plaintiffs allege that they have decided not to "assist[] in enforcement of federal civil immigration law." Compl. ¶ 33. Even assuming Plaintiffs are free to make that decision, there is no colorable argument that the federal government violated the Tenth Amendment by assigning more enforcement resources to Illinois to address the resulting need. *See Fernandez*, 326 U.S. at 362. If it were otherwise, a state or locality would have constitutional license to create a law enforcement vacuum—by both refusing to enforce the law and by suing to stop federal enforcement. Or, to put it in the facts of a hypothetical, a state could both repeal its prohibition on marijuana usage and prevent, under the guise of the anticommandeering doctrine, the federal government from assigning additional agents to the state. We are unaware of any authority standing for the proposition that the Tenth Amendment requires such an absurd result, and no authority which authorizes a court to flyspeck the federal government's decision to assign more resources to that state. *See Texas*, 599 U.S. at 678 ("Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how

22

aggressively to pursue legal actions against defendants who violate the law.'" (quoting *TransUnion LLC*, 594 U.S. at 429)).

This remains true regardless of whether an increased law enforcement presence results in a state or locality's diversion of resources. *See* Compl. ¶¶ 330-33. "[F]ederal policies frequently generate indirect effects on state revenues or state spending." *Texas*, 599 U.S. at 674, 680 n.3. If those indirect effects provided the predicate for a Tenth Amendment claim, then the federal government would be effectively paralyzed. But in many cases, such downstream costs of federal action do not even give rise to an Article III "case or controversy," as is the case here, let alone a Tenth Amendment violation. Indeed, as discussed above, just three years ago, the Supreme Court rejected by an 8-1 vote the reverse of this lawsuit—a suit brought by two states to compel *more* immigration enforcement. *Id.* at 674, 679. And even though the states claimed that federal policy caused downstream financial harms, the Supreme Court concluded that the suit failed on standing grounds, in large part because of the Executive's substantial enforcement discretion. *See id.* at 674, 679-80; *see also Arizona*, 40 F.4th at 386 (rejecting the position that "all peripheral costs imposed on States by actions of the President create a cognizable Article III injury"). If these downstream costs of federal action are insufficient to create standing, they are certainly not sufficient to state a Tenth Amendment claim. *See Minnesota*, 2026 WL 253619, at *10-11 (agreeing that it is "unlikely").

Relatedly, Plaintiffs allege that Defendants have engaged in unconstitutional coercion. Plaintiffs claim that Defendants have increased enforcement efforts in Illinois and Chicago not to enforce federal immigration law, but to "coerce" Plaintiffs to comply with Defendants' immigration policy. *See, e.g.*, Compl. ¶ 333. This theory is equally implausible.

23

Plaintiffs cite *National Federation of Independent Business v. Sebelius*, where the Supreme Court held that Congress exceeded its power under the Spending Clause when it conditioned preexisting Medicaid funding on the state's agreement to implement the Affordable Care Act's expansion of Medicaid. 567 U.S. 519, 580 (2012) (*NFIB*); *see* Compl. ¶ 4. This was because the condition's size and disproportionality, in light of the history of the Medicaid program, constituted a "gun to the head" of the States and transgressed limits on Spending Clause legislation. *NFIB*, 567 U.S. at 581.

For three reasons, this case is nothing like *NFIB*.

*First*, *NFIB* addressed unique concerns regarding the expansion of Congress's power under the Spending Clause. *See* U.S. Const., Art. I, § 8, cl. 1 (granting Congress the power to collect taxes "to . . . provide for the . . . general Welfare of the United States"); *NFIB*, 567 U.S. at 578 (explaining danger of Congress using its spending "power to implement federal policy it could not impose directly under its enumerated powers"). Here, Plaintiffs challenge the enforcement of federal law. *See* Compl. ¶ 8. Because the Executive Branch can only execute a federal law based on an enumerated power, the risk to federalism presented by valid federal enforcement actions— the actions at issue in this case—is minimal compared to the risk posed by the Spending Clause.

*Second*, *NFIB* dealt with an explicit statutory condition. 567 U.S. at 581. But here, Plaintiffs seek to deploy *NFIB*'s coercion holding in a fundamentally different way—not to challenge a clear condition, but instead, based on an *inference* of an improper subjective purpose, to challenge an objectively legitimate law-enforcement operation. To evaluate such a claim, a federal court would have to interrogate the subjective grounds for facially valid actions. Such a probe would run afoul of longstanding principles of judicial review. *See Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (explaining that "judicial inquiry into 'executive motivation'

24

represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided" (citation omitted)); *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (finding no basis "to probe the sincerity of the stated justifications for the policy by reference to extrinsic statements"); *cf. Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("Proving the motivation behind official action is often a problematic undertaking."); *Minnesota*, 2026 WL 253619, at *9 n.18 (recognizing that conducting such an inquiry would be to "venture into a uniquely controversial political question").

*Third*, *NFIB* employed a straightforward remedy—severance of the unconstitutional provision—to alleviate the coercion. *See* 567 U.S. at 585. But here, Plaintiffs seek a declaration that Defendants' enforcement efforts are in violation of the Tenth Amendment. *See* Compl. (Prayer for Relief). Given the long presumption "that officials of the Executive Branch will adhere to the law as declared by the court," *Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008), and the potential "preclusive effect" a declaratory judgment would have, *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023), Plaintiffs' requested relief would clearly violate the Take Care and Supremacy Clauses, *see Texas*, 599 U.S. at 679 ("The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States."). In the future, would Defendants have to move for relief from the declaratory judgment each time they wish to send officers into Chicago? Would the Court then have to adjudicate whether a proper purpose was behind the deployment of each officer? This is not the job of an Article III court. *See TransUnion LLC*, 594 U.S. at 423–24 ("Federal courts do not exercise general legal oversight of the Legislative and Executive Branches."); *cf. Chicago Headline Club*, 2026 WL 622677, at *5 (vacating an injunction that "effectively established the district court as the supervisor of all Executive Branch activity in the city of Chicago").

