Case: 1:26-cv-00321 Document #: 59 Filed: 04/22/26 Page 1 of 62 PageID #:417

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, a sovereign state; and the CITY OF CHICAGO, an Illinois municipal corporation,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD M. LYONS, in his official capacity as Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement; SAMUEL OLSON, in his official capacity as Field Director for U.S. Immigration and Customs Enforcement; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. BORDER PATROL; MICHAEL W. BANKS, in his official capacity as Chief of U.S. Border Patrol; and GREGORY BOVINO, in his official capacity as Senior Officer of the Department of Homeland Security and Illinois tactical commander,<br><br>　　　　Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD .................................................................................................... 3

I. Plaintiffs Stated a Claim Under the Tenth Amendment (Count I). ..................... 3

    A. Defendants Violated the Tenth Amendment by Using Violence and Intimidation to Coerce Plaintiffs to Support Federal Immigration Policies. .................................... 4

    B. Defendants' Arguments for Dismissal Misconstrue Precedent And Prematurely Require Resolution of Factual Disputes. .............................................................. 7

II. Plaintiffs Stated a Claim For *Ultra Vires* Agency Action (Count II). .............................. 12

    A. Congress Created the Border Patrol for Border Security. ..................................... 13

    B. Defendants Do Not Identify Any Statutory Authority to Support the Unprecedented Use of Border Patrol in Illinois. ................................................. 15

III. Plaintiffs' APA Claims Survive Defendants' Motion To Dismiss. ................................... 19

    A. Plaintiffs Have Standing To Pursue Their APA Claims. ...................................... 20

        1. Plaintiffs Have Alleged Actual or Imminent Injuries. .............................. 22

        2. Defendants' Policies Caused Plaintiffs to Expend Resources. ................. 24

        3. Defendants' Policies Caused Sovereign Injuries. ..................................... 29

        4. Plaintiffs Do Not Bring Claims as *Parens Patriae*. ................................ 34

    B. Plaintiffs Alleged Agency Action. ....................................................................... 34

        1. Agency Action Does Not Require a Formal Agency Statement. .............. 34

        2. Plaintiffs Alleged Discrete Agency Actions. ........................................... 36

    C. The Arbitrary Enforcement Policy is a Final Agency Action and is Not Committed to Agency Discretion (Count XI and XII). .......................................................... 41

        1. The Arbitrary Enforcement Policy is a Final Agency Action. .................. 41

        2. The Arbitrary Enforcement Policy is Not Committed to Agency Discretion. ............................................................................................... 45

    D. The Illegal Trespass Policy Exceeds Statutory And Constitutional Authority And Is Unlawful (Counts XV, XVII). ........................................................................ 47

IV. Plaintiffs Pleaded a Claim Under the Declaratory Judgment Act (Count XIX) .............. 49

V. The Court Has Authority to Resolve Plaintiffs' Claims and Award Relief. ...................... 50

CONCLUSION ............................................................................................................. 50

**TABLE OF AUTHORITIES**

**CASES**

*AAUP v. Rubio*, 802 F. Supp. 3d 120 (D. Mass. Sept. 30, 2025) .................................................... 36

*African Communities Together v. Lyons*, 25-cv-6366, Dkt. 77 (S.D.N.Y. March 24, 2026)......... 10

*Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168 (S.D. Cal. 2019) ............................. 37, 39

*Alabama Association of Realtors v. Department of Health and Human Services*, 594 U.S. 758 (2021)................................................................................................................... 16, 19, 29

*Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117 (11th Cir. 2005) ..................................... 26

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982).................. passim

*Am. Ass'n of Univ. Professors v. Trump*, No. 25-CV-07864, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ................................................................................................................................. 38

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685 (D. Md. 2025)............................................................................................................................. 36, 38

*Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015 (D.C. Cir. 2000)........................................ 41, 45

*Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022) ............................................................................. 28

*Arizona v. United States*, 567 U.S. 387 (2012) ............................................................................. 46

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) .................................................. 49

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................... 3

*Ass'n of Flight Attendants v. Huerta*, 785 F.3d 710 (D.C. Cir. 2015)........................................... 44

*ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059 (9th Cir. 2015) .............................................................. 47

*Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985).......................................................... 19

*Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281 (1970) .................................... 29

*Bautista v. Santacruz*, No. 5:25-CV-01873-SSS-BFM, 2026 WL 468284 (C.D. Cal. Feb. 18, 2026) .................................................................................................................... 12

*Bell v. City of Country Club Hills*, 841 F.3d 713 (7th Cir. 2016)................................................ 40

*Bennett v. Spear*, 520 U.S. 154 (1997)............................................................... 41, 42, 44

*Bond v. United States,* 564 U.S. 211 (2011)..................................................................... 4

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) .............................................................. 35

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41 (1986) ......................... 19

*Brennan v. Dickson*, 45 F.4th 48 (D.C. Cir. 2022) ......................................................... 22

*Brito v. Garland*, 22 F.4th 240 (1st Cir. 2021) ............................................................. 50

*Brown v. Board of Ed.*, 347 U.S. 483 (1954) ................................................................ 29

*Buschauer v. Columbia Coll. Chi.*, 579 F. Supp. 3d 1045 (N.D. Ill. 2022) ................................... 3

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ............................................................ 26

*Cantwell v. Connecticut*, 310 U.S. 296 (1940)............................................................... 28

*Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019)....................... 46

*Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048 (7th Cir. 2025) ....................... 50

*Chicago Headline Club v. Noem*, No. 25-3023 (7th Cir. Nov. 19, 2025) .................................... 24

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...................................... 45

*City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025)......................... 5

*City of Arlington, v. F.C.C.*, 569 U.S. 290 (2013)............................................................. 18

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) ........................................ 4, 32

*City of Chicago v. StubHub, Inc.*, 622 F. Supp. 2d 699 (N.D. Ill. 2009) ....................................... 4

iii

*City of Evanston v. Barr*, 412 F. Supp. 3d 873 (N.D. Ill. 2019)....................................................... 3

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)........................................................................ 22

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004)...................................................... 4, 26

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................................ 22, 28

*Comm'r Internal Rev. v. Sunnen*, 333 U.S. 591 (1948).................................................................. 12

*Cook County v. Wolf*, 962 F.3d 208 (7th Cir. 2020) ................................................................ 29, 30

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ........................... 26

*D.V.D. v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2026 WL 521557 (D. Mass.
   Feb. 25, 2026) ........................................................................................................................... 10

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ................. 45, 46

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)........................................................11, 26, 28, 31

*Dinerstein v. Google, LLC*, 73 F.4th 502 (7th Cir. 2023)............................................................... 22

*Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672 (S.D.N.Y. 2020) .............................. 47

*Drs. for Am. v. Office of Pers. Mgmt.*, 793 F. Supp. 3d 112 (D.D.C. 2025) ................................. 34

*Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1 (D.D.C. 2025) .................... 38

*Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756 (D.C. Cir. 2022).............................. 12, 13

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ............................... 24, 27

*Franciscan All., Inc. v. Becerra*, 47 F.4th 368 (5th Cir. 2022)...................................................... 23

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)........................................................................... 47

*Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873 (7th Cir. 2022) ...................................................... 3

*Greer v. Chao*, 492 F.3d 678 (8th Cir. 1987) ................................................................................. 46

iv

*Greer v. Young*, 11 N.E. 167 (Ill. 1887) ................................................................................ 47

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ........................................................ 22

*Heckler v. Chaney,* 470 U.S. 821 (1985) ................................................................ 45, 46

*Hisp. Affs. Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) ........................................ 35

*Hueso v. Soto*, No. 26-1455 (ZNQ), 2026 WL 539271 (D.N.J. Feb. 26, 2026) ............................ 12

*Hunter v. Underwood*, 471 U.S. 222 (1985) ............................................................ 10, 11

*Hussen v. Noem*, No. 26-CV-324, 2026 WL 657936 (D. Minn. Mar. 9, 2026) ........................ 10, 37

*ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270 (1987) ................................................ 46

*Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025) .............................. 5

*Illinois v. Trump*, No. 25-CV-12174, 2025 WL 2886645 (N.D. Ill. Oct. 10, 2025) ...................... 5

*Illinois v. Vought*, No. 26 CV 1566, 2026 WL 962287 (N.D. Ill. Mar. 12, 2026) ........................ 35

*Juan T.R. v. Noem*, No. 26-CV-0107 (PJS/DLM), 2026 WL 555601 (D. Minn. Feb. 26, 2026).. 12

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) ........................................... 21, 29, 31, 33

*Kumar v. Soto*, No. 26-CV-00777 (MEF), 2026 WL 585187 (D.N.J. Mar. 2, 2026) .................... 12

*Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682 (1949) .................................. 19

*Larson v. Valente*, 456 U.S. 228 (1982) ...................................................................... 31

*Learning Res. Inc. v. Trump*, 146 S. Ct. 628 (2026) ............................................... 16, 18

*Louisiana v. U.S. Env't Prot. Agency*, 712 F. Supp. 3d 820 (W.D. La. 2024) .............................. 23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................... passim

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) .................................................... 40

*Malukas v. Barr*, 940 F.3d 968 (7th Cir. 2019) ............................................................... 46

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................ 19, 25, 29, 30

*McFarland-Lawson v. Ammon*, 847 F. App'x 350 (7th Cir. 2021) ................................. 9

*McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022) ...................................... 49

*Menominee Indian Tribe of Wisc. v. Env't Prot. Agency*, 947 F.3d 1065 (7th Cir. 2020) ............. 44

*Minnesota v. Noem*, No. 26-CV-190, 2026 WL 253619 (D. Minn. Jan. 31, 2026)..................... 8, 9

*M-J-M-A- v. Hermosillo*, No. 6:25-CV-02011, 2026 WL 562063 (D. Or. Feb. 27, 2026)............ 37

*Moher v. United States*, 875 F. Supp. 2d 739 (W.D. Mich. 2012) ................................. 48

*Morales v. Trans World Airlines, Inc.,* 504 U.S. 374 (1992) ................................. 17

*Murphy v. Nat'l Coll. Athletic Ass'n*, 584 U.S. 453 (2018) ............................................. 4

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ................................... passim

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ..................................................... 8

*Natural Resources Defense Council  v. EPA*, 643 F.3d 311 (D.C. Cir. 2011) ............................... 47

*Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880 (N.D. Ill. 2020) ..................... 35, 36, 37, 39

*New England Synod v. Dep't of Homeland Sec.*, No. CV 25-40102-FDS, 2026 WL 412329 (D. Mass. Feb. 13, 2026) ................................................................ 42, 43, 44

*New York v. Trump*, 171 F.4th 1 (1st Cir. 2026) ................................................ 35, 39, 41

*New York v. U.S. Immigr. & Cust. Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019) ..................... passim

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ................................................. 41

*Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665 (2025) ................................................. 12

*OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808 (D.C. Cir. 1998)....................................... 46

*Pablo Sequen v. Albarran*, 814 F. Supp. 3d 1005 (N.D. Cal.2025) ....................................... 42, 47

*Park v. Forest Serv. of U.S.*, 205 F.3d 1034 (8th Cir. 2000) ........................................... 23

*Perez Perez v. Wolf*, 943 F.3d 853 (9th Cir. 2019) ........................................... 45

*Phila. Yearly Meeting of Religious Soc'y v. U.S. Dep't of Homeland Sec.*, No. CV 25-0243-TDC, 2026 WL 280089 (D. Md. Feb. 3, 2026) ............................................. passim

*Phila. Yearly Meeting of the Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293 (D.C. Md. Feb. 24, 2025) ..................................................... 31

*Plyler v. Doe*, 457 U.S. 202 (1982) ................................................... 29

*Preiser v. Newkirk*, 422 U.S. 395 (1975) ........................................... 49

*Printz v. United States*, 521 U.S. 898 (1997) ........................................... 4

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ................................ 17

*Ramirez Ovando v. Noem*, 810 F. Supp. 3d, 1209 (D. Colo. 2025) ................................ 38

*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018)45

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47 (2006) ........................................ 21

*Sierra Club v. Env't Prot. Agency*, 955 F.3d 56 (D.C. Cir. 2020) ................................................... 41

*Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015) ............................................................. 3

*Singh v. Moyer*, 867 F.2d 1035 (7th Cir. 1989) .............................................................. 46

*State of Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024) ................................ 21, 29, 33

*Stewart v. Ramsay*, 242 U.S. 128 (1916) ..................................................... 47

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ......................................................... 42, 43

*Texas v. U.S.*, 809 F.3d 134 (5th Cir. 2015) ................................................. 21, 27, 29, 30

*Texas v. United States*, 126 F.4th 392 (5th Cir. 2025) ................................................................. 28

*Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) ............................................................... 42, 46

*Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ................................................................. 50

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021) ............................................................. 32

*Trump v. Hawaii*, 585 U.S. 667 (2018) ..........................................................................................11

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590 (2016) ......................................... 43

*United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025) ................................................. 5, 49

*United States v. Lopez*, 514 U.S. 549 (1995) .................................................................................. 4

*United States v. Morrison*, 529 U.S. 598 (2000) .......................................................................... 21

*United States v. Picciotto*, 875 F.2d 345 (D.C. Cir. 1989) ........................................................... 18

*United States v. Texas*, 599 U.S. 670 (2023) .................................................................... 27, 28, 31

*United States v. Walton*, 763 F.3d 655 (7th Cir. 2014) ................................................................ 48

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) ....................................................................... 21

*Vasquez Perdomo v. Noem*, No. 2:25-CV-05605-MEMF-SP, 2026 WL 473121 (C.D. Cal. Feb. 18, 2026) .................................................................................................................... passim

*Venetian Casino Resort v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008) .............................................. 35

*Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253 (4th Cir. 2011) ........................................... 29

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ................................................................... 25

*Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863 (W.D. Wash. 2020)......... passim

*Washington v. United State Dep't of Educ.*, No. C 25-1228, 2025 WL 2966255 (W.D. Wash. Oct. 21, 2025) .................................................................................................................... 27

viii

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ................................................................... 35

*Wilk v. Brainshark, Inc.*, 631 F. Supp. 3d 522 (N.D. Ill. 2022) ...................................................... 12

*Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989) ........................................................... 19

*Wisconsin Voter All. v. Mills*, 166 F.4th 627 (7th Cir. 2026) .......................................................... 27

*Wyoming ex rel. Crank v. United States*, 539 F.3d 1236 (10th Cir. 2008) ..................................... 33