To Defendants' knowledge, no court has ever extended *NFIB*'s reasoning beyond the Spending Clause context. For the reasons above, this Court should not be the first. Plaintiffs' theory is that a court can take any facially legitimate exercise of any federal power, probe behind it to discern an illegitimate subjective purpose to "coerce" States to follow federal preferences, and then declare that such federal action is unconstitutional. This is not "equal sovereignty"—it is an extraordinary rewriting of foundational federalism principles through which any and all States could supplant federal priorities with their own. The Court should soundly reject this theory. *See Minnesota*, 2026 WL 253619, at *11 (concluding that the plaintiffs failed to show a "sufficient likelihood of success on the merits" on the same Tenth Amendment theory).

Even assuming the *NFIB* Spending Clause framework could be extended to challenges to federal enforcement operations, the Court should still dismiss the claim. The Affordable Care Act left States with no real choice because (i) Medicaid funding "constitut[ed] over 10 percent of most States' total revenue"; (ii) States had "developed intricate statutory and administrative regimes over the course of many decades to implement their objectives under existing Medicaid"; and (iii) the new condition was disproportionate because it provided that "[i]f a State d[id] not comply with the Act's new coverage requirements, it may lose not only the federal funding for those requirements, but all of its federal Medicaid funds." 567 U.S. at 541, 542, & 582. It was the combination of those three unique factors that gave *NFIB* its bite, and courts across the country have refused to extend *NFIB* beyond those parameters. *See, e.g.*, *New York v. Dep't of Just.*, 951 F.3d 84, 114-16 (2d Cir. 2020); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 (9th Cir. 2019).

Here, none of this is true. Perhaps most obviously, Plaintiffs have not alleged that they have changed their policies. Also, although Plaintiffs claim "financial harm," *see* Compl. ¶ 330, they do not attempt to quantify an impact on their budgets, let alone suggest that the figure is

26

comparable to what was at issue in *NFIB*. And Plaintiffs have not plausibly alleged that Defendants' enforcement efforts are disproportionate to the need created by their policies—an inquiry that again implicates the Executive Branch's conclusive and preclusive discretion over how, when, and where to enforce federal law. *NFIB* is the only case in which the Supreme Court has "deemed a condition unconstitutionally coercive in violation of the Tenth Amendment." *New York v. Yellen*, 15 F.4th 569, 582 (2d Cir. 2021). This case is no candidate to be the second.

*   *   *

Plaintiffs' view of the Tenth Amendment is not, and has never been, the law. The Court should therefore dismiss Count I.

### XIV. Count II Should Be Dismissed Because CBP Is Authorized to Enforce Federal Immigration Law Nationwide.

In Count II, Plaintiffs challenge the use of CBP officers and agents to enforce immigration law in Plaintiffs' jurisdictions. Compl. ¶¶ 335-44. Count II fails because CBP officers and agents have broad authority to conduct immigration enforcement operations nationwide. CBP has statutory authority to "enforce and administer all immigration laws," which includes "all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, expulsion, or removal of aliens." 6 U.S.C. § 211; *see* 8 U.S.C. § 1101(a). Further, federal regulations authorize "CBP officers" and "Border patrol agents" to enforce a wide variety of INA provisions. *See* 8 C.F.R. § 287.5 (exercise of powers by immigration officers). For example, 8 U.S.C. § 1357(a)(1) & (2) authorizes CBP officers and agents to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and conduct warrantless arrests when the officer has "reason to believe" the alien is in the United States unlawfully and is likely to escape before a warrant can be obtained. *See* 8 C.F.R. § 287.5(a)(1), (c). CBP officers and agents also may "take and consider evidence concerning the privilege of

27

any person to enter, reenter, pass through, or reside in the United State." 8 U.S.C. § 1357(b); *see* 8 C.F.R. § 287.5(a). Additionally, CBP officers and agents may "execute warrants of arrest for administrative immigration violations" under 8 U.S.C. § 1226 and "execute warrants of criminal arrest issued under the authority of the United States." 8 C.F.R. § 287.5(e)(3); *see* 8 U.S.C. § 1226(a) (stating that upon issuance of an administrative warrant, "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States").

Contrary to Plaintiffs' assertion, Border Patrol agents are not limited to operating only within 100 miles from the U.S. border. *See* Comp. ¶¶ 251-58. Section 1357(a)(3) provides that "[a]ny officer . . . shall have power without warrant . . . within a reasonable distance from any external boundary of the United States . . . to board and search for aliens . . . [in] any railway car, aircraft, conveyance, or vehicle . . . for the purpose of patrolling the border to prevent the illegal entry of aliens into the United." Federal regulations define a "reasonable distance" to be within 100 miles of land and coastal borders. *See also* 8 C.F.R. § 287.1. Plaintiffs incorrectly argue that this authority limits any and all CBP activity outside of 100 miles from the border. It does not. The plain text of § 1357(a)(3), as well as the implementing regulation, makes clear that CBP's authority is constrained only to a very limited extent: agents and officers generally cannot "board and search" buses or trains or cars without a warrant outside the 100-mile zone. The Complaint makes no plausible allegation that CBP officers violated that limitation in Illinois and Chicago. In any event, this provision does not override any of the authorities discussed above that provide CBP officers and agents with broad power to enforce the Nation's immigration laws without any geographic limitation. This Court should therefore dismiss Count II.

28

**XV.    Plaintiffs' APA claims are not justiciable.**

On top of their constitutional claims, Plaintiffs assert numerous claims under the APA, none of which is justiciable.

### A.    The Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, and Seventeenth Claims for Relief fail to plausibly allege a discrete agency action.

The APA does not allow a court to "exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (cleaned up). The APA instead permits review of only agency actions "made reviewable by statute" or that are "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Identifying a reviewable action is thus "necessary . . . for stating a claim under the APA." *Corner Post, Inc v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 808 (2024) (citation omitted).