*Xirum v. U.S. Immigr. & Customs Enf't*, No. 1:22-CV-00801-TWP-KMB, 2024 WL 3718145
   (S.D. Ind. Aug. 8, 2024) .................................................................................................................. 36

**STATUTES**

28 U.S.C. § 2201 ........................................................................................................................ 12, 49

5 U.S.C. § 551(13) ............................................................................................................................ 35

5 U.S.C. § 701(a)(2) .......................................................................................................................... 45

5 U.S.C. § 704-06 ............................................................................................................................. 49

5 U.S.C. § 706(1) .............................................................................................................................. 41

5 U.S.C.§ 702 .................................................................................................................................... 49

6 U.S.C. § 211(c) ................................................................................................................ 13, 15, 16, 17

6 U.S.C. § 211(e) ....................................................................................................................... 13, 17

8 U.S.C. § 1226 ................................................................................................................................. 50

8 U.S.C. § 1231 ................................................................................................................................. 50

8 U.S.C. § 1252(f)(1) ........................................................................................................................ 50

8 U.S.C. § 1357 .......................................................................................................................... passim

8 U.S.C. §§ 1221-32 ......................................................................................................................... 50

Pub. L. 82-414, 66 Stat. 163 (1952)..................................................................................... 18

**OTHER AUTHORITIES**

66 Cong. Rec. 3201-02 (1925)............................................................................................ 15

**RULES**

Federal Rule of Civil Procedure 12(b)(1) ............................................................................ 3

Federal Rule of Civil Procedure 12(b)(6) ............................................................................ 3

**REGULATIONS**

8 C.F.R. § 1.2 .................................................................................................................. 18

8 CFR § 287.5 .................................................................................................................. 18

x

**INTRODUCTION**

Plaintiffs Illinois and Chicago have enacted laws that limit state and local law enforcement from participating in enforcement of federal civil law. Plaintiffs have concluded that this policy strengthens trust between police and residents, which is invaluable to preventing and solving crimes. And it allows Plaintiffs to reserve limited law enforcement resources to fight crime, rather than using their time, money, and personnel on federal civil matters. The current administration disagrees with Plaintiffs' laws, which it derides as "sanctuary" policies. Disagreement over policy among local, state, and federal governments is a feature of our federalist system. The federal government's tactics for resolving this disagreement are not. For the first time in this country's history, the federal government reacted to Plaintiffs' refusal to fall in line with a particular administration's preferred policy with physical force. A violent incursion by the federal government to coerce state and local governments to alter their laws and policies is inconsistent with our federal system. This is the basis of Plaintiffs' Tenth Amendment claim (Count I).

To implement its coercive program, the federal government turned to Border Patrol, a paramilitary agency trained and equipped to protect the country's borders, and unleashed it in Illinois. However, Congress created Border Patrol for border security, not interior law enforcement. Thus, the use of Border Patrol against Illinois and Chicago was not authorized by Congress. This is the basis of the Plaintiffs' claim for *ultra vires* agency action (Count II).

The other tool the administration used to inflict pain on Illinois and Chicago was ICE, the immigration enforcement agency. But ICE is a law enforcement agency, not a paramilitary force, and its policies previously reflected that—they incorporated statutory and constitutional limits and set forth practices developed over decades to further its law enforcement purpose. These policies hindered the administration's plan, so it implemented new policies better suited to its coercive

1

goal. These new policies allowed ICE and Border Patrol to: question and detain any person they encountered without cause or a warrant in any location, including on private property and at sensitive locations like courthouses, hospitals, and schools; capture and retain biometric information of Illinois residents without consent; use chemical weapons without warning or adequate cause; and conceal their identities and locations. The implementation of these interlocking policies was intended to create a climate of fear and undermine public safety, order, and well-being, thus ratcheting up the pressure on Plaintiffs to do what the administration demanded. Counts III-XVIII of the Complaint challenge these new policies as violating the Administrative Procedures Act (APA) and as ultra vires.

Defendants are ICE, Border Patrol, their parent agencies, and the agency leaders responsible for implementing the unlawful policies. Defendants move to dismiss the Complaint. None of their challenges have merit. Defendants' motion to dismiss Counts I and II require the Court to ignore the Complaint's plausible allegations of coercion and accept Defendants' implausible assertion that the unprecedented disruption, harm, and violence Plaintiffs experienced was the collateral consequence of a "legitimate" immigration enforcement operation. These are questions for trial, not a motion to dismiss. Defendants' arguments on the APA claims similarly require the Court to discount the well-pleaded allegations that Defendants implemented seven distinct unlawful policies. And their standing arguments fail because Plaintiffs suffered proprietary and sovereign injuries, which squarely establish Plaintiffs as proper parties to seek relief. Defendants' assertion that additional injuries are not imminent is not relevant to Plaintiffs claims for vacatur. And Defendants continued unlawful conduct and express threats to resume their coercive campaign in full force support declaratory and injunctive relief.

The Court should deny the motion.

2

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) "test[s] the sufficiency of the complaint, not the merits of the case." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 885 (7th Cir. 2022) (citation omitted). "[T]he Court accepts as true all well-pleaded facts . . . and draws all reasonable inferences from those facts in the plaintiff's favor." *Buschauer v. Columbia Coll. Chi.*, 579 F. Supp. 3d 1045, 1048 (N.D. Ill. 2022). A complaint must state a claim that is plausible on its face and provides fair notice of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A Rule 12(b)(1) motion challenges the Court's subject matter jurisdiction. In a facial challenge, "a court does not look beyond the allegations in the complaint, which are taken as true for purposes of the motion." *City of Evanston v. Barr*, 412 F. Supp. 3d 873, 879-80 (N.D. Ill. 2019). As under Rule 12(b)(6), the Court accepts as true well-pleaded factual allegations and draws reasonable inferences in the plaintiff's favor. *Silha v. ACT, Inc.*, 807 F.3d 169, 173-74 (7th Cir. 2015).[1]

I.  **Plaintiffs Stated a Claim Under the Tenth Amendment (Count I).**

Defendants assert that Plaintiffs have not stated a Tenth Amendment claim because they have not alleged facts to support a viable legal theory based on interference, anticommandeering, or coercion. Dkt. 44 at 18-27. But Defendants' arguments ignore the well-pled allegations, which, accepted as true, reveal Defendants' concerted effort to use violent and unlawful conduct to accomplish what they could not directly command—to coerce Plaintiffs to alter their laws and policies to align with federal goals. In doing so, Defendants exceeded the federal government's enumerated powers and invaded the domain reserved to the states under the Tenth Amendment.

---

[1] Defendants set out the standards for both factual and facial challenges under Rule 12(b)(1). Because Defendants did not introduce any jurisdictional facts, Plaintiffs treat Defendants' 12(b)(1) motion as a facial challenge.

3

**A.** **Defendants Violated the Tenth Amendment by Using Violence and Intimidation to Coerce Plaintiffs to Support Federal Immigration Policies.**

The power to enact and enforce law and implement policy is what makes States "sovereigns." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982).[2] "[T]his general power of governing, possessed by the States but not by the Federal Government, [i]s the 'police power.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 536 (2012); *see also City of Chicago v. StubHub, Inc.*, 622 F. Supp. 2d 699, 703 (N.D. Ill. 2009) (Chicago has same police powers as state except where limited by legislature). The Supreme Court has identified several areas where the States have primary or sole governing responsibility. *See United States v. Lopez*, 514 U.S. 549, 566-68 (1995). In these areas, "[t]he independent power of the States . . . serves as a check on the power of the Federal Government." *NFIB*, 567 U.S. at 536. "Impermissible interference with state sovereignty is not within the enumerated powers of the National Government." *Bond v. United States,* 564 U.S. 211, 225 (2011).

The federal government interferes with State sovereignty and violates the Tenth Amendment when it attempts to bar States or local governments from enacting laws within their police powers or to compel them to implement and enforce federal programs. *Murphy v. Nat'l Coll. Athletic Ass'n*, 584 U.S. 453, 474-75 (2018); *Printz v. United States*, 521 U.S. 898, 925 (1997); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 866-73 (N.D. Ill. 2018). This limit on federal power applies equally whether the federal government "directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *NFIB*, 567 U.S. at 578.

Here, the federal government is using unlawful and violent tactics to coerce Plaintiffs to abandon their laws and policies, which restrict the use of state and local law enforcement resources

---

[2] Municipalities' proprietary interests are indistinguishable from a State's sovereign interests. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197-98 (9th Cir. 2004). For simplicity, Plaintiffs use the terms "sovereign" and "sovereignty" throughout to encompass both State and municipal interests.

for federal civil immigration enforcement. ¶ 31.[3] These laws, grounded in legitimate law enforcement goals, ensure that Plaintiffs invest in critical public safety activities, like suppressing violent crime and vindicating victims, rather than civil immigration enforcement. ¶ 32. Through a multifaceted campaign, the federal government has sought to compel Plaintiffs to devote their resources, and exercise their police power, to enforce the administration's immigration priorities. ¶ 3. While the federal government is free to "create incentives for States to act in accordance with federal policies," whether to do so must "remain the prerogative[] of the States not merely in theory but in fact." *NFIB*, 567 U.S. at 577, 581. When "pressure turns into compulsion," the federal government exceeds its authority. *Id.* at 577. Defendants' efforts to coerce Plaintiffs to adopt federal policy has crossed the line in violation of the Tenth Amendment.

**First**, Defendants have made clear their antipathy towards Plaintiffs' policies, and that they will attempt to invalidate them. Their campaign began when the federal government sued Plaintiffs, seeking to nullify their statutes and compel them to invest resources and personnel to further federal enforcement of immigration law. This effort failed. *United States v. Illinois*, 796 F. Supp. 3d 494, 530 n.19 (N.D. Ill. 2025). Next, the federal government attempted to conscript Plaintiffs' resources through financial pressure by withholding Congressionally appropriated federal funding. But numerous courts held that doing so violates the Tenth Amendment. *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75 (D.R.I. 2025); *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1195 (N.D. Cal. 2025). Because Plaintiffs did not submit to financial pressure, Defendants escalated, threatening a military incursion by National Guard troops under federal control. That too failed. *See Illinois v. Trump*, No. 25-CV-12174, 2025 WL 2886645 (N.D. Ill. Oct. 10, 2025) (enjoining deployment of Illinois and Texas National Guard troops in

---

[3] ¶ ___ refers to paragraph numbers in Plaintiffs' Complaint For Declaratory and Injunctive Relief (Dkt. 1).

5

Illinois), *aff'd by Trump v. Illinois*, 146 S. Ct. 432 (2025); *see also* ¶¶ 38-42. This case arises from yet another tactic – unleashing the Border Patrol and ICE, bringing interdiction tactics used to secure national borders to Illinois, and instructing agents to "push the envelope." ¶ 5. Defendants' unrelenting pressure strongly suggests that Defendants are using different tactics to achieve the same unconstitutional goal: coercing Plaintiffs to conform to federal preferences and thereby commandeer Plaintiffs' resources to further federal ends.[4]

**Second**, Defendants' tactics themselves support the conclusion that Defendants are engaged in a program of coercion under the pretense of "immigration enforcement." Removal of undocumented immigrants is accomplished through targeted investigation, individualized arrest, and due process preceding removal. ¶¶ 5, 74. Interior removal enforcement never has required phalanxes of militarized Border Patrol agents roving through neighborhoods, hiding their identities, indiscriminately questioning residents, deploying tear gas, and conducting warrantless arrests. ¶¶ 44-71. That Defendants' conduct is ineffective, unprecedented, and counter to historic understandings of what constitutes effective "immigration enforcement" further supports the conclusion that "immigration enforcement" is a cover for retaliation and coercion.

**Third,** Defendants' widespread use of unlawful and violent tactics has had a pervasive negative impact on Plaintiffs' sovereignty and well-being. Defendants made public spaces unsafe, dissuaded residents from using public health and family support benefits, jeopardized the functioning of the judicial and education systems, undermined Plaintiffs' economies, and violated

---

[4] There is evidence that the pressure campaign is ongoing. The Secretary of DHS recently threatened to remove customs officials from airports in jurisdictions, like Plaintiffs', that do not expend money to further federal immigration policy. "If cities are going to sit there and say that they're not going to enforce immigration policies, then . . . it doesn't make any sense for us to process international travelers through that city." Noe Padilla, *DHS threatens to remove customs officers at sanctuary city airports*, USA Today (Apr. 8, 2026, at 12:50 ET), https://www.usatoday.com/story/news/california/2026/04/07/dhs-secretary-markwayne-mullin-threatens-removing-customs-sanctuary-city-airports/8949872007/ (on file with OAG).

the personal liberties and property rights of Plaintiffs' residents. ¶¶ 325-32. These devastating consequences are the direct and predictable effects of Defendants' violent and unconstitutional campaign; it is reasonable to infer that Defendants intended these outcomes to coerce Plaintiffs.

**Fourth**, Defendants have used and continue to use Border Patrol and ICE for purposes unrelated to immigration enforcement. Former Attorney General Bondi admitted this when she offered to decrease ICE and Border Patrol's presence in Minnesota if the State altered sovereign policies unrelated to immigration.[5] And in March, President Trump threatened to send ICE agents to airports to pressure Congress to approve his proposed DHS budget. "If the Radical Left Democrats don't immediately sign an agreement . . . , I will move . . . ICE Agents to the Airports where they will do Security like no one has ever seen before . . . ."[6] The use of immigration enforcement officers for purposes other than immigration enforcement supports Plaintiffs' allegations that is what is happening in Illinois.

The allegations in the Complaint, accepted as true, establish (a) Defendants' avowed intent to change Plaintiffs' laws and policies; (b) that the tactics they have used are unprecedented, violent and counterproductive to the purpose they purport to employ them; (c) the pervasive injuries to Plaintiffs' sovereign functions caused by those tactics; and (d) Defendants' pattern of using immigration enforcement agents to further policy objectives unrelated to immigration enforcement. These allegations plausibly state a claim that Defendants are engaged in retribution and coercion in violation of the Tenth Amendment.

> **B.      Defendants' Arguments for Dismissal Misconstrue Precedent And Prematurely Require Resolution of Factual Disputes.**

---

[5] Letter from Pamela Bondi, United States Attorney General, to Tim Walz, Minnesota Governor (Jan. 24, 2026), available at https://sos.mn.gov/media/wihf4a05/ag-bondi-gov-walz-letter-012426.pdf (on file with OAG).