For an "agency action" to be reviewable under the APA, it must be one of the "circumscribed, discrete" actions identified in the statutory definition of that term, *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004)—*i.e.*, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). A plaintiff seeking judicial review under the APA must therefore challenge a "specific" agency action falling within one of these discrete categories, rather than attempt to challenge an "abstract" policy or decision divorced from a concrete action, *Biden v. Texas*, 597 U.S. 785, 809 (2022), or challenge "at a high[] level of generality" an agency "operation" or "program," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990); *accord SUWA*, 542 U.S. at 64 (the APA's discrete-action "limitation . . . precludes . . . broad programmatic attack[s]"); *Sierra Club v. U.S. Army*

29

*Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006) ("A broad agency program is not a final agency action within the meaning of 5 U.S.C. § 704."). In that way, the APA constrains courts to their constitutionally limited role, permitting them to review discrete, concrete acts but precluding them from reviewing "sweeping actions" that seek "systemic" or "programmatic improvements" of agency operations or "wholesale correction" of agency conduct, which would impermissibly enmesh courts into pervasive oversight of an agency's "day-to-day operations," *see Lujan*, 497 U.S. at 891, 893, 894, 899, and require them to "adjudicate generalized grievances" with "an agency's performance," *City of New York v. DOD*, 913 F.3d 423, 431 (4th Cir. 2019); *see also id.* ("Courts are well-suited to reviewing specific agency decisions," like "rulemakings, orders or denials. They "are woefully ill-suited, however, to adjudicate generalized grievances" that ask "to improve an agency's performance or operations."). The APA's discrete-action requirement keeps courts "from entering such a quagmire." *Id.*

Plaintiffs claim that Defendants are operating in Illinois under certain "policies" that violate the APA. Specifically, Counts III and IV allege that Defendants are operating under a "policy" of "indiscriminately interrogating" Illinois residents regarding their immigration status. *See* Compl ¶¶ 351, 355. Counts V and VI allege that Defendants are operating under a "policy" of scanning "biometric information" (*e.g.*, facial photographs, fingerprint scans) of Illinois residents without restrictions. *Id.* ¶¶ 365–66, 373. Counts VII and VIII allege that Defendants are operating under a "policy" to make "arrests without a warrant, without probable cause," and "through field warrants without an accompanying charging document." *Id.* ¶¶ 381, 386. Counts IX and X allege that |Defendants are operating under a "policy" to disperse tear gas "without warning and in the absence of active resistance." *Id.* ¶¶ 396, 401. Counts XIII and XIV allege that Defendants are operating under a "policy" to remove, obscure, or change license plates on DHS

vehicles. *Id.* ¶¶ 424–25, 429. And Counts XV, XVI, and XVII allege that Defendants are operating under a "policy" to enter private property without a warrant or consent. *Id.* ¶¶ 437–38, 442, 450.

But Plaintiffs' complaint contains no "*factual* matter" that suggests that these imagined "policies" even exist, much less that they are embodied in discrete agency actions of the type listed in § 551(13) and capable of judicial review. *See Twombly*, 550 U.S. at 556 (emphasis added); *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020) ("naked assertions devoid of further factual enhancement" cannot suffice to plead a plausible claim for relief (cleaned up) (quoting *Iqbal*, 556 U.S. at 678)). Indeed, Plaintiffs point to no document, order, regulation, statement, or any other concrete expression indicating that these purported policies exist.[2] Instead, Plaintiffs simply speculate, through vague and conclusory assertions, that they do. *See Taha*, 947 F.3d at 469 (a court should "reject sheer speculation, bald assertions, and unsupported conclusory statements" "when considering the viability of a claim" under Rule 12(b)(6)). But Plaintiffs "nebulous assertion of the existence of a 'policy,'" supported by "no facts," cannot plausibly establish that the policy actually exists. *Rodriguez v. U.S. Dep't of the Air Force*, 387 F. Supp. 3d

---

[2] While the State cites a "February 2025 DHS Privacy Threshold Analysis" for the Mobile Fortify Mobile App in support of its claim regarding an alleged policy of unrestricted scanning of Illinois residents' biometric information, that document does not suggest that such a policy exists, much less that it is reflected in a discrete agency action. As a Privacy Threshold Analysis, that document provided only "a general description of" the Mobile Fortify app, the personally identifiable information the app would collect "and from whom," and how DHS would use "that information," all for the sole purpose of assessing "whether there is a need for additional Privacy Compliance Documentation." *See* Ex. 2, DHS, *Privacy Threshold Analysis* at 1 (Feb. 2025). Given its limited purpose, the document did not purport to create, implement, summarize, or fully reflect DHS policy regarding the collection and use of biometric information during immigration enforcement operations, including existing restrictions on that collection and use. Therefore, even with this document, plaintiffs' allegations regarding a policy of unrestricted scanning of Illinois residents' biometric information rests on sheer speculation. And in any event, the State's allegations come nowhere close to plausibly identifying a discrete, reviewable agency action that reflects this imagined policy, as a Privacy Threshold Analysis is neither a "rule, order, license, sanction, relief, or the equivalent or denial thereof," *see* 5 U.S.C. § 551(13); *id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"); *see also Biden*, 597 U.S. at 809 (considering it an "error" to "review[] an abstract decision apart from specific agency action, as defined in the APA"), much less bears any of the markers of finality—*i.e.*, the consummation of a decisionmaking process with legal consequences for the State, *see infra* 28-34.