[6] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 21, 2026, at 10:34 AM ET), https://truthsocial.com/@realDonaldTrump/posts/116267892671497457 (on file with OAG).

Defendants acknowledge the Tenth Amendment bars "unconstitutional coercion." Dkt. 44 at 23. But they assert Plaintiffs' claim is "implausible" because it is different than *NFIB*, where the Supreme Court held expansion of the federal Medicaid program unconstitutionally coercive. *Id.* at 23-26. Defendants highlight three distinctions between this case and *NFIB*, but they are immaterial. *NFIB*'s holding and reasoning apply here.

To start, Defendants assert that enforcement of a "federal law based on an enumerated power" presents "minimal" federal concern. *Id.* at 24. But *NFIB* and this case both arise from enforcement of a federal law based on an enumerated power. In *NFIB*, the Court recognized that the Spending Clause gave the federal government authority to create, modify, and expand Medicaid but concluded that the nature and scope of the proposed expansion was unconstitutionally coercive. 567 U.S. at 582. Contrary to Defendants' suggestions, a violent incursion under the guise of Article II authority to enforce immigration law presents as much "danger" to federalism as when the government threatened the loss of Medicaid funds under the Spending Clause. Dkt. 44 at 24.

In both instances, the federal government violates the Tenth Amendment by purporting to carry out federal responsibilities in a way intended to compel the States to abandon sovereign laws and policies. As a Minnesota District Court recently stated: "Several courts have already determined that the federal government cannot coerce 'sanctuary' jurisdictions into changing their laws or carrying out the Executive Branch's immigration priorities by threatening to withhold appropriated funds. Using a surge of executive force against a 'sanctuary jurisdiction' to accomplish the same ends is arguably no less coercive than withholding funds." *Minnesota v. Noem*, No. 26-CV-190, 2026 WL 253619, at *9 (D. Minn. Jan. 31, 2026); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("A government official cannot do indirectly what she is

8

barred from doing directly.").

In *Minnesota*, the plaintiffs sought a preliminary injunction based on a similar Tenth Amendment theory. Though the court "ma[de] no final determination on the merits of" that claim, it noted that "[p]laintiffs certainly have put forth evidence to support" a Tenth Amendment coercion claim. 2026 WL 253619, at *1, *9. Plaintiffs' allegations here likewise support the claim. In *Minnesota*, the court declined to issue a preliminary injunction because of disputed questions of fact and concerns about the scope of relief requested by the plaintiffs. *Id.* at *9, *12. But on a motion to dismiss, the factual disputes regarding Defendants' coercive purpose that precluded injunctive relief in *Minnesota* support denying Defendants' motion. *See e.g.*, *McFarland-Lawson v. Ammon*, 847 F. App'x 350, 355 (7th Cir. 2021) (partially reversing order dismissing case because trial court "decided a factual dispute that should not have been resolved on a motion to dismiss").

Defendants also attempt to distinguish *NFIB* on the grounds that the federal government "explicit[ly]" threatened repercussions against the states in that case, while here Plaintiffs' coercion claim turns on "an *inference* of an improper subjective purpose" from "facially valid actions." Dkt. 44 at 24. This argument fails on the facts and the law.

First, no "inference" is required to discern Defendants' intent to coerce Plaintiffs; it was expressly stated. ¶¶ 33-43. For example, former Attorney General Bondi stated that if Illinois and Chicago "don't comply with us . . . we're going to work with our other agencies to cut off their federal funding. We are going to send in law enforcement just like we did during the L.A. riots, just like we're doing here in Washington D.C." ¶ 36. That is a sufficiently "explicit" threat, Dkt. 44 at 24, even under Defendants' unsupported distinction between obvious and inferential threats.

Moreover, Defendants' mere assertion of an "objectively legitimate law-enforcement operation," Dkt. 44 at 24, does not carry the day when the Complaint plausibly alleges their actions

were intentionally wrongful, inconsistent with purported law-enforcement activity, and interfered with the exercise of Plaintiffs' sovereign authority. Defendants characterize their conduct as merely "assigning more enforcement resources to Illinois," *id.* at 20, and repeat the mantra of immigration enforcement on virtually every page. But Defendants cannot refute the allegations in the Complaint by force of repetition. The Complaint alleges in detail that Defendants are abusing their power with an unprecedented intrusion into the powers reserved to the State to force Plaintiffs to exercise their sovereign authority as Defendants demand. *See* § I.A., *supra*. Plaintiffs have alleged that Defendants' purported enforcement of immigration law is a pretext. ¶¶ 1, 8, 33-43, 70. Defendants' argument would require the Court to disregard Plaintiffs' allegations and accept Defendants' denials, which is the opposite of the legal standard on a motion to dismiss.[7]

Nevertheless, Defendants assert the Court must accept as true any "facially valid" justification Defendants proffer because "interogat[ing] the subjective grounds" for their conduct would improperly intrude upon executive authority and pose unique problems for judicial review. Dkt. 44 at 24-25. But the cases on which Defendants rely make clear that courts regularly inquire into the subjective grounds for executive action. This case is no exception.

In *Hunter v. Underwood*, 471 U.S. 222 (1985), the Court held a provision in the Alabama constitution violated the Equal Protection Clause even though the provision "on its face [was] racially neutral." *Id.* at 227. To assess the Equal Protection challenge, the Court did what Defendants claim is prohibited: it examined the subjective grounds for a facially valid provision

---

[7] Defendants' request that the Court accept without inquiry Defendants' proffered explanation for their conduct also fails because, in a short period of time, they have established themselves as chronically dishonest litigants who repeatedly make false and incomplete representations in court. *See, e.g.*, *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2026 WL 521557, at *5 (D. Mass. Feb. 25, 2026) (noting Defendant DHS admitted submitting a false declaration under oath); *Hussen v. Noem*, No. 26-CV-324, 2026 WL 657936, at *9, *22 (D. Minn. Mar. 9, 2026) (concluding ICE employee's sworn statement was not credible); *African Communities Together v. Lyons*, 25-cv-6366, Dkt. 77 at 1 (S.D.N.Y. March 24, 2026) (letter from AUSAs to judge admitting "material misstatements of fact that the Government made to the Court" and blaming both ICE and ICE's counsel for repeatedly relaying false information).

and concluded discrimination against Black residents motivated the provision. *Underwood*, 471 U.S. at 228-32. Similarly, in *Trump v. Hawaii*, the Court declined to accept the government's purported facially valid rationale for its action and "look[ed] behind the face of the Proclamation" to consider[ ] whether the entry policy is plausibly related to the Government's stated objective . . . ." 585 U.S. 667, 704-05 (2018). The same was true in *Department of Commerce v. New York*, where the government included an immigration question on the census form purportedly because the data would facilitate enforcement of the Voting Rights Act. 588 U.S. 752, 761-62 (2019). After examining the evidence, the district court concluded the government's purported rationale was a pretext and vacated the rule, and the Supreme Court affirmed. *Id.* at 780-84 ("[T]he evidence tells a story that does not match the explanation the Secretary gave for his decision").

Here, too, the Court is not required to take Defendants at their word. Whether Defendants "assign[ed] more enforcement resources to Illinois to address the . . . need," Dkt. 44 at 22, or initiated violent and unlawful tactics to coerce Plaintiffs to adopt federal immigration policies is a fact question for trial. Plaintiffs have alleged, and intend to prove, it is the latter.[8]

Lastly, Defendants take issue with Plaintiffs' request for declaratory relief, characterizing the relief in *NFIB*—"severance of the unconstitutional [statutory] provision"—as a "straightforward remedy" and arguing that declaratory relief would "violate the Take Care and Supremacy Clauses." Dkt. 44 at 25. Defendants do not explain why a declaratory judgment would "effectively establish[ ] the district court as the supervisor of all Executive Branch activity in the

---

[8] Defendants' analogy to a hypothetical State legalizing marijuana is off base. Dkt. 44 at 22. Defendants inquire whether the Tenth Amendment would preclude the government from assigning additional drug enforcement agents to the marijuana-friendly State. *Id*. But the apt hypothetical is whether the federal government could send hundreds of federal agents to the State to arbitrarily question residents about marijuana possession; arrest without a warrant anyone they accuse of possession; and litter neighborhoods with tear gas and pepper balls under the guise of enforcement. In that circumstance, as here, the disproportionality, ineffectiveness, and consequences of the conduct, combined with an improper motive to coerce a change in law, would raise Tenth Amendment coercion concerns.

11

city of Chicago." *Id.* In fact, a declaratory judgment is the *least* intrusive form of relief as it merely "declare[s] the rights" of the parties "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Defendants fear the "preclusive effect" of such a declaration, Dkt. 44 at 25, but a declaration could be preclusive "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." *Comm'r Internal Rev. v. Sunnen*, 333 U.S. 591, 598 (1948). At this early stage, there are no findings and no verdict, so Defendants' speculation regarding the "preclusive effect" of a declaration on future actions is premature. *Cf. Wilk v. Brainshark, Inc.*, 631 F. Supp. 3d 522, 531 (N.D. Ill. 2022) (a plaintiff "need not show his entitlement to the precise forms of relief that he seeks at the pleading stage").[9]

## II.     Plaintiffs Stated a Claim For *Ultra Vires* Agency Action (Count II).

Count II of the Complaint alleges an equitable claim for *ultra vires* agency action arising from the deployment of the Border Patrol to Illinois. To succeed on an ultra vires claim, the plaintiff must show that "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.* ("*FedEx*"), 39 F.4th 756, 763 (D.C. Cir. 2022); *see also Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). Defendants have not disputed the first two factors. The only question is whether Plaintiffs have alleged that Defendants

---

[9] Defendants' contention that a declaration is an improper remedy fails for a second reason. The premise of the argument is "the presumption that officials of the Executive Branch will adhere to the law as declared by the Court." Dkt. 44. at 25. But *these Defendants* are not entitled to that presumption. *Kumar v. Soto*, No. 26-CV-00777, 2026 WL 585187, at *12 (D.N.J. Mar. 2, 2026) (explaining that ICE was responsible for "scores of violations of recent judicial orders" and made "no commitment to do anything at all" to prevent future violations "[a]nd no statement of regret"); *Juan T.R. v. Noem*, No. 26-CV-0107 (, 2026 WL 555601, at *2-*25 (D. Minn. Feb. 26, 2026) (listing 210 separate court orders that ICE violated); *Bautista v. Santacruz*, No. 5:25-CV-01873, 2026 WL 468284, at *7 (C.D. Cal. Feb. 18, 2026) ("[E]ven after the judicial declaration of law. . . , Respondents still insist they can continue their campaign of illegal action."); *Hueso v. Soto*, No. 26-1455, 2026 WL 539271, at *3 (D.N.J. Feb. 26, 2026) ("The Government's continued actions after being called to task can now only be deemed intentional.").

12

have "stepped so plainly beyond the bounds of [statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *FedEx,* 39 F.4th at 764.

Defendants ignore the statutes that directly set forth, and limit, Border Patrol's duties and argue that Congress delegated to Border Patrol "broad authority to conduct immigration enforcement operations nationwide." Dkt. 44 at 27. The statutes cited by Defendants do not authorize Border Patrol to conduct removal operations in the country's interior or to act as a strike force against state and local governments that resist federal priorities. To the contrary, the statutes reveal Congress' intent to restrict Border Patrol to interdiction and security at the border, rendering their actions in Illinois *ultra vires*.

### A.       Congress Created the Border Patrol for Border Security.

The Border Patrol is the "law enforcement office" of U.S. Customs and Border Protection (CBP). 6 U.S.C. § 211(e)(3)(A). Congress gave CBP responsibility for safeguarding the border against smuggling of contraband and illegal entry. 6 U.S.C. § 211(c). It did not give it authority over removals of undocumented residents, nor a role in interior law enforcement.

In 2016, Congress passed the "U.S. Customs and Border Protection Authorization Act," and codified it in 6 U.S.C. § 211. Pub. L. No. 114-125, § 802 (2016). The Act formally established the CBP. *Id.* In subsection 211(c), Congress gave CBP eighteen specific duties, all of which directly relate to facilitating the lawful movement of goods and persons into and out of the United States and preventing the unlawful entry of persons and contraband. 6 U.S.C. § 211(c). There is no nexus between this long list of duties assigned by Congress and the authority Defendants claim to operate Border Patrol in the country's interior.

Border Patrol is a component of CBP. Its duties are set forth in 6 U.S.C. § 211(e)(3):

"The U.S. Border Patrol shall—

13

(A)    serve as the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a designated port of entry

(B)    deter and prevent the illegal entry of terrorists, terrorist weapons, persons, and contraband; and

(C)    carry out other duties and powers prescribed by the Commissioner [of CBP]."

Border Patrol's statutory authority is a subset of CBP's authority and tailored to preventing the illegal entry of goods and persons. Border Patrol's training and operations reflect this; it uses equipment, training, and use of force policies developed and designed to combat smuggling, trafficking, and illegal border crossing. ¶¶ 55-58.  Thus, in § 211, Congress established CBP and Border Patrol. It gave CBP specific duties related to the border and delegated Border Patrol the border-related law enforcement duties within CBP.

In fact, in written testimony to Congress in 2014, DHS described CBP's role as enforcement of federal laws related to border enforcement:

CBP enforces customs laws related to tariff and revenue protection, and *immigration laws **related to the admission of individuals to the United States***. Additionally, because of its presence at the border and its unique border search authority, which is shared with ICE, *CBP has been given the broad mandate to enforce all federal laws including drug, export control, money laundering, and agriculture laws **at the borders of the United States***. This requires ensuring that all persons and cargo enter the United States legally and safely through official POEs, preventing the illegal entry of persons and contraband into the United States at and between POEs, promoting the safe and efficient flow of commerce into the United States, and enforcing trade and tariff laws and regulations.

DHS further explained that a separate program, Enforcement and Removal Operations (ERO), which is not part of CBP, "enforces civil immigration law." "ERO identifies and apprehends convicted criminals and other individuals deemed removable, detains [them], and removes individuals determined to be illegally present. . . ." [10]

---

[10] *Authorizing Customs and Border Protection and Immigration and Customs Enforcement: Hearing on H.R. 3846 and H.R. 4279 Before the H. Comm. on Homeland Security*, 113th Cong. (2014) (statement of CBP Deputy Commissioner Kevin McAleenan and ICE Deputy Director Daniel Ragsdale) (emphasis added).