130, 135 (D.D.C. 2019) (citation omitted); *accord, e.g.*, *L.A. Press Club v. Noem*, --- F. Supp. 3d ----, 2026 WL 103972, at *9 (C.D. Cal. Jan. 8, 2026) ("conclusory" allegations cannot "plausibly establish the existence of . . . a policy"); *Daines v. IRS*, 2025 WL 2694788, at *4 (E.D. Wisc. Sept. 22, 2025) ("speculation and conjecture" cannot "plausibly alleg[e] the existence of" a policy, much less "the existence of a rule," "under the APA"). Nor can the State "nakedly assert" that defendants have adopted a "policy … to go on a fishing expedition for evidence to support" their speculations. *See People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 60 F. Supp. 3d 14, 20 (D.D.C. 2014); *accord Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d. 320, 328 (D.D.C. 2018) ("Plaintiff cannot use the APA to justify a fishing expedition for evidence that defendants" have a "policy that plaintiff believes exists."); *Scruggs v. McAleenan*, 2019 WL 4034622, at *1 (N.D. Ill. Aug. 27, 2019) ("Plaintiffs don't get access to discovery without first stating a viable [APA] claim," for which "final agency action is a necessary component."); *Nw. Ctr. for Alternatives to Pesticides v. DHS*, 552 F. Supp. 3d 1078, 1087 (D. Or. 2021) (rejecting APA challenge to DHS's surge of officers to Portland, Oregon that allegedly was "to quell protests using large volumes of chemical and other munitions")

Moreover, Plaintiffs' reliance on allegations regarding the purported conduct of some DHS agents is misplaced. The conduct of agency officers or employees is not itself discrete agency action. *See* 5 U.S.C. § 551(13) ("rule," "order," "license," etc.); *see also Lujan*, 497 U.S. at 899 (the APA does not permit review of an agency's "day-to-day operations"); *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (the APA does not permit review of "agency behavior" (citation omitted)); *Vigil v. FEMA*, 2024 WL 2404487, at *39 (D.N.M. May 23, 2024) (explaining that "an agency's daily operations" and "the day-to-day activities of agency employees" are not reviewable agency actions under the APA (cleaned up)); *L.A. Press Club*, 2026 WL 103972, at *8

32

("A 'pattern and practice' is" not sufficiently "discrete" to be "reviewable final agency action." (citation omitted)). Nor can one reasonably infer from Plaintiffs' allegations regarding disparate incidents involving DHS agents that any of Plaintiffs' imagined policies exist, much less that they are reflected in discrete, reviewable actions. *See Bark*, 37 F. Supp. 3d at 50 (the APA "requires more" than merely "attach[ing] a 'policy' label to" and agency's "practices" to plead "final agency action"); *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1207 (S.D. Cal. 2019) ("A plaintiff may not simply attach a policy label to disparate agency practices or conduct."); *L.A. Press Club*, 2026 WL 103972, at *8 (refusing to infer a policy's existence based on allegations about a "pattern" of conduct).

Instead of challenging discrete action, Plaintiffs effectively bring a broad programmatic challenge to every aspect of DHS's law enforcement response to the problem of illegal immigration in Chicago. Such challenges are impermissible under the APA. The Supreme Court's decision in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 875 (1990) squarely forecloses Plaintiffs' request for judicial review of these alleged "policies" or "programs." In that case, the National Wildlife Federation brought a challenge to what it called the Bureau of Land Management's "land withdrawal review program." 497 U.S. at 875. That "program" consisted of thousands of various actions, such as public land status determinations, that BLM undertook pursuant to the directives of the Federal Land Policy and Management Act *Id.* at 877, 890. The Supreme Court held that the "so-called 'land withdrawal review program'" was "not an 'agency action' within the meaning of § 702" because it did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id.* at 890. What the plaintiffs alleged was a "program" that was "no more an identifiable 'agency action' . . . than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of

33

the Drug Enforcement Administration." *Id.* Plaintiffs' complaint suffers from the same flaw, as they attempt to aggregate hundreds of disparate interactions between federal law enforcement officers and the citizens of Illinois into a purported policy. The APA does not permit such a lawsuit. *See Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("[A]n on-going program or policy is not, in itself, a 'final agency action' under the APA," and a court's "jurisdiction does not extend to reviewing generalized complaints about agency behavior." (citation omitted)).

A unanimous Supreme Court reaffirmed this view in *SUWA*, in which the plaintiffs sought to compel the Secretary of Interior to take additional actions with respect to off-road vehicle use, arguing that the failure to take such action amounted to "agency action unlawfully withheld or unreasonably delayed" under Section 706 of the APA. 542 U.S. at 57 (citation omitted). In rejecting APA review in that case, the Court analyzed the definition of "agency action" in the APA and stressed that the five specific actions listed ("rule, order, license, sanction [and] relief") all "involve circumscribed, discrete agency actions," *id.* at 62 (citation omitted), and consequently, "agency action" does not include a broad challenge to the manner in which an agency implements its programs, *id.* at 63-64. Moreover, citing the Attorney General's Manual on the APA, the Court noted that the APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing how it shall act.'" *Id.* (emphasis omitted). Consequently, the Court concluded that challenges to "[g]eneral deficiencies in [agency] compliance . . . lack the specificity requisite for agency action." *Id.* at 66.

As in *Lujan* and *SUWA*, Plaintiffs here are not challenging a discrete "agency action" subject to review under the APA. Therefore, each of these claims should be dismissed pursuant to Rule 12(b)(6) for failing to plausibly allege a reviewable agency action. *Corner Post*, 603 U.S. at 808.