14

This limit on Border Patrol's authority has been in place for more than a century. 66 Cong. Rec. 3201-02 (1925). In 1925, Congress for the first time gave the Border Patrol arrest power. Specifically, Congress authorized the Border Patrol to "arrest any alien who . . . is entering or attempting to enter the United States in violation of any law." 66 Cong. Rec. 3201-02 (1925). Congress made clear that the Border Patrol's arrest authority did not include the power "to go into an interior city and pick up aliens in the street and arrest them, but it is just at the border where they are patrolling that we want them to have this authority." 66 Cong. Rec. 3202 (Sen. Reed).

Thus, as summarized in a 2025 Congressional Research Service report: "CBP is responsible for border security where foreign nationals enter at U.S. land, air, and sea ports of entry (POEs) and along U.S. borders between POEs. ICE is responsible for enforcing immigration laws in the U.S. interior[.]"[11]

## B. Defendants Do Not Identify Any Statutory Authority to Support the Unprecedented Use of Border Patrol in Illinois.

Defendants ignore Border Patrol's express statutory duties and their own recognition of the limits on its power. They rely on inapposite statutory provisions to argue that Border Patrol has limitless authority to enforce immigration laws anywhere in the country.

From the list of eighteen duties assigned to CBP, Defendants pluck the phrase "enforce and administer all immigration laws," from 6 U.S.C. § 211(c)(8), and claim this supports broad authority to deploy Border Patrol to the interior. Dkt. 44 at 27. Such a unbounded reading of subsection (c)(8) ignores its context and history and would render Congress' careful recitation of duties superfluous. Subsection (c)(8) states:

> The Commissioner shall . . . in coordination with U.S. Immigration and Customs Enforcement and United States Citizenship and Immigration Services, enforce and administer all immigration laws, as such term is defined in paragraph (17) of section 1101(a) of Title 8, including—

---

[11] Holly Straut-Eppsteiner, Cong. Rsch. Serv., R45020, *Primer on U.S. Immigration Policy* 13 (2025).

15

**(A)** the inspection, processing, and admission of persons who seek to enter or depart the United States; and

**(B)** the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States."

On its face, the general grant of authority in subsection (c)(8) is informed by specific examples of border-specific immigration laws under CBP's purview, which Defendants ignore. *Id*. § 211(c)(8)(A-B). They also ignore that subsection (c)(8) is embedded in a lengthy list of CBP duties, all of which are exclusively about border security. *Id*. § 211(c). The Supreme Court recently recognized that when Congress delegates to an agency a list of express authorities, it "is notable" that Congress omitted the specific authority the executive seeks to exercise: "It stands to reason that had Congress intended to convey the distinct and extraordinary power [at issue], it would have done so expressly . . . ." *Learning Res. Inc. v. Trump*, 146 S. Ct. 628, 642 (2026).

Defendants' reliance on the general introductory sentence in (c)(8) while ignoring the specific duties that follow and surround it is similar to the government's unsuccessful argument in *Alabama Association of Realtors v. Department of Health and Human Services*, 594 U.S. 758 (2021). There, the government asserted an eviction moratorium was statutorily authorized because "the first sentence of § 361(a) [of the Public Health Service Act] gives the CDC broad authority to take whatever measures it deems necessary to control the spread of COVID–19." *Id.* at 763. The Court rejected this argument, explaining that the statute's "second sentence informs the grant of authority by illustrating kinds of measures that could be necessary." *Id*. "Reading both sentences together, rather than the first in isolation, it is a stretch to maintain" that Congress authorized the eviction moratorium. *Id*. at 764.

16

Defendants' acontextual approach violates the "well established canon of statutory interpretation . . . that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384 (1992)). When a statute "contains general provisions and also special ones upon a subject, which, standing alone, the general provisions would include," the specific-over-general canon applies to prevent "specific provision[s] [from being] swallowed by the general one," which would "violat[e] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *Id.* at 645-46 (citation modified). That is the case here. Defendants' assertion that the introductory phrase in Section 211(c)(8) granted Border Patrol the distinct and extraordinary power to enforce any immigration laws anywhere in the country would render Congress' careful delegation of specific duties to CBP and Border Patrol superfluous.

Defendants also purport to find statutory authorization for Border Patrol to lay siege to Chicago and the surrounding area in a different statute governing the powers of immigration enforcement agents. Dkt. 44 at 27-28 (citing 8 U.S.C. § 1357). Section 1357 identifies specific actions that "any officer or employee of the Service" may take within their statutorily enumerated duties. This means that when acting within the scope of authority granted by § 211(e), Border Patrol may "interrogate" and "arrest" non-citizens and "take and consider evidence." 8 U.S.C. §§ 1357(a)(1)-(2), 1357(b). Defendants' reliance on the phrase "any officer or employee" as expanding Border Patrol's express statutory authority to include unprecedented and vast power to use interdiction tactics against Illinois residents is untenable.

To start, Defendants' expansive reading of § 1357 would lead to plainly absurd results. They claim that because Border Patrol officers are "immigration officers," they have plenary authority to interrogate, arrest, and gather evidence throughout Illinois. Dkt. 44 at 27-28. But DHS

17

also classifies "airplane pilot[s]," "fingerprint specialist[s]," "forensic document analyst[s]," and "helicopter pilot[s]" as "immigration officer[s]." 8 C.F.R. § 1.2. Under Defendants' limitless approach, DHS could assign DHS-employed airplane pilots and document analysts to engage in roving patrols, interrogating anyone in the interior about their immigration status. There is no statutory basis to believe Congress intended such a result.

Moreover, Defendants' reliance on 8 U.S.C. § 1357(a)(1-2)-(b) as a source of authority is particularly weak because Defendants purport to have discovered extraordinary and unprecedented powers in a statute passed over seventy years ago, Pub. L. 82-414, 66 Stat. 163 (1952), but never before invoked to support the authority to deploy *en masse* the country's border protection force to the interior for purported law enforcement. This new authority exceeds limits that have governed Border Patrol for more than a century and would be inconsistent with Border Patrol's historic practice and institutional competence. *See supra* § II.A; ¶¶ 15-21. "The lack of historical precedent" for using Border Patrol to interrogate and arrest immigrants in the interior "coupled with the breadth of the authority" Defendants seek to exercise, "is a telling indication" that the deployment extends beyond Defendants' "legitimate reach." *Learning Res.*, 146 S. Ct. at 641 (citation modified); *id.* at 643 (reasoning that novelty of Defendants' statutory interpretation is "strong evidence that [the purported authority] does not exist").[12]

Lastly, Border Patrol's unprecedented deployment to Illinois to question, arrest, and scan the biometric information of Illinois citizens, and to use physical violence against citizens and non-citizens alike fundamentally upset the balance between state and federal responsibilities. Border

---

[12] Defendants rely on 8 CFR § 287.5, which is irrelevant. Dkt. 44 at 27-28. Agencies have only the power granted by Congress. *See, e.g.*, *City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013) ("No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*."). Agencies cannot grant themselves new powers through regulation. *See, e.g.*, *United States v. Picciotto*, 875 F.2d 345, 346-47 (D.C. Cir. 1989).

18

Patrol's conduct has dissuaded residents from reporting crimes, attending court proceedings, and otherwise cooperating with law enforcement for fear of being caught in Border Patrol's dragnet. ¶¶ 158-159. Plaintiffs' ability to enforce the law and vindicate the rights of crime victims—a core police power—has been diminished. "[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989) (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)); *Alabama Ass'n of Realtors*, 594 U.S. at 764 (agency action that "intrudes into an area that is the particular domain of state law" invalid where not supported by "exceedingly clear [statutory] language"). Thus, Defendants must identify a clear and express delegation from Congress, which they have not done and cannot do.[13]

Congress gave Border Patrol specific duties, and none of those duties hint at permitting a violent incursion hundreds of miles from the border. Because Border Patrol "is not doing the business which the sovereign has empowered [it] to do," Plaintiffs have plausibly alleged that Border Patrol's incursion into Illinois is *ultra vires*. *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 689 (1949).

### III.    Plaintiffs' APA Claims Survive Defendants' Motion To Dismiss.

Defendants are four federal agencies and their leaders. ¶¶ 18-27. The agencies are law enforcement agencies, and their statutory authority, regulations, and policies generally reflect this.

---

[13] Defendants assert Plaintiffs lack standing to bring their *ultra vires* claim. Dkt. 44 at 5-6. But Border Patrol's incursion onto Plaintiffs' land, and its interference with sovereign functions, establish standing. *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (reasoning that states have standing to sue the federal government based on their "quasi-sovereign interests," that "concern the state as a whole"); *id.* at 519-23 (explaining that interest in land and property can establish state standing); *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 50 n.17 (1986) (acknowledging a state's "judicially cognizable interest in the preservation of its own sovereignty" (citation modified)); *see also* § III.A.3, *infra*.

However, Defendants are not pursuing a law enforcement mission in Illinois; they are pursuing the goal of coercing Plaintiffs to change their laws and policies. To enable their campaign of intimidation, Defendants implemented seven new policies better suited to their new mission: Roving Patrol (Counts III, IV), Biometric Scanning (Counts V, VI), Warrantless Arrests (Counts VII, VIII), Tear Gas (Counts IX, X), Arbitrary Enforcement at Sensitive Locations (Counts XI and XII), Conceal Plates (Counts XIII, XIV) and Private Trespass (Counts XV-XVII). These policies violate the APA because they exceed statutory authority and are arbitrary and capricious.

Defendants move to dismiss Plaintiffs' APA claims on several threshold grounds, none disputing the merits of the claims and all unpersuasive. They assert: (1) Plaintiffs lack standing to pursue their APA claims, Dkt. 44 at 6-18; (2) six of the policies (all except Arbitrary Enforcement) are not "agency action," *id.* at 29-38; (3) the Arbitrary Enforcement Policy is not a "final" action, and is subject to unreviewable agency discretion, *id.* at 38-42; and (4) Plaintiffs failed to state a claim that the Private Trespass Policy exceeded statutory and constitutional authority, *id.* at 43-45. The Court should reject these arguments and allow the APA claims to proceed.

### A.      Plaintiffs Have Standing To Pursue Their APA Claims.

Defendants implemented a series of unwritten policies intended to cause Plaintiffs harm, and those policies have done just that. *See* § I, *supra*. Defendants' policies have forced Plaintiffs to expend resources, decreased their tax revenue and economic activity, invaded their property, undermined public safety and trust, and interfered with fundamental sovereign rights. Plaintiffs plausibly alleged that Defendants' policies caused these injuries, so they have pleaded standing.

To establish standing, a plaintiff must demonstrate (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) a causal connection between the injury and the challenged conduct; and (3) that a favorable decision will likely redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). At the pleading stage, "general factual

20

allegations of injury" may "suffice" because it is "presume[d] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561. Harm need not be substantial to confer standing, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) (holding that nominal damages are sufficient for standing), and "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Unlike private parties, Plaintiffs are sovereigns and have standing to redress sovereign, and quasi-sovereign injuries, as well as financial and property injuries. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). Federal actions that intrude on Plaintiffs' core sovereign powers over education, public health, and law enforcement cause sovereign injuries. *See, e.g.*, *Kentucky v. Biden*, 23 F.4th 585, 599, 608-10 (6th Cir. 2022) (public health); *State of Tennessee v. Dep't of Educ.*, 104 F.4th 577, 593 (6th Cir. 2024) (education); *United States v. Morrison*, 529 U.S. 598, 618 (2000) (law enforcement). Quasi-sovereign injuries lack a "formal definition," but include the state's interest "in the health and well-being—both physical and economic—of its residents in general." *Snapp*, 458 U.S. at 607; *Texas v. U.S.*, 809 F.3d 134, 153 (5th Cir. 2015) (reasoning that federal policy "affects the states' 'quasi sovereign' interests by imposing substantial pressure on them to change their laws . . . .").

Defendants raise only cursory challenges to the causation and redressability components of standing, focusing primarily on injury-in-fact. As to injury-in-fact, Defendants do not dispute Plaintiffs' standing arising from harm to their local economies and tourism, or to their ability to maintain safe public spaces, streets, and systems of transit. *See, e.g.*, ¶¶ 8, 153, 159, 260, 285, 326, 330-32. These allegations confer standing and are unrebutted. *See Vasquez Perdomo v. Noem*, No. 2:25-CV-05605-MEMF-SP, 2026 WL 473121, at *12-*13 (C.D. Cal. Feb. 18, 2026) (holding

21

municipalities had standing to challenge unlawful immigration raids after alleging loss of tax revenue, diversion of resources, additional costs, and frustration in priorities).

Defendants raise four challenges to Plaintiffs' standing to pursue APA claims. They assert Plaintiffs' injuries are (1) insufficiently imminent, (2) indirect, (3) lack concreteness, and (4) are based on a parens patriae theory. Dkt. 44 at 6-18. Plaintiffs respond to each challenge below.

### 1. Plaintiffs Have Alleged Actual or Imminent Injuries.

Defendants assert that Plaintiffs lack standing for all their APA claims because Plaintiffs' injuries occurred in the past and repetition is not "imminent." Dkt. 44 at 6-7, 10, 12, 15-16, 18. They are wrong for two reasons.

First, an injury sufficient for standing must be "actual *or* imminent." *Lujan*, 504 U.S. at 560-61 (emphasis added). Defendants' unlawful policies have caused *actual* injuries. Because Plaintiffs already were injured, they have standing to challenge and seek vacatur of the unlawful policies. Dkt. 1 at 98 ¶ d; *Brennan v. Dickson*, 45 F.4th 48, 54 (D.C. Cir. 2022) (plaintiff seeking vacatur show that challenged action has "*either* harmed him *or* imminently will do so"). An "impending" injury is required for a plaintiff to seek *only* future relief, as in the cases Defendants cite. Dkt. 44 at 5-7, 10, 12, 18 (*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) and *Dinerstein v. Google, LLC*, 73 F.4th 502 (7th Cir. 2023)). Defendants do not identify any case that required plaintiffs to show an "impending" injury to support vacatur.