34

**B.      Counts XI and XII fail to plausibly allege final agency action.**

Counts XI and XII challenge two DHS memoranda that provide immigration agents with the current guidance regarding enforcement operations in certain sensitive locations like churches, schools, and courthouses. *See* Ex. 1; Mem. from Todd M. Lyons, Acting ICE Director, "Civil Immigration Enforcement Actions In or Near Courthouses" (May 27, 2025) ("Lyons Memo"), attached hereto as Ex. 3. While these memoranda are discrete agency actions, they are not *final* agency actions susceptible to APA review. *See New England Synod v. DHS*, 2026 WL 412329, at *27 (D. Mass. Feb. 13, 2026) (the Huffman Memo is not final agency action reviewable under the APA).[3]

An agency action is "final" under the APA if it (i) "mark[s] the consummation of the agency's decisionmaking process," and (ii) determines "rights or obligations" or creates "direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597-98 (2016) (citation omitted).   "The core question" is whether the result of an agency's decisionmaking process "will directly affect *the parties*." *Dhakal v. Sessions*, 895 F.3d 532, 540 (7th Cir. 2018) (citation omitted and emphasis added).  The Seventh Circuit has focused the second inquiry on the party seeking judicial review, asking whether the challenged action directly "inflicts an actual, concrete injury" on the plaintiff, *id.* (citation modified), for example, by imposing "obligations" on the plaintiff or by denying the plaintiff "relief," *Menominee Indian Tribe of Wis.*

---

[3]  In addition to *New England Synod*, two other district courts have addressed challenges to the Lyons and Huffman Memos, but those courts reached a different conclusion and found the memos reviewable under the APA.  *See Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP, 2025 WL 3724878, at *6-7 (N.D. Cal. Dec. 24, 2025); *Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 2026 WL 280089 (D. Md. Feb. 3, 2006).  As explained herein, the Court should follow the reasoning and analysis set forth *New England Synod*.

35

*v. EPA*, 947 F.3d 1065, 1070 (7th Cir. 2020) (quoting *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427).

By that measure, while the Huffman and Lyons Memos may satisfy finality's first prong, they cannot satisfy the second.

Both the Huffman and Lyons Memos are routine policy statements that explain "how the agency . . . will exercise its broad enforcement discretion" under existing statutory and regulatory rules—*i.e.*, the INA and its implementing regulations. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (citation omitted); *accord New England Synod*, 2026 WL 412329, at *27 (the Huffman Memo is a "general statement of policy" that "explains how the agency will exercise its broad enforcement discretion" (cleaned up)). Policy statements like these rarely constitute final agency action. *N.E. Synod*, 2026 WL 412329, at *27 (citing *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013)); *see also, e.g.*, *Arizona v. Biden*, 40 F.4th at 387–89 (policy statement that created guidelines for the exercise of agency discretion was not final agency action); *Huerta*, 785 F.3d at 715–718 (same). That is because policy statements, like the Huffman and Lyons Memos, impose no legally binding obligations or prohibitions on the general public or regulated parties. *See Huerta*, 785 F.3d at 716–17. Indeed, one of the defining characteristics of a policy statement (as opposed to, say, a legislative rule) is that they have no binding legal effect at all, and the agency thus retains the authority and discretion to change its position from that of an existing policy statement in any given case. *Id.* Moreover, the Huffman and Lyons Memos each expressly confirms that it "is not intended to, does not, and may not be relied upon to create any right or benefit," *see* Huffman Memo at 1—a "telltale sign[] . . . of a nonbinding policy statement, not of reviewable agency action." *Arizona*, 40 F.4th at 388.

36

Given all this, Plaintiffs cannot establish that the Huffman or Lyons Memos directly inflict a legal injury on or create any other legal consequences for the State—a necessary element of final agency action. *Dhakal*, 895 F.3d at 540. It neither imposes obligations on the Plaintiffs nor denies them any relief. *See id.* Nor does it put the Plaintiffs to a choice "between heavy compliance costs or feared [legal] liability." *Arizona*, 40 F.4th at 387. So "[w]hatever costs" the Huffman and Lyons Memos may allegedly create for the Plaintiffs "downstream arise only from officials who exercise the[] discretion" that the INA has delegated to them and that the Huffman and Lyons Memos have preserved. *Id.* at 388. Those alleged costs thus cannot be said to be the Huffman or Lyons Memo's "'direct or appreciable legal' consequences." *Id.* (citation omitted); *Hawkes*, 578 U.S. at 598 (any legal consequences must be "direct and appreciable" to satisfy finality's second prong (citation omitted)).

Moreover, it makes no difference for finality purposes that the Huffman Memo officially revoked an earlier 2021 policy memo governing immigration enforcement at sensitive locations (the Mayorkas Memo). *New England Synod*, 2026 WL 412329, at *27 (the Huffman Memo's revocation of the Mayorkas Memo did not make it final agency action). That memorandum, like the Huffman Memo, was a nonbinding policy statement that explained how the agency would "exercise its broad enforcement discretion." *See Huerta*, 785 F.3d at 716 (citation omitted). It offered no interpretations of the INA or any other relevant statute or regulation. *See New England Synod*, 2026 WL at 412329, at *27. It imposed no obligations or prohibitions on the general public or regulated parties, nor created any rights or benefits. *Huerta*, 785 F.3d at 716–17; *Arizona* 40 F.4th at 387–88. And it neither withdrew nor limited the agency's enforcement discretion, but simply provided guidance for lower-level officials who exercise that discretion. *See New England Synod*, 2026 WL 412329, at *27 (the Mayorkas Memo simply "provided guidance regarding

37

enforcement discretion"); *see also, e.g.*, *Arizona*, 40 F.4th at 387–89 (guidance document that did "not rule out any enforcement action against any noncitizen" but rather "preserve[d] officials' discretion" and allowed them "to make decisions 'depending on the facts'" was not finial agency action (citation omitted)); *Huerta*, 785 F.3d at 718 (same conclusion for similar reasons). Therefore, because the Mayorkas Memo created no "direct and appreciable legal consequences," *see Hawkes*, 578 U.S. at 598 (citation omitted), its revocation had no such consequences either. *See New England Synod*, 2026 WL 412329, at \*27 (the Mayorkas Memo's revocation had no "legal consequences").

Thus, the Eleventh and Twelfth Claims for Relief should thus be dismissed under Rule 12(b)(6) for failing to plausibly allege final agency action. *See Corner Post*, 603 U.S. at 808.