Second, Plaintiffs have standing to seek injunctive relief because they have alleged the existence of a policy and that they are likely to be subjected to it again. *City of Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983); *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987).[14] Plaintiffs

---

[14] Defendants cite *Clapper* and *Dinerstein* to argue Plaintiffs' injuries must be "certainly impending," but those cases involved plaintiffs who had not suffered actual injuries. For parties that have been injured, *Lyons* provides the standard for standing to pursue injunctive relief.

have alleged seven unlawful policies, § III.B, *infra*, that remain in place and are being enforced against Plaintiffs and others. Indeed, only weeks before Plaintiffs filed this brief, Defendants made multiple courthouse arrests in Chicago under the Arbitrary Enforcement Policy.[15]

Moreover, Plaintiffs have not acceded to Defendants' demand that they change their laws and policies and redirect resources to civil immigration enforcement. Because the impetus for Defendants' wrongful conduct remains, *see* § I.A., *supra*, it is likely that Defendants will continue or increase enforcement of their unlawful policies. In fact, they have specifically threatened to repeat the same conduct with increased resources and ferocity. ¶¶ 310-15. These threats continue.[16] "Statements of future intent" are among the most "relevant considerations" when assessing risk of recurrence. *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1038-39 (8th Cir. 2000).

These threats carry weight because Defendants have declined to disavow an intent to renew their efforts. This Court specifically inquired whether "Operation Midway Blitz is going to ramp up again," and Defendants did not disclaim an intent to do so. Tr: 10:7-12 (Feb. 19, 2026). Courts have found that a defendant's refusal to disavow future enforcement supports granting injunctive relief. *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022) (entering injunction where defendant agency "repeatedly refused to disavow enforcement against" the plaintiff); *Louisiana v. U.S. Env't Prot. Agency*, 712 F. Supp. 3d 820, 864 (W.D. La. 2024) (finding standing for injunctive

---

[15] Violet Miller, *Local officials warn of ICE arrests at domestic violence courthouse, decry feds violating state law*, Chi. Sun Times (Apr. 2, 2026), https://chicago.suntimes.com/immigration/2026/04/02/local-officials-warn-of-ice-arrests-at-domestic-violence-courthouse-decry-feds-violating-state-law.

[16] For example, on March 31, 2026, President Trump said in a statement, "Really, Chicago should call and say we'd like help . . . now we're going to have to do something when it comes World Cup time, and we're going to have to force ourselves upon them." C-SPAN, *President Trump Signs Mail-in Voting Executive Order*, at 7:48 (Mar. 31, 2026) https://www.c-span.org/program/white-house-event/president-trump-signs-mail-in-voting-executive-order/676647 (on file with OAG). And Border Czar Tom Homan recently reposted an April 9, 2026 post by Nick Sortor on X advocating to "bring back LA and Chicago style sweeps DO NOT BACK DOWN!" Thomas D. Homan (@RealTomHoman), X , https://x.com/RealTomHoman (reposting Nick Sortor (@nicksortor), X (Apr. 9, 2026, 6:28 PM), https://x.com/nicksortor/status/2042384305037393957) (on file with OAG).

relief where "counsel for Defendants . . . refused to disavow the imposition of the mandates").

Defendants rely on an interim order staying a preliminary injunction in *Chicago Headline Club* to assert that Plaintiffs have not pleaded that their injuries are likely to recur. Dkt. 44 at 6 (citing *Chicago Headline Club v. Noem*, No. 25-3023 (7th Cir. Nov. 19, 2025). But Defendants ignore the court's specific instruction to "not overread today's order." Order at 2. The court's stated reason for granting the stay was that the relief was "overbroad." *Id.* On standing, the court merely stated that "open questions remain whether plaintiffs have shown that the past harm . . . is likely to imminently happen to them in the future." *Id.* But that case involved individual plaintiffs asserting First and Fourth Amendment claims, and the order on review entered broad injunctive relief. Defendants' ongoing enforcement of the unlawful policies at issue here, their threats of future escalation, and their refusal to disavow a resumption of activity support the conclusion that Plaintiffs are sufficiently likely to suffer sovereign and economic injuries to seek the limited injunctive relief sought here.

### 2. Defendants' Policies Caused Plaintiffs to Expend Resources.

Defendants claim Plaintiffs' injuries are "indirect" or "downstream" and therefore not cognizable as injuries in fact. Dkt. 44 at 7, 8, 11, 12, 14. But Plaintiffs have alleged direct injuries to their property and fisc, which Defendants ignore. And, contrary to Defendants' contention, Plaintiffs' downstream injuries to their economies and public spaces can confer standing.

Plaintiffs have alleged direct injuries arising from the Tear Gas and Trespass Policies. Like any other plaintiff, states and municipalities have standing when they suffer "a monetary injury [or] an injury to one's property." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). The Tear Gas Policy injured Plaintiffs' employees and fisc: police officers and first responders performing public duties were exposed to, and injured by, Defendants' deployment of

24

tear gas. ¶ 205. Plaintiffs pay for injured officers' medical expenses so bear the costs of Defendants' policy. *Id.*; *see Washington v. Trump*, 847 F.3d 1151, 1159-61 (9th Cir. 2017) (finding state had standing arising from injuries to faculty and students at public university). Defendants acknowledge these injuries, and do not dispute that they confer standing. Dkt. 44 at 12.

Similarly, the Trespass Policy injured Plaintiffs because, acting under that policy, Defendants trespassed on Plaintiffs' property—a cognizable injury "in [the] capacity as a landowner." *Massachusetts*, 549 U.S. at 522; ¶¶ 300-08. These are direct injuries to Plaintiffs' property rights, not "derivative injuries" of private landowners. Dkt. 44 at 17. The fact that others also were injured by the policy does not negate Plaintiffs' standing based on their own injuries to challenge the policy. *Lujan*, 504 U.S. at 581 ("[I]t does not matter how many persons have been injured by the challenged action, [so long as] the party bringing suit . . . show[s] that the action injures him in a concrete and personal way" (Kennedy, J., concurring)).[17]

In addition to these direct injuries, Defendants' policies also have caused downstream harm to Plaintiffs and their economies.

- Because of the Warrantless Arrests Policy, Plaintiffs redirected resources to provide emergency responses to altercations with agents, requiring them to suspend regular programs and operations. ¶ 154-57.

- Defendants' Warrantless Arrests and Roving Patrol Policies have created widespread fear of leaving home, dissuading residents from attending schools, participating in local economies or using Plaintiffs' public services, spaces, and transit. ¶¶ 94, 159.

- As a result of the Tear Gas Policy, Plaintiffs' law enforcement officers and first responders have had to deviate from their ordinary duties to provide care to individuals facing physical injuries resulting from Defendants' policy. ¶ 204.

- Plaintiffs' residents have been sickened by wanton use of tear gas in public, requiring Plaintiffs' emergency and medical services to expend resources to respond. ¶ 203-04.

---

[17] Defendants also assert that they are not subject to state or local trespass laws. Dkt. 44 at 17. But they confuse standing with the merits. For standing purposes, it is sufficient that Plaintiffs have cognizable property interests, which Defendants infringed. Whether Defendants' conduct was permissible goes to the merits of Plaintiffs' APA claims.

25

- The Conceal Plates Policy has forced law enforcement officers to expend resources on a new public program to identify agents' vehicles to secure information essential to crime prevention and law enforcement. ¶¶ 285-87.

- Defendants' policies have undermined Plaintiffs' abilities to attract immigrants, ¶ 327 and tourists, depressing business and tax revenue and damaging local economies. ¶¶ 330-32, threatening billions of dollars in potential state revenue. ¶ 153.

These myriad injuries to Plaintiffs' public spaces, safety, services, and economies are injuries-in-fact for purposes of standing. *See Vasquez Perdomo*, 2026 WL 473121, at *12 (holding municipalities had standing to challenge roving patrols policy because "expected loss of tax revenue can constitute a sufficient injury for purposes of Article III standing" as can threats to a state's police power); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004) (holding city demonstrated standing to challenge development plan based on traffic increase and crowds "affecting City-owned streets as well as municipal management and public safety functions.")

The Supreme Court has long recognized that "standing is not precluded" when "the plaintiff is not himself the object of the government action or inaction he challenges." *Lujan*, 504 U.S. at 562. In APA suits, "it is typical" for a plaintiff to "challenge an allegedly unlawful agency rule that regulates others but also has adverse downstream effects on the plaintiff." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). These "downstream costs," Dkt 44, at 7-8, 11, including economic costs, are concrete injuries that confer standing. *Dep't of Com. v. New York*, 588 U.S. 752, 766-67 (2019) (states had standing to challenge inclusion of a citizenship question on census given to third parties); s*ee also California v. Azar*, 911 F.3d 558, 572 (9th Cir. 2018) (states had standing to challenge interim agency rules exempting employers from covering contraception as "women losing coverage from their employers will turn to state-based programs or programs reimbursed by the state" "which will then result in economic harm to the states."); *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005) ("Corps management of Lake Lanier that violates federal law may adversely

26

impact the environment and economy downstream in the ACF Basin, thereby injuring Alabama and Florida."). This is equally true for agency actions related to immigration. *Texas*, 809 F.3d at 156 (state had standing based on downstream cost of issuing additional driver's licenses to individuals regulated by federal enforcement policy). Defendants' attempt to dismiss these injuries because they are "downstream" or "indirect" is not supported by any of the cases on which Defendants rely. Dkt. 44 at 7-8.

First, Defendants rely on *Alliance for Hippocratic Medicine*, for the proposition that Plaintiffs' use of resources to respond to Defendants' conduct cannot confer standing. Dkt. 44 at 7-8, 11-12. There, the Court explained that "abstract social interests" and "strong opposition to the government's conduct," are not concrete injuries, nor can a plaintiff make them so by "expending money to gather information and advocate against the defendant's action." *Id.*; *see also Wisconsin Voter All. v. Mills*, 166 F.4th 627, 640 (7th Cir. 2026) (Brennan, J. concurring). Here, Plaintiffs' injuries do not arise from information gathering or advocacy. They suffered pecuniary injuries, and expended financial and human resources to protect and preserve services, employees, and property. ¶¶ 94, 154-58, 205. *Hippocratic Medicine* recognized these types of injuries confer standing. 602 U.S. at 390-91 (identifying diversion of resources and increasing insurance costs as injuries but finding plaintiffs "lack record support" that they will incur such injuries in the future). *See also Washington v. United States Dep't of Educ.*, No. C 25-1228, 2025 WL 2966255, at *6-7 (W.D. Wash. Oct. 21, 2025) (states had standing to challenge revocation of grants to third parties based on "fiscal harm to Plaintiff States that will flow from Defendants' actions: . . . the discontinuation of any Grant will decrease student access to school-based services and lead students . . . to seek needed mental health services" from Plaintiffs' "mental health care system.") (citation modified).

Second, Defendants rely on *United States v. Texas*, 599 U.S. 670 (2023), for the supposed

inadequacy of "indirect" or "downstream" injuries. Dkt. 44 at 7, 12. But Defendants fundamentally misunderstand that case. There, the state lacked standing because it was challenging *non-enforcement* of a law, not because its injury was supposedly indirect. The Court recognized that the state's monetary loss was "an injury," but found the injury was not "legally and judicially cognizable" due to the limitation on the judiciary compelling the Executive Branch to make more arrests or initiate more prosecutions. 599 U.S., at 676-77. By contrast, here, Defendants' excessive *use* of coercive power is precisely the point. Plaintiffs are not seeking *more* enforcement of federal law, nor challenging the Executive's exercise of investigative or prosecutorial discretion. [18]

Lastly, Defendants challenge some of Plaintiffs' injuries as "too attenuated" to establish standing. Dkt. 44 at 14 n.1 (citing *Clapper*, 568 U.S. at 414 n.5). Plaintiffs' standing is grounded in allegations that flooding public streets with federal agents indiscriminately questioning the citizenship of residents and arresting them without cause was so disruptive that it threatened public order; interfered with Plaintiffs' ability to provide public services; and required Plaintiffs to spend resources to maintain critical government functions. *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940) (when "immediate threat[s] to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious"). Plaintiffs have demonstrated standing based on the "predictable effect" of Defendants' policies, which directly harmed third parties, and inevitably injured Plaintiffs. ¶¶ 94, 259-60, 330; *Dep't of Com.*, 588 U.S. at 766-67 (state's standing "turn[ed] on their expectation that reinstating a citizenship question will depress the census response rate and lead to an inaccurate population count"); *Texas v. United States*, 126 F.4th 392, 412 (5th Cir. 2025) (state had standing based on anticipated expenditures for individuals who likely would leave the

---

[18] *Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022) also concerned a challenge to non-enforcement, so similarly does not support Defendants' argument. Dkt. 44 at 8. Moreover, the court there acknowledged that indirect costs from federal regulation could confer standing – as Plaintiffs allege here – but held the alleged costs were too speculative and attenuated. *Id*. at 385-86 Plaintiffs are not "speculat[ing]" about future uncertainties; they already suffered harm.

28

state absent defendant's policy).

### 3. Defendants' Policies Caused Sovereign Injuries.

Plaintiffs have alleged concrete sovereign and quasi-sovereign injuries. "It is of considerable relevance that [a] party seeking review here is a sovereign State and not . . . a private individual." *Massachusetts*, 549 U.S. at 518. Because "sovereign interests are unique to states as separate sovereigns," *Tennessee*, 104 F.4th at 588 n.7, states are afforded "special solicitude" in challenging federal policies that affect sovereign and "quasi-sovereign" interests. *Massachusetts*, 549 U.S. at 520. They "are not normal litigants for the purposes of invoking federal jurisdiction." *Texas*, 809 F.3d at151, *aff'd by an equally divided court*, 579 U.S. 547 (2016).

Sovereigns have standing "to sue when [states] believe that the federal government has intruded upon areas traditionally within states' control." *Kentucky*, 23 F.4th at 598-99. Plaintiffs' "sovereign power over individuals and entities within [their] jurisdiction . . . involves the power to create and enforce a legal code," *Snapp*, 458 U.S. at 601, including the "enforcement of state law," *Texas*, 809 F.3d at 153, and the "administration of []state program[s]," *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011). Courts have long recognized core sovereign functions reserved to states include the operation of a judicial system, authority over education and public health, and protecting and securing property rights. *Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285, (1970) (states reserved power to maintain "judicial systems for the decision of legal controversies"); *Plyler v. Doe*, 457 U.S. 202, 222-23 (1982) ("[E]ducation is perhaps the most important function of state and local governments") (quoting *Brown v. Board of Ed.*, 347 U.S. 483 (1954)); *Cook County v. Wolf*, 962 F.3d 208, 220 (7th Cir. 2020) (discussing county's interest in "[e]nsuring that immigrants have access to affordable basic health care"); *Alabama Ass'n*, 594 U.S. at 764 (describing regulation of private

29

property as "the particular domain of state law"). Federal intrusion in these areas is a sovereign injury, *see Snapp*, 458 U.S. at 601, even if it is intangible, *Lujan*, 504 U.S. at 562-63.