**C.      The Eleventh and Twelfth Claims for Relief challenge actions that are committed to agency discretion.**

The lack of final agency action aside, the Huffman and Lyons Memos also reflect wholly discretionary policy choices about how best to enforce federal immigration laws. Those decisions are committed to agency discretion by law, and thus unreviewable under the APA.

The APA bars judicial review of agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). A statute commits an action to an agency's discretion where it "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *accord ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) (An action is committed to agency discretion where it is impossible to devise from the statute "an adequate standard of review" for an agency action). Determining whether a meaningful standard for reviewing an agency's discretionary decision exists thus requires careful examination of the statutory "language" and "structure" that supplies the applicable legal standards for reviewing that decision and "the nature of the agency action" at

issue. *Singh v. Moyer*, 867 F.2d 1035, 1038 (7th Cir. 1989). The absence of any statutory standards that guide the agency's exercise of discretionary authority, or upon which a court can review a specific exercise of that authority, generally indicates that an agency action is committed to agency discretion by law. *Scalise v. Thornburgh*, 891 F.2d 640, 648–49 (7th Cir. 1989); *accord Andrew v. Consol. Rail Corp.*, 831 F.2d 678, 686 (7th Cir. 1987); *see also Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (A "good reason[]" to find that a decision is committed to agency discretion is when it "involves a complicated balancing of a number of factors which are peculiarly within its expertise." (citation omitted)). Only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion," should a court find that there is sufficient law to apply on judicial review. *Heckler*, 470 U.S. at 833–34. And where "the type of agency decision in question has traditionally been committed to agency discretion"—*e.g.*, the exercise of enforcement discretion—the action does not "become[] reviewable" just because the agency provides a "reason" for it (or fails to do so). *ICC*, 482 U.S. at 282–83 (citation modified; *Malukas v. Barr*, 940 F.3d 968, 971 (7th Cir. 2019).

Measured by these principles, the Huffman and Lyons Memos reflect decisions that are committed to agency discretion by law.

Congress, through the INA and other statutes, has granted DHS broad discretion in enforcing federal immigration laws. *See Arizona*, 567 U.S. at 396 ("A principal feature of the" statutory "removal system is the broad discretion exercised by immigration officials."). Nothing in the INA indicates that Congress intended to "limit [the] agency's exercise of enforcement power" "by setting substantive priorities or by otherwise circumscribing [the] agency's power to discriminate among issues or cases it will pursue." *Heckler*, 470 U.S. at 832–33. The INA, far from seeking to impose constraints on the agency's "exercise of enforcement power," thus affords

39

the Executive Branch ample discretionary authority to prioritize when and, as relevant here, where it will enforce the law. *Id.* at 833.

Indeed, the INA imposes few location-based restrictions on DHS's broad authority to investigate and make arrests, *see, e.g.*, 8 U.S.C. § 1357(e) (limiting when immigration enforcement officers may enter a farm or similar agricultural operation for investigative purposes), and it imposes only limited constraints on DHS's discretion with respect to the mechanics of enforcement, *see, e.g.*, *id.* §§ 1226(a), 1231(a)(1)(A), (2), 1357(a). But aside from the requirement to obtain a warrant in certain circumstances, *id.* § 1226(a), Congress has placed no other restrictions on DHS's enforcement discretion, like whether, when, or under what circumstances immigration officers may enter or approach sensitive locations like churches or courthouses. The INA's silence with respect to these types of locations leaves this Court with no meaningful standard to apply in reviewing the reasonableness of the Huffman Memo. *See Heckler*, 470 U.S. at 830; *see also, e.g.*, *Scalise*, 891 F.2d at 648–49 (holding that the Attorney General's decision not to issue regulations governing international prisoner transfer decisions was committed to his discretion because the governing statute gave neither the Attorney General nor the court any "guidance" or "standards" by which to "measure" an exercise of this discretionary authority); *Andrews v. Consol. Rail Corp.*, 831 F.2d 678, 686 (7th Cir. 1987) (holding that a statute committed an enforcement decision to an agency because the statute set "no guidelines by which" a court "may review" the decision (citation omitted)).

The "nature of the agency action" at issue further supports the conclusion that the Huffman and Lyons Memos are committed to agency discretion. *See Singh*, 867 F.2d at 1038. "When it comes to" an agency's exercise of "discretionary enforcement powers, courts do not usually interfere." *Greer v. Chao*, 492 F.3d 678, 966 (7th Cir. 1987); *accord Sorreda Transport, LLC v.*

40

*DOT*, 980 F.3d 1, 4 (1st Cir. 2020) (Courts "typically do not question" an "agency's enforcement discretion."); *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 159 (D.C. Cir. 2006) (an agency's enforcement choices are "an area in which the courts have traditionally been most reluctant to interfere" (citation omitted)). That is because enforcement decisions traditionally involve considerable agency discretion, *see United States v. Texas*, 599 U.S. 670, 678 (2023) ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." (cleaned up)); *see also Arizona*, 567 U.S. at 396 ("A principal feature of the removal system is the broad discretion exercised by immigration officials."), and typically "involve[] a complicated balancing of . . . factors" that "are peculiarly within" an agency's "expertise," *Lincoln*, 508 U.S. at 191 (citation omitted). Agency decisions are generally unsuitable for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise" or involve choices about where best to spend "agency resources," including whether the agency "is likely to succeed if its acts" and "whether the particular enforcement action requested best fits the agency's overall policies." *Heckler*, 470 U.S. at 831; *accord Menominee Indian Tribe*, 947 F.3d at 1072. An "agency is far better equipped than the courts" to balance these factors and "to deal with the many variables involved in the proper ordering of its [enforcement] priorities." *Heckler*, 470 U.S. at 831–32. For these reasons, the Supreme Court and the Seventh Circuit have long recognized that agency decisions about whether to pursue enforcement action are committed to agency discretion. *See, e.g.*, *id.* at 831 ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."); *Andrews*, 831 F.2d at 686 (an agency's decision whether to bring an

41

enforcement action was committed to agency discretion); *Arnow v. U.S. Nuclear Regul. Comm'n*, 868 F.2d 223, 234 (7th Cir. 1989) (same).