In determining whether injuries to sovereign interests confer standing, courts have considered three factors derived from *Massachusetts v. EPA*, and set out in *Texas v. United States*: whether the suit "(1) involves the proper construction of a congressional statute, (2) does not purport to immunize [state] citizens from federal law, and (3) seeks to advance the state's quasi-sovereign interests" such as by "questioning federal assertions of authority to regulate matters alleged to be within the state's control" or "alleging federal interference with enforcement of state law." *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 875-76 (W.D. Wash. 2020) (quoting *Texas* 809 F.3d at 151-53); *see Massachusetts*, 549 U.S. at 516-20. Here, Plaintiffs have standing to seek redress for sovereign injuries.

**Arbitrary Enforcement.** Plaintiffs allege the Arbitrary Enforcement Policy led to an onslaught of arrests and detentions at courthouses, schools and public service locations that interfered with Plaintiffs' ability to maintain public health, operate courthouses and schools, and administer their programs. ¶¶ 219-42, 245-47, 250-63. Intimidating residents from using public services causes sovereign injury that confers standing. *Texas*, 809 F.3d at 163 (challenge to immigration policies by states harmed in capacity as providers of public benefits); *Wolf*, 962 F.3d at 220 (finding county alleged standing to challenge federal rule that would burden it with the cost of a substantial population with inadequate medical care). Two federal courts already reached this conclusion. In *Washington*, the court applied the *Texas* factors to an earlier courthouse arrest policy, concluding that the "litigation satisfies all of these criteria, and the State has 'constitutional' standing" based on its sovereign injury. 614 F. Supp. 3d at 875-76. The court in *New York v. U.S. Immigr. & Cust. Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019) reached the same conclusion.

30

Defendants argue Plaintiffs injuries will not be remedied by a decision in Plaintiffs' favor. They assert that the prior policy did not bar all operations at sensitive locations so vacatur of the Arbitrary Enforcement Policy will not eliminate such operations. Dkt. 44 at 15. But for standing, Plaintiffs need only allege the challenged conduct is "in part responsible for" the injury. *Phila. Yearly Meeting of the Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 315 (D.C. Md. Feb. 24, 2025); *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (A plaintiff "need not show that a favorable decision will relieve his *every* injury."). Here, Defendants removed restrictions, then increased enforcement, which harmed Plaintiffs' sovereign interests. Vacatur likely would decrease enforcement and, in part, remedy the injury. Defendants point out that this causal chain depends on residents reducing use of Plaintiffs' services at sensitive locations because of Defendants' conduct. Dkt. 44 at 15. But that is a "predictable" reaction to Defendants' policy, so Plaintiffs' injury is sufficiently traceable to Defendants' conduct to confer standing. *Dep't of Com.*, 588 U.S. at 768; *Phila. Yearly Meeting*, 767 F. Supp. at 316 (finding injuries traceable to sensitive locations policy where fears of enforcement "relate specifically to the presence of immigration officers at places of worship, not in the general community.").[19]

**Roving Patrols and Warrantless Arrests.** Plaintiffs have alleged sovereign and quasi-sovereign injuries from the Roving Patrol and Warrantless Arrests Policies. Defendants' policies implicate "matters . . . within the state's control" and "interfere[ ] with enforcement of state law." *See Washington*, 614 F. Supp. 3d at 876; *Kentucky*, 23 F.4th at 598-99. These policies have undermined Plaintiffs' efforts to maintain public spaces and services for the use and enjoyment of residents, and reduced cooperation with law enforcement investigations and proceedings. ¶¶ 158,

---

[19] Defendants rely on *United States v. Texas* for their claim of broad immunity for federal actions purportedly related to enforcement discretion. 599 U.S. at 678; Dkt. 44, at 13. As discussed above, the plaintiffs in *United States v. Texas* lacked standing to challenge executive non-enforcement, which is not the case here.

159, 326. The policies also diminish trust between law enforcement and communities, which "interferes with the State and City's law enforcement priorities." ¶¶ 94, 358-59. This interference burdens Plaintiffs' exercise of their police powers, which, contrary to Defendants' protestations, Dkt. 44 at 7-8, is a paradigmatic sovereign injury. *Cf. City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 877-78 (N.D. Ill. 2018) (finding irreparable harm where "Chicago's compliance with the Conditions would damage local law enforcement's relationship with immigrant communities and decrease the cooperation essential to prevent and solve crimes."); *Vasquez Perdomo*, 2026 WL 473121, at *3, *13 (discussing decrease in public trust as an injury from roving patrols).

Defendants object that Plaintiffs' injuries from the Roving Patrol and Warrantless Arrests Policies are insufficiently "concrete" because they lack an analogue in common law. Dkt. 44 at 7-8, 12. They rely on *TransUnion LLC v. Ramirez*, and the cases following it, but in *TransUnion* the Court held that Congress could not confer standing via statute on a plaintiff that had not otherwise suffered an injury. 594 U.S. 413, 429 (2021) (Congress could not "freely authorize *unharmed* plaintiffs to sue"). Here, Plaintiffs' injuries do not arise from a statutorily-created right of action but from the effect of Defendants' policies on Plaintiffs' sovereign and quasi-sovereign powers. *TransUnion* does not apply.

**Biometric Scanning.** Plaintiffs have alleged sovereign and quasi-sovereign injuries from the Biometric Scanning Policy. The *Texas* factors are satisfied, as Plaintiffs challenge a policy that undermines state laws at the heart of Illinois' sovereign power: exercise of police power and protection of privacy. In Illinois, the protection of personal private information is sacrosanct. ¶¶ 119-20 (citing Ill. Const. art. I, § 6); *see Snapp*, 458 U.S. at 605-07 (recognizing the quasi-sovereign interest in non-economic well-being of residents). The Illinois Constitution requires individualized suspicion, relevance, and strict procedures for the collection of biometric

32

information. ¶ 120. Defendants' Biometric Scanning Policy authorizes biometric scanning of any individual an agent encounters, including citizens, without cause or consent, retaining their information for 15 years. ¶¶ 110-13. Defendants have deployed this scanning in the field more than 100,000 times. ¶ 109.

Where the "federal government has intruded upon areas traditionally within states' control," rending a state law ineffective, states suffer a sovereign injury. *Kentucky*, 23 F.4th at 598-99 (state had standing to challenge federal employer vaccination mandate that was contrary to state vaccination policy); *Tennessee*, 104 F.4th at 591 (federal guidance on interpretation of Title IX injured the states by threatening "the continued enforceability of [the states'] own statutes"); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (state had standing to challenge federal agency's interpretation and application of state law that "interferes with [state's] ability to enforce its legal code"). Illinois has an overriding sovereign interest in upholding its Constitution, and the Biometric Scanning renders its efforts to do so ineffective.

Defendants assert that Plaintiffs have not pleaded sovereign injury from the Biometric Scanning Policy because states lack power to impede Defendants' exercise of authority granted by Congress. Dkt 44. at 10-11. But Plaintiffs allege that Congress did *not* grant Defendants authority to engage in mass surveillance. ¶¶ 360-67. Plaintiffs seek to impede Defendants from acting outside its statutory authorization. Thus, the scope of Defendants' statutory authority is a merits issue, not a threshold standing question. Similarly, Defendants' contention that Plaintiffs lack standing to challenge the Biometric Scanning Policy because they are exempt from complying with state law misunderstands Plaintiffs' injury. Plaintiffs seek compliance with *federal* laws and further seek respect for their authority as sovereigns. The scope of Defendants' immunity from state law is distinct from whether Plaintiffs' sovereign interests have been injured.

### 4. Plaintiffs Do Not Bring Claims as *Parens Patriae*.

As discussed above, Plaintiffs have alleged specific, concrete, discrete injuries to their economic and other resources, their property, and their sovereign and quasi-sovereign interests. Defendants have inflicted these injuries on Plaintiffs. Defendants characterize Plaintiffs' injuries as solely flowing to third parties, and cast Plaintiffs' claims as improperly invoking *parens patriae* standing. Dkt. 44 at 9, 12, 17. But Plaintiffs have alleged in detail their own injuries, separate and distinct from the harm Defendants have caused their residents. Plaintiffs do not seek redress for injuries to those individuals. *See Vasquez Perdomo*, 2026 WL 473121, at *18 (finding municipalities had standing to challenge roving patrols based on their own injuries, not as *parens patriae*). Defendants' assertion that Plaintiffs seek standing as *parens patriae* is without merit.

### B. Plaintiffs Alleged Agency Action.

"An agency activity is a final agency action only if it is both an 'agency action'" and 'final.'" *Drs. for Am. v. Office of Pers. Mgmt.*, 793 F. Supp. 3d 112, 137 (D.D.C. 2025). For six of the seven policies alleged, Defendants take issue only with the first prong of this test. Importantly, they do not challenge the sufficiency of the allegations supporting each policy. Instead, Defendants assert that Plaintiffs are bringing a "broad programmatic challenge to every aspect of DHS's law enforcement response" because Plaintiffs have not identified an agency "document, order, regulation, [or] statement" setting forth each policy. Dkt. 44 at 30, 33. Defendants are wrong on the law – no such "document" is required – and ignore the allegations in the Complaint, which identify distinct, specific, identifiable, and ongoing agency policies supported by numerous "documents" and "statements."

### 1. Agency Action Does Not Require a Formal Agency Statement.

Under the APA, "'agency action' includes the whole or a part of an agency rule, order,

34

license, sanction, relief, or the equivalent or denial thereof[.]" 5 U.S.C. § 551(13). The "central purpose" of the APA is to permit a "broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). The word "action" in § 551(13) encompasses "comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478, (2001). This expansive statutory definition reaches situations in which agencies adopt an "equivalent" of rules or orders, 5 U.S.C. § 551(13), without producing a formal and final statement. An "'agency action need not be in writing to be judicially reviewable as a final action.'" *Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 902 (N.D. Ill. 2020).

In *New York v. Trump*, for example, the plaintiffs challenged an OMB funding freeze that was evidenced by a memorandum. 171 F.4th 1 (1st Cir. 2026). The government withdrew the memorandum and argued there was no longer an "agency action" subject to review. *Id.* at *11, *16. But the court rejected this ploy, explaining "[t]he States are challenging the OMB Directive, not the piece of paper that contained it." *Id.* at *16. *See also Venetian Casino Resort v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("The Manual is relevant insofar as it illuminates the nature of the policy, but the agency took final action by adopting the policy, not by including it in the Manual."); *Illinois v. Vought*, No. 26 CV 1566, 2026 WL 962287, *2, *4 (N.D. Ill. Mar. 12, 2026) (finding reviewable agency action despite "no formal, official memo" based on "circumstantial" evidence).

Accordingly, whether an agency has taken a reviewable "action" depends on questions of fact, which can be proved through evidence other than an express written agency policy statement. *New York,* 171 F.4th at 16 (citing *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 n.4 (D.C. Cir. 2018) (plaintiffs "employ[] the declarations for the distinct and permissible purpose of proving" a "*de facto* policy of authorizing long-term visas")). Courts have relied on all manner of probative allegations to find agency action, including (a) statements by agency decision makers describing

35

an agency policy; (b) pervasive implementation of the policy by agency employees; (c) ratification of agency conduct by those with decision-making authority; and (d) whether the alleged action is inconsistent with established agency policies or rules.[20] Plaintiffs' allegations fall within each of these categories, easily surpassing the plausibility bar for alleging a series of discrete and reviewable policies subject to APA review.

### 2. Plaintiffs Alleged Discrete Agency Actions.

Defendants argue Plaintiffs have not pleaded "*factual* matter" to show that the Roving Patrol, Biometric Scanning, Warrantless Arrests, Tear Gas, Conceal Plates, and Private Trespass policies are "discrete agency actions" reviewable under the APA. Dkt. 44 at 31-35. But Defendants do not address the substantive allegations supporting each agency action, dismissing them collectively as "vague," "conclusory," "speculative," and "unsupported." *Id*. at 31-32. The Complaint refutes these descriptions.

**Roving Patrol**. Defendants implemented a policy of arbitrarily stopping and questioning residents about their citizenship without cause or justification replacing a previous policy of targeted investigation and arrest. ¶ 74. Defendants admitted this was their new policy. ¶ 84 (agents "are trained to" question "anyone anywhere in the United States as to their citizenship"). And Defendants repeatedly implemented the policy in Illinois. ¶¶ 87–90. These allegations suffice to

---

[20] *Xirum v. U.S. Immigr. & Customs Enf't*, No. 1:22-CV-00801-TWP-KMB, 2024 WL 3718145, at *10 (S.D. Ind. Aug. 8, 2024) (relying on statements by ICE Director to find agency action via adoption of general policy); *Nava*, 435 F. Supp. 3d at 903 (finding reviewable agency action where the plaintiffs "allege that ICE applied the policy in five specific cases, and likely in numerous others"); *New York*, 431 F. Supp. 3d at 387 (change in number of courthouse arrests "suggests that the Directive embodies ICE's novel interpretation of its statutory authority to conduct courthouse arrests, and not merely case-by-case guidance to individual officers."); *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d at 871-73 (rejecting argument that courthouse arrest policy was not agency action "because CBP has done nothing to disassociate itself from its agents' behavior"); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 750-51 (D. Md. 2025) (agency decision to allow broad disclosure of personal information "upended [] longstanding policy and practice that governed the [agency]" and was therefore agency action); *AAUP v. Rubio*, 802 F. Supp. 3d 120, 191 (D. Mass. Sept. 30, 2025) (finding enforcement initiative used in "unprecedented way" and "new use of the invoked statutes" was final agency action).