This is particularly true for immigration enforcement decisions. *See Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 921–22 (8th Cir. 2025) ("Discretion in the enforcement of federal immigration law," including the need to "balance many factors" like public safety, public welfare, and resource constraints, "is vital for accomplishing the purposes of federal immigration law." (citation omitted)). Indeed, the Supreme Court recently emphasized that lawsuits (like this one) that challenge agency immigration enforcement operations "run up against the Executive's Article II authority to enforce federal law," and that "courts generally lack meaningful standards for assessing the propriety of enforcement choices" regarding arrest and detention, given the Executive Branch's need to weigh "resource constraints and regularly changing public-safety and public-welfare needs . . . when devising arrest and prosecution policies." *Texas*, 599 U.S. at 678–80; *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999) ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." "These concerns are greatly magnified in the deportation context." (citation omitted)).

Therefore, without any meaningful standards by which to assess the exercise of discretion reflected in the Huffman and Lyons Memos, those actions are committed to agency discretion by law. This Court should thus dismiss the Eleventh and Twelfth Claims for Relief under Rule 12(b)(6) on that basis as well.[4]

---

[4] For these reasons, the Court in *Phila. Yearly*, 2026 WL 280089 at *6-8 (D. Md. Feb. 3, 2026), erred in finding Huffman Memo was not committed to agency discretion by law.

42

### D. Plaintiffs' Claims Sounding in Trespass Should Be Dismissed

Counts 15 and 17 should be dismissed for failure to state a claim. These counts allege that Defendants are "entering private property in Illinois without a warrant or the consent of the owner purportedly to search for immigrants unlawfully in the United States." Compl. ¶¶ 438, 452.

Count 15 asserts a statutory claim alleging that that Border Patrol agents are authorized to access private lands only within twenty-five miles of the border "for the purpose of patrolling the border to prevent illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3). As explained above, however, CBP officers and agents have broad authority to conduct immigration enforcement operations nationwide. 8 U.S.C. § 1357(a)(1) & (2) authorizes CBP officers and agents to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and conduct warrantless arrests when the officer has "reason to believe" the alien is in the United States unlawfully and is likely to escape before a warrant can be obtained. *See* 8 C.F.R. § 287.5(a)(1), (c). The 25-mile limitation in § 1357(b)(3) for purposes of "patrolling the border" as defined in 8 C.F.R. § 287.1(c) does not impose an across-the-board geographic constraint on CBP's other statutory authorities to enforce the Nation's immigration laws. Count 15 is simply a re-packaged version of Count 2, and fails for the same reasons.

Plaintiffs' Fourth Amendment claim in Count 17 similarly misses the mark. Plaintiffs complain that federal authorities have "repeatedly used parking lots and other school areas operated by [Plaintiffs], some of which had signs prohibiting use for immigration enforcement, to conduct civil immigration enforcement operations, including as staging areas for such operations." Compl. ¶ 300. This, Plaintiffs claim, constituted a violation of Plaintiffs' Fourth Amendment rights in their capacity as property owners. But none of the areas owned by Plaintiffs and mentioned in their Complaint—a cemetery, various

43

neighborhood areas within the City of Chicago, or CPS-owned "parking lots and school areas," *see* ¶¶ 300-308, are within the places and things encompassed within the Fourth Amendment's protections. "Not all trespasses by law enforcement are violations of the Fourth Amendment. *United States v. Sweeney*, 821 F.3d 893, 900 (7th Cir. 2016). "To violate the Fourth Amendment, the trespass must occur on a 'constitutionally protected area'—that is, one explicitly enumerated in the text of the Fourth Amendment." *Id.* As the Supreme Court has explained, "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to *Katz*) gather information in what we have called "open fields"—even if those fields are privately owned— because such fields are not enumerated in the Amendment's text." *Florida. v. Jardines*, 569 U.S. 1, 6 (2013) (citing *Oliver v. United States,* 466 U.S. 170, 176 (1984); *see United States v. Alexander,* 888 F.3d 628, 631 (2d Cir. 2018) ("that portion of private property that extends outside a home's curtilage—what the caselaw terms an 'open field'—is beyond the purview of the Fourth Amendment, and can be warrantlessly and suspicionlessly searched without constitutional impediment"); *Moher v. United States*, 875 F. Supp. 2d 739, 774 (W.D. Mich. 2012) (dismissing Fourth Amendment claim against CBP under open fields doctrine when officers searched for illegal immigration activity on of private timber land). "Quite simply, an open field, unlike the curtilage of a home, is not one of those protected areas enumerated in the Fourth Amendment." *United States v. Jones*, 565 U.S. 400, 411 (2012).

As for the alleged trespass by federal officers on privately owned property (*i.e.*, not by Plaintiffs), Plaintiffs lack *parens patrie* standing to assert such claims. *See supra* at 15. Additionally, Plaintiffs cannot assert the Fourth Amendment rights on behalf of private individuals

44

because the State and City have no reasonable expectation of privacy in property owned by individual residents. *See, e.g.*, *United States v. Walton*, 763 F.3d 655, 658 (7th Cir. 2014) (stating that the key inquiry for Fourth Amendment standing is whether the proponent "had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge") (quoting *Rakas v. Illinois*, 439 U.S. 128, 133 (1978)).