36

show the Roving Patrol Policy is agency action. *See Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1208 (S.D. Cal. 2019) (finding agency action based on "various instances of U.S. government officials' acknowledgement of [the unwritten] policy alleged in the complaint"); *id.* (finding "extensive allegations of alleged turnbacks of asylum seekers by CBP officers . . . along U.S.-Mexico border . . . plausibly point to the existence of an unwritten policy"); *Nava*, 435 F. Supp. 3d at 903 (finding unwritten agency action where plaintiffs alleged numerous applications).

**Biometric Scanning.** Defendants implemented a policy of capturing biometric information without consent of any person encountered by immigration agents and retaining that information for fifteen years. ¶ 114. This policy replaced a prior policy, as detailed in Directive 026-11, that limited the use of biometric scanning technology and retention of the data gathered. ¶¶ 104-06. DHS rescinded Directive 026-11 and replaced it with the Biometric Scanning Policy centered on Mobile Fortify and summarized in a new Privacy Threshold Analysis ("PTA"). ¶¶ 106, 110-14. The Biometric Scanning Policy permits agents to use Mobile Fortify to collect information from anyone they "encounter," regardless of citizenship or immigration status, without notice, and without probable cause, reasonable suspicion, or consent. ¶¶ 110-11. Also, under the Biometric Scanning Policy, DHS retains biometric data for fifteen years—regardless of whether any immigration action was initiated or whether the person is a U.S. citizen. ¶ 113.[21]

Defendants object that the PTA did not "fully reflect DHS policy regarding the collection and use of biometric information . . . ." Dkt. 44 at 31 n.2. But the PTA is *evidence* of the new biometric policy. It reveals enough of the policy to support the conclusion – in combination with the other allegations in the Complaint – that the Biometric Scanning Policy substantially expanded

---

[21] The Biometric Scanning Policy has been implemented nationwide, further supporting the conclusion that Plaintiffs have alleged agency action. ¶¶ 115-–18; *see Hussen v. Noem*, No. 26-CV-324, 2026 WL 657936, at *9, *13, *15, *18, *39 (D. Minn. Mar. 9, 2026) (describing biometric scanning by ICE agents in Minnesota); *M-J-M-A- v. Hermosillo*, No. 6:25-CV-02011, 2026 WL 562063, at *6 (D. Or. Feb. 27, 2026) (documenting use of Mobile Fortify in Oregon).

DHS's invasion into the privacy of the individuals with whom it interacts. *Am. Fed. Of State, Cnty. And Muni. Emps., AFL-CIO, v. Soc. Sec. Adm.,* 778 F. Supp. 3d 685, 750-51 (D. Md., Apr. 17, 2025) (holding decision to grant access to personal data was agency action where there was previously a "longstanding policy and practice at [the agency] of guarding the confidentiality and privacy of" personal data and "allowing only tailored access").

**Warrantless Arrests.** Defendants implemented a policy of making civil immigration arrests without a warrant and without probable cause, leading to arrests of numerous Illinois residents. ¶¶ 132, 141-46. DHS repeatedly stated this was its policy, and Bovino acknowledged its implementation in Illinois. ¶¶ 133–35. Defendants changed their procedures to advance the policy by abandoning Field Operations Worksheets. ¶¶ 129, 131-32. The Complaint "as a whole leaves no doubt that defendants in practice have consummated a decisionmaking process that resulted in the implementation of a new policy of conducting warrantless civil immigration arrests based on a lower standard than probable cause." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 43 (D.D.C. 2025); *Cf. Am. Ass'n of Univ. Professors v. Trump*, No. 25-CV-07864, 2025 WL 3187762, at *35 (N.D. Cal. Nov. 14, 2025) ("Defendants' numerous public statements on the issue and pattern of implementing the . . . Policy at other universities makes the directive sufficiently clear to show [final agency action.]")

In fact, several courts have found DHS has a "policy of effecting warrantless immigration arrests under § 1357(a)(2) without regard for individualized flight risk," and that the policy is reviewable under the APA. *Ramirez Ovando v. Noem*, 810 F. Supp. 3d, 1209, 1235 (D. Colo. 2025) (collecting cases); *see also id.* at 1236 (holding that the warrantless arrest policy "is sufficiently 'discrete'"); *Escobar Molina*, 811 F. Supp. 3d at 42-49 (holding that the warrantless arrest policy is reviewable final agency action). Plaintiffs have alleged facts that compel the same conclusion

38

here.

**Tear Gas.** Defendants implemented a policy of deploying tear gas without warning against persons who were not resisting. ¶ 177. The sheer volume of incidents – at least forty-nine times over six weeks, ¶ 178, -- belies Defendants' contention that these were "disparate incidents involving DHS agents" rather than a policy. Dkt. 44 at 33; *see also Nava*, 435 F. Supp. 3d at 903 (rejecting a similar argument where plaintiffs alleged multiple, specific applications of ICE's warrantless arrest policy). That Bovino, who directed Illinois operations, personally deployed tear gas against non-resisting residents without warning and instructed others to do so supports a finding of agency action. ¶¶ 180, 186. Bovino admitted the Tear Gas Policy was a DHS decision when he described those dispersing tear gas against innocent bystanders without warning as "operating with extreme professionalism" and "exemplary." ¶ 187. Public recognition of an agency policy by its leaders supports the conclusion that the policy is an exercise of agency power. *See Al Otro Lado*, 394 F. Supp. 3d at 1208; *New York*, 171 F.4th at 16.

**Conceal Plates.** Defendants have implemented a policy to conceal, remove, or swap license plates in violation of federal and state law and contrary to Defendants' own regulations. ¶¶ 264-69. The Conceal Plates Policy is supported by specific allegations of pervasive and widespread conduct, ¶¶ 270-79; Defendants' admissions that they were following such a policy, ¶¶ 281-82; and their continuation of the policy after they were advised it was unlawful, ¶ 280. Thus, Defendants maintained a policy to conceal agents' locations and identities. ¶¶ 281-82.

**Private Trespass.** In May 2025, Defendant Lyons issued a memorandum explaining part of this policy ("Lyons Trespass Memo").[22] The Lyons Trespass Memo authorizes immigration

---

[22] Memorandum from Acting Dir. Todd Lyons to U.S. Immigr. and Customs Enf't, "Utilizing Form I-205, Warrant of Removal" (May 12, 2025), is attached as Attachment A. The Lyons Trespass Memo was disclosed after the Complaint was filed so it is not alleged in the Complaint. However, the Court may take judicial notice of the Lyons Trespass Memo because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot

officers to enter private residences without a judicial warrant, owner consent, or exigent circumstances. The Complaint alleges this Private Trespass Policy and dozens of examples of its implementation in Illinois. The Lyons Trespass Memo, and these allegations establish agency action. ¶¶ 292-307.

Because the Complaint specifically identifies seven distinct agency actions, Defendants' contention that Plaintiffs are bringing "a broad programmatic challenge" necessarily fails, and the cases they cite are easily distinguishable. Dkt. 44 at 33-34 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)). *Lujan* was an APA challenge to the Bureau of Land Management's "land withdrawal review program." *Id.* at 875. The Supreme Court rejected the plaintiffs' effort to aggregate all the agency's conduct into a single APA challenge, concluding the "program" was not "an identifiable 'agency action'" but "simply the name by which [the agency had] occasionally referred to" ongoing operations. *Id.* at 890.

Defendants accuse Plaintiffs of similarly "aggregat[ing] hundreds of disparate interactions between federal law enforcement officers and the citizens of Illinois into purported policy." Dkt. 44 at 34. But the Complaint does the opposite. Plaintiffs disaggregated Defendants' conduct, identified the core provisions of each of Defendants' agency actions, and challenged each policy separately. *Lujan* permits this approach; it recognized that components of the land review program were "rules of general applicability," 497 U.S. at 892, and thus agency actions that could "of course be challenged under the APA" even when "the entire 'land withdrawal review program' . . . would thereby be affected," *id.* at 890 n.2. Here, Plaintiffs have challenged under the APA seven discrete policies implemented by Defendants. "[B]ecause nothing prevents a plaintiff from challenging

---

reasonably be questioned." Fed. R. Evid. 201(b). The Court may consider information subject to judicial notice on a motion to dismiss. *Bell v. City of Country Club Hills*, 841 F.3d 713, 716 (7th Cir. 2016).

40

more than a single discrete final agency action in a single suit," there is "no merit to the Government's argument that the States' APA claims . . . constitut[e] an impermissible 'programmatic attack.'" *New York*, 171 F.4th at 18.[23]

### C. The Arbitrary Enforcement Policy is a Final Agency Action and is Not Committed to Agency Discretion (Count XI and XII).

Counts XI and XII challenge the Arbitrary Enforcement Policy, which rescinded a prior policy limiting immigration enforcement at certain sensitive locations and implemented a new policy leading to increased arrests at courthouses, medical and social service facilities, and schools.[24] Unlike the other policies, Defendants concede this policy is "agency action" but contend it is unreviewable because it (a) was not "final," and (b) is committed to the agency's exclusive, unreviewable discretion. Dkt. 44 at 35-42. Neither argument is persuasive.

#### 1. The Arbitrary Enforcement Policy is a Final Agency Action.

An agency action is final if it satisfies two elements: (1) it "mark[s] the consummation of the agency's decisionmaking process," and (2) it determines "rights or obligations" or has "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Defendants dispute only the second element. Dkt. 44 at 36. "Whether an agency action has direct and appreciable legal consequences under the second prong of *Bennett* is a pragmatic inquiry." *Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 62 (D.C. Cir. 2020). An agency action meets this requirement if it alters the rights or obligations of the agency, those it regulates, or others downstream of the rule. *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (guidance creating "obligations on the

---

[23] Defendants' reliance on *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) is misplaced. There, the plaintiffs sought to "compel agency action unlawfully withheld" under section 706(1) of the APA. 542 U.S. at 57 (quoting 5 U.S.C. § 706(1)). The Court held that plaintiffs may not compel an agency to act unless they "assert[ ] that an agency failed to take a *discrete* agency action that it is *required to take*." *Id*. at 64. Plaintiffs' APA claims do not seek to compel Defendants to do anything. They seek to vacate and enjoin the unlawful policies.

[24] Defendants refer to this policy as the Huffman and Lyons Memos. Dkt. 44 at 35-38.

part of State regulators and those they regulate" satisfied second prong of *Bennett*); *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (An "agency's guidance documents binding it and its staff to a legal position . . . meet[s] the second prong of *Bennett*.").

Two courts already have concluded that the Arbitrary Enforcement Policy and a similar policy applied to immigration courts met *Bennett*'s finality test because they had legal consequences for (a) the agency by "redetermin[ing] the rights and obligations of DHS personnel," and (b) those now subject to arrest at or near sensitive locations based on the elimination of the prior "effective safe harbor" for noncitizens at such locations. *Phila. Yearly Meeting of Religious Soc'y v. U.S. Dep't of Homeland Sec.*, No. CV 25-0243-TDC, 2026 WL 280089, at \*4-\*5 (D. Md. Feb. 3, 2026); *see also Pablo Sequen v. Albarran*, 814 F. Supp. 3d 1005, 1025 (N.D. Cal.2025) (policy granting ICE agents unfettered discretion to make immigration court arrests "had an immediate effect on [ICE's] day-to-day operations" and affected the plaintiffs arrested at immigration court). *But see New England Synod v. Dep't of Homeland Sec.*, No. CV 25-40102-FDS, 2026 WL 412329 (D. Mass. Feb. 13, 2026). Either finding is sufficient to support finality. Both are correct.

First, the policy "materially redetermined the rights and obligations of immigration officers by removing the restrictions and limitations of the [prior] Policy." *Phila. Yearly Meeting*, 2026 WL 280089, at \*5; *see also Texas v. United States*, 40 F.4th 205, 214, 220-21 (5th Cir. 2022) (agency action curbing officers' discretion and advising on how to exercise it was final).

Second, under the policy, DHS agents routinely arrest those attending court hearings, going to school or daycare, accessing services at homeless and domestic violence shelters, and seeking medical care at hospitals and health centers. ¶¶ 219-42, 263. Increased arrests are a concrete consequence that meets the second prong of *Bennett*. *See Washington*, 614 F. Supp. 3d at 871-72

42

(relying on increase in immigration arrests at courthouses to support finding of finality). These locations had been considered "safe harbors" under the prior policy, and the recission of that assurance was a final action. *Phila. Yearly Meeting*, 2026 WL 280089, at *5 (concluding that withdrawal of safe harbor in this context meets the second prong of *Bennett*) (citing *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599-600 (2016)); *See also Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (guidance that "establishe[d] safe harbors . . . produc[ed] legal consequences and determine[ed] rights and obligations of regulated parties.").

Third, as discussed above, Plaintiffs suffered concrete injuries from the Arbitrary Enforcement Policy. The policy dissuaded and intimidated residents from using public services, thereby interfering with Plaintiffs' ability to perform sovereign functions, like administering a system of justice and providing education for all residents. *See* § III.A.3, *supra*. Interference with Plaintiffs' sovereign authority is a legal consequence of the Arbitrary Enforcement Policy.

Defendants acknowledge that the Arbitrary Enforcement Policy replaced the prior policy, but they assert this did not create "legal consequences" because the 2021 Policy was a "nonbinding policy statement" that "imposed no obligations or prohibitions," but "simply provided guidance for lower-level officials." Dkt. 44 at 37. Thus, according to Defendants, its recission and replacement had no legal impact and so was not a "final" agency action. The court in *New England Synod* adopted Defendants' position. 2026 WL 412329, at *26-*27.

However, the two 2021 memoranda codifying the prior policy had all the substantive and procedural hallmarks of final agency action, including (a) barring enforcement actions at sensitive locations "to the fullest extent possible" as an "obligation" applicable "at all times;" (b) enumerating the "limited" circumstances when enforcement was permissible, such as threats to national security or public safety, or risk of death, violence, or physical harm; (c) requiring agents

43

to "seek prior approval from their Agency's headquarters," before invoking an exception; (d) instituting mandatory documentation and reporting requirements.[25] They also subject personnel who violated the policy to potential discipline. *Phila. Yearly Meeting*, 2026 WL 280089, at *4. Thus, the 2021 Policy imposed obligations on agents, limited their discretion, and created an oversight mechanism – all supporting finality. Replacing this final agency action with the Arbitrary Enforcement Policy had legal consequences, so it, too, was final. ¶¶ 215-18.