Citing *Adderley v. State of Florida*, 385 U.S. 39, 47 (1966), Plaintiffs maintain that they "ha[ve] power to preserve the property under its control for the use to which it is lawfully dedicated." Compl. ¶ 289. The plaintiffs in *Adderley* were protesters who claimed that they had a First Amendment right to protest on the premises of the Leon County, Florida county jail. In holding to the contrary, the Supreme Court held that "[t]he United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose." *Adderley*, 385 U.S. at 48. What the Constitution does forbid via the Supremacy Clause, however, is the state promulgating a law for the purpose of interfering with the federal government's exercise of enforcement power granted to it under Article I of the Constitution. *See Perez v. Campbell*, 402 U.S. 637, 652 (1971) ("[A]ny state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause."). Nor can there be any question that Plaintiffs' purpose is discriminatory: Plaintiffs' Complaint expressly notes that the City of Chicago enacted a prohibition for the express purpose of thwarting civil immigration enforcement activity. Compl. ¶ 289 ("On October 6, 2025, Chicago Mayor Brandon Johnson signed an executive order prohibiting the use of city-owned or controlled parking lots, vacant lots, and garages for certain civil immigration enforcement activity."). Simply put, Plaintiffs do not have a constitutional right to impede federal immigration enforcement efforts with which they disagree. For these reasons, Plaintiffs' trespass claims are invalid.

45

### E.     Plaintiffs Ultra Vires Claim Should Be Dismissed.

As a threshold matter, Plaintiffs' ultra vires claim (Count 18) is merely a repackaged version of their 15 APA claims that collectively challenge seven of Defendants' alleged immigration enforcement-related policies (Counts 3-17). Like the APA claims, the ultra vires claim argues that Defendants lacked statutory authority to "adopt[] and implement[]" the alleged policies and practices that are collectively the subject of Claims 3-17. *See* Compl. ¶ 458.

The Supreme Court has "strictly limited" the scope of ultra vires review, reasoning that "ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (noting than an ultra vires claim "is essentially a Hail Mary pass-and in court as in football, the attempt rarely succeeds" (citation omitted)). Thus, the Supreme Court has held that ultra vires claims must fit within "painstakingly delineated procedural boundaries"; such review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition'" in a statute. *Id.* (first quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964), then quoting *Railway Clerks v. Assoc. for Benefit of Noncontract Emps.*, 380 U.S. 650, 660 (1965)). Here, Plaintiffs "basically dress up a typical statutory-authority argument as an ultra vires claim." *Nuclear Regul. Comm'n*, 605 U.S. at 682. "That is a fairly common maneuver" in trying to bring an ultra vires claim—which the Supreme Court has now squarely rejected. *Id.* Plaintiffs' ultra vires claim therefore fails.

Plaintiffs' ultra vires claim also fails for the independent reason that ultra vires review is unavailable if, "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bd. of Governors, FRS v.*

46

*MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Here, Congress enacted the APA to enable courts to review appropriate challenges to final agency actions. Given this "alternative path to judicial review," *id.*, an ultra vires claim is not available.

In any event, the ultra vires claims fail on their merits for the same reasons as those described above as to the APA, given that "if the plaintiff's claims would have failed under the APA, then those same claims necessarily 'could not succeed under' ultra vires review, which has an even 'narrower scope.'" *See Fed. Express Corp. v. U.S. Dep't of Com.,* 39 F.4th 756, 765 (D.C. Cir. 2022) (citation modified). This Court should dismiss these claims.

> **F.       Plaintiffs Declaratory Judgment Claim Should Be Dismissed.**

Count 19 seeks a declaration that the aforementioned policies and practices are unlawful. Compl., ¶¶ 460-464, based on the legal theories asserted in the 15 substantive counts (Claims 3-17). Declaratory judgments are remedies, not claims, so Plaintiffs' separate cause of action for a declaratory judgment also fails. *See Precision Shooting Equip. Co. v. Allen,* 646 F.2d 313, 314 n.4 (7th Cir. 1981) ("The Declaratory Judgment Act provides a procedural remedy but confers no new jurisdiction.").

## XVI.   This Court Lacks Jurisdiction to Issue Injunctive Relief.

Finally, an independent jurisdictional impediment to injunctive relief exists in 8 U.S.C. § 1252(f)(1). The statute provides that, except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim of the identity of the party or parties bringing this action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." 8 U.S.C. § 1252(f)(1). Part IV of the subchapter includes Sections 1221-1231, which the Supreme Court has described as provisions that "charge the Federal Government with

the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022).

In *Aleman Gonzales*, the Supreme Court interpreted Section 1252(f)(1) as applying broadly to immigration enforcement operations. The Court explained that the provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id*. at 550. Accordingly, if an order enjoins or restrains action that "in the Government's view" serves to "enforce, implement, or otherwise carry out" Sections 1221-1231, it is impermissible—regardless of whether the court considers the Government to be carrying out those sections as "properly interpreted." *Id*. at 550-52. Because Plaintiffs' requested relief would restrict the manner in which the federal government engages in immigration enforcement activity in the State of Illinois, it restrains the government "from actions that[,]" in the government's view, "are allowed" by Sections 1221-1231, and it "interfere[s] with the government's efforts to operate" those provisions. *Id*. at 551. Section 1252(f)(1) thus bars this Court from enjoining or restraining Defendants from engaging in the "inspection, apprehension, examination, and removal of aliens" as authorized by Sections 1226 and 1231. *Aleman Gonzalez*, 596 U.S. at 549-50; *see Biden v. Texas*, 597 U.S. 785, 797 (2022). Consequently, Plaintiffs' claims should be dismissed to extent they would "enjoin or restrain the operation" of 8 U.S.C. §§ 1221-1231.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

48

Dated: March 16, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

/s/ Lee Reeves

BRANTLEY T. MAYERS (FL#1039996)
Counsel to the Assistant Attorney General
ANDREW WARDEN
Assistant Director
LEE REEVES
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 616-5084
Fax: (202) 616-8470
Andrew.Warden@usdoj.gov

*Counsel for Defendants*

Telephone: (202) 616-5084
Fax: (202) 616-8470
Andrew.Warden@usdoj.gov

*Counsel for Defendants*

49