The court in *New England Synod* took an overly narrow view of finality, suggesting only policies that "limit an agency's or employee's statutory authority" have sufficient "concrete" legal consequences to be final. 2026 WL 412329, at *27, *28. This is inconsistent with the "pragmatic approach" dictated by *Bennett*. Agency policies that direct and guide the discretion of front-line employees alter their obligations and impact enforcement. *New York*, 431 F. Supp. 3d at 387 (policy "has legal consequences for the aliens who were not previously subject to potential enforcement actions at state courthouses, but who now are, as well as for the proper functioning of the state courts themselves"). Here, DHS reversed its prior policy, endorsed enforcement actions previously barred, and increased risk of arrest for those accessing public services.[26]

Defendants note that the memos setting forth the policy contained boilerplate language disclaiming that the policy created any rights or benefits. Dkt. 44 at 36. "[S]uch a disclaimer by an agency about what its statements do and do not constitute as a legal matter are not dispositive."

---

[25] Memorandum from Alejandro N. Mayorkas, Sec'y, Dep't of Homeland Sec., Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021); Memorandum from Acting Dir. Tae Johnson and Acting Comm'r Troy Miller to U.S. Immigr. and Customs Enf't and U.S. Customs and Border Prot., "Civil Immigration Enforcement Actions in or near Courthouses" (Apr. 27, 2021).

[26] The other cases cited by Defendants are inapposite. *Ass'n of Flight Attendants v. Huerta,* found agency guidance was not final because regulated entities were "free to ignore" it. 785 F.3d 710, 717 (D.C. Cir. 2015). That is not the case here for those arrested at courthouses and other sensitive locations that DHS policy previously treated as safe harbors. ¶¶ 220-42. Likewise, in *Menominee Indian Tribe of Wisc. v. Env't Prot. Agency*, the court declined to review "purely informational" letters that "reiterated the status quo." 947 F.3d 1065, 1070 (7th Cir. 2020). Here, by contrast, the Arbitrary Enforcement Policy was not informational. It had real legal consequences.

*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 516 (9th Cir. 2018), *rev'd in part, vacated in part on other grounds*, 140 S. Ct. 1891 (2020); *Appalachian Power Co.*, 208 F.3d at 1022-23 (concluding guidance document "certainly" created legal "obligations" notwithstanding "boilerplate" disclaimer); *Phila. Yearly Meeting*, 2026 WL 280089, at *6.

**2. The Arbitrary Enforcement Policy is Not Committed to Agency Discretion.**

Defendants also move to dismiss the Arbitrary Enforcement APA claims on the grounds that the policy is exempt from judicial review because it is "committed to agency discretion by law." Dkt. 44. at 38 (citing 5 U.S.C. § 701(a)(2)). However, section 701(a)(2) is a "very narrow" exception to the presumption of judicial review. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). It is limited to those "rare instances" when "there is no law to apply." *Heckler v. Chaney,* 470 U.S. 821, 830 (1985). Here, there is ample law to guide the Court's review.

Defendants attempt to turn the "very narrow" exception in § 701(a)(2) into a broad rule that immigration "enforcement decisions" are immune from review. Dkt. 44 at 40 ("aside from the requirement to obtain a warrant in certain circumstances, Congress has placed no other restrictions on DHS's enforcement discretion"); *id.* at 41 ("agency decisions about whether to pursue enforcement actions are committed to agency discretion"). But courts regularly review immigration enforcement policies under the APA. *See*, *e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 19 (2020) (DHS deferred enforcement program reviewable); *Perez Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019) ("In several immigration cases, we have held that there are meaningful standards of review and have declined to apply § 701(a)(2)").

Defendants' mistake is failing to distinguish between "single-shot []enforcement decision[s]," which may be within the agency's discretion, and "an agency's adoption of a general enforcement policy, [which] is subject to review." *OSG Bulk Ships, Inc. v. United States*, 132 F.3d

45

808, 812 (D.C. Cir. 1998). Defendants rely on *Chaney*, 470 U.S. 821, and cases that followed it, but those cases are about individual enforcement decisions. *Id.* at 832-33.[27] "Major agency policy decisions are quite different from day-to-day agency enforcement decisions. Where an agency expresses a broad or general enforcement policy, different considerations than those driving *Chaney*'s presumption are at play." *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 699 (4th Cir. 2019). Although the "rescission [of a policy] may lead to increased enforcement, it does not, by itself, constitute a particular enforcement action" committed to agency discretion. *Regents*, 591 U.S. at 18; *see also Texas v. United States*, 40 F.4th 205, 221-22 (5th Cir. 2022) (finding reviewable agency action because it "does not represent a one-off enforcement decision, but rather a calculated, agency-wide rule limiting ICE officials' abilities to enforce statutory law.").

Courts reviewing the Arbitrary Enforcement Policy have recognized this distinction and concluded the policy is subject to review. *See New York*, 431 F. Supp. 3d at 385-86 (finding reviewability where "[p]laintiffs do not challenge ICE's decision to arrest particular aliens as opposed to others" but instead challenge "a categorical policy to conduct immigration arrests in particular places"); *Phila. Yearly Meeting*, 2026 WL 280089, at *7 (finding 2025 Policy regarding enforcement actions at non-courthouse sensitive locations to be reviewable because "it is . . . based on broader considerations than those at issue in individual enforcement decisions as in *Heckler*.").

To the extent Defendants assert there are no "meaningful standards" against which to compare the Policy, that argument also fails. Dkt. 44 at 38-42. "Even where statutory language grants an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or

---

[27] Dkt. 44 at 39-41 (citing *Chaney*, 470 U.S. at 832-33; *Greer v. Chao*, 492 F.3d 678, 962 (8th Cir. 1987) (investigation of plaintiff's complaint); *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) (denial of petition for rehearing); *Malukas v. Barr*, 940 F.3d 968, 969 (7th Cir. 2019) (motion to reconsider denial of relief); *Singh v. Moyer*, 867 F.2d 1035, 1036-37 (7th Cir. 1989) (denial of waiver of visa requirement for individual); *Arizona v. United States*, 567 U.S. 387, 396 (2012) (explaining deference warranted when "equities of an individual case may turn on many factors").

agency practice provide a meaningful standard by which this court may review its exercise of discretion." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) (citation modified). *See also Natural Resources Defense Council  v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (concluding that agency withdrawal of previously-held discretion is reviewable agency action); *Franklin v. Massachusetts*, 505 U.S. 788, 819-20 (1992) (Stevens, J., concurring in part) ("[t]he statutory framework and the long-held administrative tradition provide a judicially administrable standard of review."). "Prior policies" can "provide a benchmark against which to measure whether [each] agency justified its choice on specious grounds, failed to satisfy the general requirements of reasoned agency decisionmaking, or failed to comply with its own regulations." *Pablo Sequen*, 814 F. Supp. 3d at 1027). DHS's former policy, codified in the 2021 memoranda, established standards for enforcement activities at sensitive locations and thus provide "law to apply."[28]

### D. The Illegal Trespass Policy Exceeds Statutory And Constitutional Authority And Is Unlawful (Counts XV, XVII).

Defendants challenge Counts XV and XVII for failure to state a claim. Those counts allege that Defendants' policy of entering private property to conduct immigration enforcement without a warrant or consent of the owner exceeds statutory and constitutional authority. ¶¶ 433-38, 447-53. The Lyons Trespass Memo confirmed the existence of this policy authorizing immigration officers to enter private residences without a judicial warrant, owner consent, or exigent circumstances. There is no statute authorizing warrantless entry (Count XV), and the Fourth Amendment bars such conduct (Count XVII).

---

[28] Courts reviewing the Arbitrary Enforcement Policy as applied to courthouses have found a "common-law privilege against civil arrest while at or in transit to or from a courthouse, [to be] an obvious standard against which to evaluate the agency's exercise of discretion." *Washington*, 614 F. Supp. 3d at 873-75; *Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 688 (S.D.N.Y. 2020); *New York*, 431 F. Supp. 3d at 389-93. Illinois has long recognized a common law privilege barring civil arrest of persons attending, entering, or exiting a courthouse. *Greer v. Young*, 11 N.E. 167, 168 (Ill. 1887); *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916). Thus, as to courthouses (Count XI), the Court may look to Illinois common law, incorporated into the Immigration and Nationality Act, to inform its review.

47

Defendants assert Congress authorized them to trespass, pointing to their "broad authority to conduct immigration enforcement operations nationwide." Dkt. 44 at 43 (citing 8 U.S.C. § 1357(a)(1) & (2)). Nothing in § 1357(a)(1) or (a)(2) grants authority to access private property at all. And the limited authority to "access private lands" within "25 miles of the border" under section 1357(a)(3) reveals Congress' intent to restrict, rather than broadly permit, such conduct. Thus, there is no basis to dismiss Count XV.

Defendants also assert Plaintiffs have not alleged the policy exceeded constitutional authority (Count XVII) because the areas onto which they trespassed are akin to "open fields" which may be searched without a warrant. Dkt. 44 at 43-44. But none of the cases Defendants cite support the conclusion that the school properties and parking lots at issue here are "open fields," and, in any event, that determination presents a fact question that cannot be decided on a motion to dismiss. *United States v. Walton*, 763 F.3d 655, 666 (7th Cir. 2014).[29]

The Complaint also alleges that Defendants illegally trespassed on private yards of Illinois residents. ¶¶ 295-99. Defendants assert that Plaintiffs do not have standing to complain about Defendants' violations of residents' rights to be free from unreasonable searches. Dkt. 44 at 44-45. But, as discussed above, *see*, § III.A.2-4, *supra*, Defendants do not assert the rights of their residents; their standing is based on their own sovereign and economic injuries. *Vasquez Perdomo*, 2026 WL 473121, at *18 (municipalities sufficiently alleged independent qualifying harms caused by government's violation of individuals' Fourth Amendment rights). The fact that others also are injured by the policy does not negate Plaintiffs' standing.

Lastly, citing a mayoral executive order, Defendants contend the City's attempt to protect

---

[29] The only case cited by Defendants that applied the "open fields" rule "involve[d] a search of open forest land far away from [Plaintiff's] home and its curtilage." *Moher v. United States*, 875 F. Supp. 2d 739, 774 (W.D. Mich. 2012).

its property from trespass "discriminat[ed]" against the federal government. Dkt. 44 at 45. This argument is a non-starter. Plaintiffs' APA counts challenging the Private Trespass Policy do not allege Defendants violated the executive order, so the Court need not determine whether the executive order is discriminatory. ¶¶ 433-53. And, regardless, the executive order is not discriminatory. A state or local law unlawfully discriminates against the federal government only if the law "treats comparable classes of federal and state [or local] employees differently, advantaging the state [or local] employees," and "no significant differences between the two classes justify the differential treatment." *United States v. Illinois*, 796 F. Supp. 3d 494, 533 (N.D. Ill. 2025), *appeal pending*, No. 25-2904 (7th Cir.) (citation modified). Plaintiffs do not treat the federal government less favorably than other trespassers. Rather, Plaintiffs prohibited the use of City-owned lots for certain types of "civil immigration enforcement activity." ¶ 301. "The mere fact" that a state or local law "touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022).

## IV. Plaintiffs Pleaded a Claim Under the Declaratory Judgment Act (Count XIX)

Plaintiffs are entitled to relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. The Court has jurisdiction over this case under the APA and under its equitable jurisdiction. 5 U.S.C. §§ 702, 704-06; *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Declaratory relief is appropriate when "the facts alleged . . . show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975). Defendants do not dispute that this standard is met but assert that the request for declaratory relief was mislabeled a claim rather than relief. Dkt. 44 at 47. Regardless of the label, Plaintiffs properly pleaded they are entitled to declaratory relief.

49

**V.     The Court Has Authority to Resolve Plaintiffs' Claims and Award Relief.**

Defendants' assertion that 8 U.S.C. § 1252(f)(1) is a "jurisdictional impediment to injunctive relief" is incorrect. Dkt. 44 at 47. By its plain terms, § 1252(f)(1) prohibits "enjoin[ing] . . . the operation of the provisions of part IV of this subchapter." Part IV, in turn, covers 8 U.S.C. §§ 1221-32. Only four months ago, the Seventh Circuit explained the limits of § 1252(f)(1). *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1058-59 (7th Cir. 2025). Defendants' failure even to cite this recent binding precedent is telling. As the Seventh Circuit explained, § 1252(f)(1) does not limit courts' ability to enjoin conduct that implicates other sections of the INA, like § 1357. *Id.* at 1058. Thus, the court concluded that § 1252(f)(1) did not bar an injunction that "focused squarely on Defendants' compliance with § 1357(a)(2)" even if the order had "collateral effects" on activity governed by the provisions identified in § 1252(f)(1). *Id.* Defendants make the conclusory assertion that they acted under §§ 1226 and 1231, Dkt. 44 at 48, but they argue elsewhere that their policies derive from 8 U.S.C. § 1357 and other statutory or regulatory provisions, which are outside § 1252(f)(1)'s limited reach. *See supra* § II, III.A, III.D.

Moreover, assuming *arguendo* there was a claim arising under Part IV, the Court still has jurisdiction to adjudicate the claims and award declaratory relief and vacatur of the unlawful policy. *Brito v. Garland*, 22 F.4th 240, 252 (1st Cir. 2021) ("[D]eclaratory relief remains available under section 1252(f)(1)."); *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022) ("[Section] 1252(f)(1) does not apply to vacatur."). Section 1252(f)(1) does not support dismissal.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion.

KWAME RAOUL
*Attorney General of Illinois*

50

by:

/s/    Paul Berks
CARA HENDRICKSON
Executive Deputy Attorney General
PAUL BERKS
VIKAS DIDWANIA
Complex Litigation Counsels
MARY GRIEB
ELIZABETH JORDAN
EMILY HIRSCH
ALEXANDRA REED
CHRISTINA BEELER
R. HENRY WEAVER
MOLLY PETCHENIK*
REBEKAH NEWMAN
Assistant Attorneys General
Office of the Illinois Attorney General
115 South LaSalle Street
31st Floor
Chicago, Illinois 60603
(312) 814-3000
Cara.Hendrickson@ilag.gov

*Counsel for the State of Illinois*

* Admission pending

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of Chicago

By: /s/ Stephen Kane
Stephen Kane
John Hendricks
Rebecca Hirsch
Chelsey Metcalf
Rachel Zemke
Psalm Brown
John Kauffman
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
312-744-6934
stephen.kane@cityofchicago.org
*Counsel for the City of Chicago*

51