**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT COURT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF ILLINOIS, *et al.*, | ) | |
| | ) | No. 26-cv-321 |
| *Plaintiffs,* | ) | |
| | ) | Hon. Sara L. Ellis, |
| v. | ) | District Judge |
| | ) | |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION. .................................................................................................... 1

ARGUMENT. ........................................................................................................... 1

I.     Plaintiffs lack standing to seek the requested relief. ......................................... 1

     A.     Plaintiffs fail to plausibly allege the imminent harm necessary for forward-looking relief. ............................................................................................... 1

     B.     Plaintiffs' alleged financial harms do not confer standing to seek forward-looking relief. ............................................................................................... 5

     C.     Plaintiffs' alleged sovereign harms do not confer standing to seek forward-looking relief. ............................................................................................... 8

II.     Plaintiffs Fail to State a Tenth Amendment Claim. .......................................... 11

III.     Plaintiffs' APA claims are not justiciable. ...................................................... 18

     A.     Most of Plaintiffs' APA claims fail to plausibly allege discrete agency action. ..................................................................................................... 18

     B.     Counts XI and XII fail to plausibly allege final agency action. ........................... 22

     C.     Counts XI and XII challenge actions that are committed to agency discretion. ................................................................................................ 25

III.     Count II Should Be Dismissed Because CBP Is Authorized to Enforce Federal Immigration Law Nationwide. .......................................................................... 26

V.     Plaintiffs' *Ultra Vires* Claim Should Be Dismissed. ........................................ 30

VI.     Plaintiffs' Declaratory Judgment Claim Should Be Dismissed. ....................................... 30

CONCLUSION. ....................................................................................................... 30

i

## TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE(S)**

*Al Otro Lado, Inc. v. McAleenan*,
   394 F. Supp. 3d 1168 (S.D. Cal. 2019) .................................................................................... 19

*Am. Tort Reform Ass'n v. OSHA*,
   738 F.3d 387 (D.C. Cir. 2013) ............................................................................................... 22

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ....................................................................................... 7, 8, 22, 23

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ...................................................................................................... 9

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
   785 F.3d 710 (D.C. Cir. 2015) .............................................................................................. 22, 25

*Bark v. U.S. Forest Serv.*,
   37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................................................. 19

*Biden v. Texas*,
   597 U.S. 785 (2022) .................................................................................................................... 19

*Brennan v. Dickson*,
   45 F.4th 48 (D.C. Cir. 2022) ...................................................................................................... 2

*Brown v. CACH, LLC*,
   No. 20-CV-4579, 2021 WL 4133517 (N.D. Ill. Sept. 10, 2021) ............................................ 20

*Burke v. 401 N. Wabash Venture, LLC*,
   714 F.3d 501 (7th Cir. 2013) ..................................................................................................... 21

*Charles C. Steward Mach. Co. v. Davis*,
   301 U.S. 548 (1937) .................................................................................................................... 15

*Chicago Headline Club v. Noem*,
   168 F.4th 1033 (7th Cir. 2026) .............................................................................................. 3, 17

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ....................................................................................................................... 2

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) .................................................................................................................. 2, 3

*Nuclear Regul. Comm'n v. Texas*,
  605 U.S. 665 (2025)...................................................................................................... 30

*Corner Post, Inc v. Bd. of Govs. of Fed. Reserve Sys.*,
  603 U.S. 799 (2024)...................................................................................................... 18

*Department of Commerce v. New York*,
  588 U.S. 752 (2019)........................................................................................... 7, 14, 16

*Dhakal v. Sessions*,
  895 F.3d 532 (7th Cir. 2018) ................................................................................... 22–23

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024).................................................................................................. 6, 7, 8

*Franciscan All., Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) ......................................................................................... 4

*Fridley Public School District v. Mullin*
  No. 26-cv-1023 (LMP/LIB), 2026 WL 1244043 (D. Minn. May 6, 2026).............. 9, 23, 25–26

*Graham v. Connor*,
  490 U.S. 386 (1989)...................................................................................................... 13

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) .............................................................................................. 9, 12, 17

*Heckler v. Chaney*,
  470 U.S. 821 (1985)................................................................................................. 25, 26

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981)...................................................................................................... 14

*Hussen v. Noem*,
  No. 26-CV-324 (ECT/ECW), 2026 WL 657936 (D. Minn. Mar. 9, 2026) ............................... 3

*I.C.C. v. Brotherhood of Locomotive Engineers*,
  482 U.S. 270 (1987)...................................................................................................... 25

*Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*,
  163 F.3d 449 (7th Cir. 1998) ....................................................................................... 21

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ....................................................................................... 10

*L.A. Press Club v. Noem*,
--- F. Supp. 3d ---, 2026 WL 103972 (C.D. Cal. Jan. 8, 2026) .................................................. 19

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ...................................................................................................... 26

*Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*,
924 F.3d 375 (7th Cir. 2019) ......................................................................................... 4

*Louisiana v. U.S. Env't Prot. Agency*,
712 F. Supp. 3d 820 (W.D. La. 2024) ............................................................................. 4

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ...................................................................................................... 19

*Mannie v. Potter*,
326 F. Supp. 2d 880 (N.D. Ill. 2004) ............................................................................. 13

*Maryland v. United States Dep't of Agric.*,
151 F.4th 197 (4th Cir. 2025) ......................................................................................... 6

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
778 F. Supp. 3d 1 (D.D.C. 2025) ......................................................................... 9, 24, 25

*Minnesota v. Noem*,
No. 26-CV-190 (KMM/DJF), 2026 WL 253619 (D. Minn. Jan. 31, 2026) ........................... 12

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, (*NFIB*),
567 U.S. 519 (2012) ............................................................................... 13, 15, 16, 17, 18

*New England Synod v. DHS*,
--- F. Supp. 3d ----, 2026 WL 412329 (D. Mass. Feb. 13, 2026) ................................. 22, 24, 25

*New York v. United States*,
505 U.S. 144 (1992) ...................................................................................................... 18

*Norton v. Southern Utah Wilderness All.*,
542 U.S. 55 (2004) ........................................................................................................ 19

*Ohio v. Thomas*,
173 U.S. 276 (1899) ...................................................................................................... 11

*Park v. Forest Serv. of United States*,
205 F.3d 1034 (8th Cir. 2000) ......................................................................................... 4

iv

*Patterson v. Howe*,
   96 F.4th 992 (7th Cir. 2024) ....................................................................... 10

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ....................................................................................... 15

*Pennsylvania v. Trump*,
   795 F. Supp. 3d 607 (E.D. Pa. 2025) .......................................................... 2

*Pollack v. U.S. Dep't Of Just.*,
   577 F.3d 736 (7th Cir. 2009) ....................................................................... 4

*Precision Shooting Equip. Co. v. Allen*,
   646 F.2d 313 (7th Cir. 1981) ..................................................................... 30

*Rohde v. ADP, LLC*,
   No. 19 C 3347, 2020 WL 12139101 (N.D. Ill. Feb. 21, 2020)................... 21

*Scalise v. Thornburgh*,
   891 F.2d 640 (7th Cir. 1989) ............................................................... 25, 26

*Simic v. City of Chicago*,
   851 F.3d 734 (7th Cir. 2017) ....................................................................... 2

*Singh v. Moyer*,
   867 F.2d 1035 (7th Cir. 1989) ............................................................. 25, 26

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008)................................................................................... 16

*Taha v. Int'l Bhd. of Teamsters, Loc., 781*,
   947 F.3d 464 (7th Cir. 2020) ..................................................................... 20

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) ........................................................................ 2

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ..................................................................... 10

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021).............................................................................. 2, 10

*Trump v. United States*,
   603 U.S. 593 (2024)................................................................................... 17

v

*Trump v. Vance*,
  591 U.S. 786 (2020)........................................................................................... 13

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016)............................................................................... 23, 24, 25

*United States v. Butler*,
  297 U.S. 1 (1936).............................................................................................. 15

*United States v. Chem. Found., Inc.*,
  272 U.S. 1 (1926).............................................................................................. 17

*United States v. Chen*,
  2 F.3d 330 (9th Cir. 1993) ............................................................................... 29

*United States v. Illinois*,
  796 F. Supp. 3d 494 (N.D. Ill. 2025) .............................................................. 12

*United States v. Leyba*,
  627 F.2d 1059 (10th Cir. 1980) ....................................................................... 29

*United States v. Magana*,
  797 F.2d 777 (9th Cir. 1986) ........................................................................... 29

*United States v. Orozco*,
  191 F.3d 578 (5th Cir. 1999) ...................................................................... 20–30

*United States v. Texas*,
  599 U.S. 670 (2023).......................................................................... 6, 7, 9, 13, 17

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982)........................................................................................... 11

*Virginia ex rel. Cuccinelli v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011) ........................................................................... 11

*Warth v. Seldin*,
  422 U.S. 490 (1975)............................................................................................. 5

*Washington v. U.S. Department of Homeland Security*,
  614 F. Supp. 3d 863 (W.D. Wash. 2020)............................................................ 9

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ........................................................................... 5

*Washington v. U.S. Food & Drug Admin.*,
108 F.4th 1163 (9th Cir. 2024) ............................................................................ 6, 10

*Wyoming ex rel. Crank v. United States*,
539 F.3d 1236 (10th Cir. 2008) ............................................................................... 10

## STATUTES

5 U.S.C. § 551(13) ...................................................................................................... 19

5 U.S.C. § 701(a)(2) ................................................................................................. 25, 26

6 U.S.C. § 211(c)(8) ..................................................................................................... 28

8 U.S.C. § 1101(a) ....................................................................................................... 28

8 U.S.C. § 1226 ............................................................................................................ 27

8 U.S.C. § 1357 ............................................................................................................ 29

## ADMINISTRATIVGE AND EXECUTIVE AUTHORITIES

8 C.F.R. § 1.2 ............................................................................................................... 27

8 C.F.R. § 287.1(a)(2) .................................................................................................. 27

8 C.F.R. § 287.5 ....................................................................................................... 27, 28

## OTHER AUTHORITIES

Donald J. Trump (@realDonaldTrump),
Truth Social (Mar. 21, 2026, at 10:34 AM ET),
https://truthsocial.com/@realDonaldTrump/posts/116267892671497457 ............................... 14

*Vacatur of Rules Under the Administrative Procedure Act*,
40 Yale J. on Reg. Bull. 119 (2023) ......................................................................... 2

## **INTRODUCTION**

As explained in Defendants' Motion to Dismiss, Plaintiffs fail to establish the Court's jurisdiction over this case or state a valid claim. Plaintiffs' Opposition does not persuade otherwise.

Plaintiffs fail each element of Article III standing, alleging injuries that are not cognizable, not traceable to Defendants' actions, and not redressable by this Court. Additionally, Plaintiffs cannot establish standing to obtain prospective relief based on alleged conduct that occurred months ago when no injury is certainly impending. Beyond these threshold issues, Plaintiffs ask the Court to adopt a novel reading of the Tenth Amendment that has never before been accepted. They advance an atextual reading of the U.S. Customs and Border Protection's enforcement authority. And they seek to challenge disparate actions by law enforcement officers as purported hypothetical policies under the Administrative Procedure Act, contrary to the requirements of final agency action and the limitation on judicial review of actions that are committed to agency discretion. The Court should dismiss the Complaint in full.

## **ARGUMENT**

### I.     **Plaintiffs lack standing to seek the requested relief.**

Defendants moved to dismiss for a lack of standing. Mot. at 4–18. Plaintiffs respond by arguing that their alleged injuries are actual or imminent, as well as sufficiently concrete. Resp. at 20–34. Plaintiffs are wrong.

#### A. **Plaintiffs fail to plausibly allege the imminent harm necessary for forward-looking relief.**

Plaintiffs contest Defendants' imminence argument on two grounds. First, Plaintiffs argue that past injury is sufficient to seek vacatur. Resp. at 22. Second, Plaintiffs argue that they have

adequately alleged imminent injury for the purposes of their APA claims.[1] *Id.* Neither argument saves Plaintiffs from dismissal.

Vacatur operates to nullify agency action and "re-establish the status quo" that existed before the agency acted. *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022). In this sense, vacatur operates as "a prospective remedy, which eliminates the binding effect of regulations for the future." John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale J. on Reg. Bull. 119, 129 (2023). Accordingly, vacatur of an agency policy is "forward-looking relief," and thus "requires a showing that the plaintiff faces imminent harm in the future," *Pennsylvania v. Trump*, 795 F. Supp. 3d 607, 628 (E.D. Pa. 2025).

*Brennan v. Dickson*, 45 F.4th 48 (D.C. Cir. 2022), does not hold otherwise. Resp. at 22. The D.C. Circuit did not address whether vacatur could redress a past injury (it cannot) and simply noted in a single sentence that that the petitioner had not shown that the challenged rule "either harmed him or imminently will do so." *Id.*; *see Cruz v. Am. Airlines, Inc.*, 356 F.3d 320, 328 (D.C. Cir. 2004) ("prospective injunction against *future* applications of the 30–day rule will do nothing to remedy that past harm."). The Court should accordingly dismiss Plaintiffs' claims because they lack a plausible allegation of imminent future harm.

To plausibly allege standing to seek prospective relief, a plaintiff must allege a "'real and immediate' threat of future injury." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). Past injury "alone is insufficient," *id.*, as is "conjecture," *Lyons*, 461 U.S. at 108.

---

[1] Plaintiffs do not mount an imminence argument with respect to Count II, thus this claim should be dismissed on that basis alone. Resp. at 19 n.13 (responding to motion to dismiss Count II but not arguing that any injury is imminent).

No such plausible allegation can be found in the Complaint,[2] especially because Plaintiffs rely on alleged misconduct that predates the Complaint by months. *See* Mot. at 6–7, 11–13, 15–16; *cf. Chicago Headline Club v. Noem*, 168 F.4th 1033, 1038 (7th Cir. 2026) (noting the plaintiffs' representation in December 2025 that 'the roughly 200-225 DHS agents' involved in Operation Midway Blitz 'are no longer operating in the Northern District of Illinois'"). And in their response, Plaintiffs rest on nothing more than speculation as to future harm. This is not good enough. *See Chicago Headline Club*, 168 F.4th at 1041 ("[P]laintiffs suing for injunctive relief cannot establish standing by mere speculation.").

In support of their standing theory, Plaintiffs argue that the alleged policies that form the basis for their APA claims "remain in place and are being enforced against Plaintiffs and others." Resp. at 23. But this is not right. For one, Plaintiffs fail to plausibly allege the existence of any policy, which makes it harder to show likelihood of future injury. *Cf. Hussen v. Noem*, No. 26-CV-324 (ECT/ECW), 2026 WL 657936, at *31 (D. Minn. Mar. 9, 2026) ("The standing determination depends partially on the nature of Defendants' policies, so those policies must be determined at the outset."). Also, even assuming the existence of any such policy, none are directed at the State of Illinois or the City of Chicago. Instead, Plaintiffs allege that acts taken pursuant to these policies against *other people* result in downstream harm to Plaintiffs. That Plaintiffs' theory of injury relies on a chain of events increases its speculative nature. *See, e.g.*, *Clapper v. Amnesty International USA*, 568 U.S. 398, 414 (2013). For example, even if it is likely that courthouse arrests will continue in Chicago, this alone is insufficient. Instead, Plaintiffs need to plausibly allege that these arrests will both occur and result in cognizable injury to Plaintiffs. No such allegation is present.

---

[2] Although the motion to dismiss focused on Counts II through XIX, the same is true for Count I. Absent a plausible allegation of imminent harm, Plaintiffs also lack standing to seek forward-looking relief with respect to their Tenth Amendment claim.

3

The same is true regarding the use of CBP agents. Plaintiffs' allegations do not indicate an imminent return (a proposition proven by the passage of time), *see* Compl. ¶¶ 310–15, but even if they did, it remains entirely speculative that the presence of CBP agents alone would cause a cognizable injury to Plaintiffs.

To compensate for the missing allegations as to the likelihood of future harm, Plaintiffs rely on post-complaint occurrences. *See* Resp. at 23–24 & 23 nn.16–17. According to a case on which Plaintiffs rely, these won't do. *See Park v. Forest Serv. of United States*, 205 F.3d 1034, 1037 (8th Cir. 2000) (concluding that events which "occurred after Ms. Park filed her original complaint" were not relevant "on the issue of standing"); *see also Pollack v. U.S. Dep't Of Just.*, 577 F.3d 736, 742 n.2 (7th Cir. 2009) ("[A] plaintiff must establish standing at the time suit is filed and cannot manufacture standing afterwards."). In any case, the possibility that Defendants could "renew" their immigration efforts sometime in the future is an insufficient basis for Article III standing. Resp. at 23; *see Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 395 (7th Cir. 2019) ("We consistently have understood *Lyons* to foreclose claims for equitable relief based on lack of standing where 'the possibility' that the plaintiff 'would suffer any injury as a result of' the challenged practice was 'too speculative.'").

That the government has not "disclaim[ed] an intent" to engage in all future enforcement efforts does not create standing. Resp. at 23–24. The two cases on which Plaintiffs rely concern direct threats of enforcement. *See id.* Given the circumstances of those cases, and in the light of the defendants' refusal to disavow enforcement, the courts concluded that a credible threat of enforcement existed. *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022); *Louisiana v. U.S. Env't Prot. Agency*, 712 F. Supp. 3d 820, 864 (W.D. La. 2024). But those cases have no application here because Plaintiffs are not themselves the object of a potential enforcement action,

4

rendering those theories of future harm inapposite.

For these reasons, the Court should conclude that Plaintiffs failed to plausibly allege the imminent harm necessary to support their requests for forward-looking relief.

**B. Plaintiffs' alleged financial harms do not confer standing to seek forward-looking relief.**

Plaintiffs offer three reasons why their allegations of financial injury are sufficient to support their claims. None convince.

1. First, Plaintiffs contend, with respect to the alleged Tear Gas and Trespass policies, that they have alleged direct harms. Resp. at 24–25. Even assuming that Plaintiffs have alleged injuries to Chicago officers traceable to the alleged Tear Gas policy and alleged that the city has procedure in place that allows for the public payment of medical expenses, this argument does not support standing. Compl. ¶ 205; *see Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (concluding that fiscal injuries were self-inflicted "from decisions by their respective state legislatures"). Plaintiffs do not provide any support for their attempt to vindicate their employees' interests. The one case on which they seemingly rely, *Washington v. Trump*, arises from the educational context, in which schools have long "been permitted to assert the rights of their students." 847 F.3d 1151, 1160 (9th Cir. 2017). Plaintiffs point to no such similar authority in this context and thus the normal rule applies. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party."). And under that normal rule, Plaintiffs were careful to avoid alleging that Chicago has incurred any financial liability as a result of injured employees. Even if it is reasonable to infer that Chicago has incurred this liability, nothing about that inference solves Chicago's imminence

problem.[3]

2. Plaintiffs next describe allegations of downstream financial harm. *See* Resp. at 25–27. This argument does not work either.

For one, some of Plaintiffs' descriptions do not match their allegations. As an example, Plaintiffs claim that the alleged Conceal Plates Policy caused the expenditure of resources on a "new public program." Resp. at 26. But the creation of a new program is not alleged in the Complaint. In any event, the Supreme Court has made clear that plaintiffs cannot establish standing by alleging that they are "diverting resources" in response to a federal policy—such as by "incurring costs to oppose [the government's] actions." *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 390, 394 (2024).

Also, even though "monetary harms generally qualify as injuries-in-fact," when viewing "the injuries of states" and localities, it is necessary to "consider the context in which the alleged injuries arose." *Maryland v. United States Dep't of Agric.*, 151 F.4th 197, 209 (4th Cir. 2025). Accordingly, the fact that downstream pocketbook injury is sufficient for standing in some contexts does not mean that it always is, particularly with state government plaintiffs. *See Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1175 (9th Cir. 2024) (denying standing to Idaho and noting "the Supreme Court has specifically cautioned us to be wary of theories of state standing that rely on the 'indirect effects' of federal policy on state revenue or state spending"). The Supreme Court's decision in *Texas* confirms as much. There, of course, the district court found that the plaintiff states "would incur additional costs" because of the enforcement policy at issue. *United States v. Texas*, 599 U.S. 670, 676 (2023). But the Supreme Court concluded, after consulting its "precedents and longstanding historical practice," that the suit was not the "kind

---

[3] The same is true about Plaintiffs' allegations of trespass on City-owned property. *See* Mot. at 18.

6

redressable by a federal court," especially in the backdrop of "the Executive's Article II authority to enforce federal law." *Id.* at 678.

The Court should reach the same result here. Plaintiffs' theory of standing—which would "allow for a state or locality to conscript a federal court to review the ins and outs of federal enforcement efforts," Mot. at 8—is incompatible with *Texas*. Plaintiffs' argument to the contrary rests on one of the reasons the Supreme Court offered in support of its conclusion—the fact that the policy at issue concerned non-enforcement of the law. Resp. at 28; *see* 599 U.S. at 678. This rebuttal confuses one of the rule's rationales for the rule itself. Here, like in *Texas*, Article II's enforcement authority is the central focus of this case. And here, like in *Texas*, indirect financial injury does not give rise to an Article III case or controversy.

Plaintiffs' attempt to distinguish the Sixth Circuit's reasoning in *Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022), fails for the same reason. *See* Resp. at 28 n.18. There, the court explained why cases like *Department of Commerce v. New York*, 588 U.S. 752 (2019), on which Plaintiffs rely here, do not always vest states and localities with standing to challenge federal policies based on theories of indirect financial harm. In *New York*, the states alleged that, upon addition of the citizenship question to the census, fewer noncitizen households would respond, and the states would resultingly lose federal funding. *Id.* at 767. Many of the alleged policies at issue here do "not impose any direct costs on [Plaintiffs] or threaten the loss of any federal funding." *Arizona*, 40 F.4th at 386. Instead, like in *Arizona*, any costs to Plaintiffs come through "individual officers' discretionary enforcement choices, noncitizens' actions in response to those choices, the States' own crime-and-punishment decisions, and the States' other social-welfare policy choices." *Id.*

Plaintiffs also argue that the Supreme Court's decision in *Alliance for Hippocratic Medicine* helps, rather than hurts, their argument. Resp. at 27. But the opposite is true. In that case,

7

the Supreme Court rejected a similarly attenuated theory of standing that relied on a "speculative" and "attenuated" causal link and declined to start the "Federal Judiciary down" a path that "would seemingly not end until virtually every citizen had standing to challenge virtually every government action that they do not like." 602 U.S. at 392. Plaintiffs' theory would lead to the same place. The Court should reject it.

*Alliance for Hippocratic Alliance* also foils Plaintiffs' reliance on a diversion of resources by the Chicago Mayor's Office of Immigrant, Migrant and Refugee Rights (IMRR) to establish standing to sue over the alleged Warrantless Arrest Policy. *See* Compl. ¶¶ 154–58. As Defendants explained in the motion, *Alliance* requires an allegation that the defendant's action "directly affected and interfered" with a core business activity and confirms that a diversion of resources alone is not enough. *See* Mot. at 11–12; 602 U.S. at 395. Plaintiffs did not allege any such direct interference with respect to IMRR, and therefore this theory of financial harm fails.

### C. Plaintiffs' alleged sovereign harms do not confer standing to seek forward-looking relief.

As a sovereign, a state "may have more theories of injury available to them." *Arizona*, 40 F.4th at 386. But that does not allow the state to "bypass proof of injury in particular or Article III in general." *Id.* And here, Plaintiffs seek to do exactly that.

1. Plaintiffs first claim a sovereign injury vests them with standing to challenge the recission of the Sensitive Locations Policy. Resp. at 30.[4] But this theory of standing also runs into the Supreme Court's decision in *Texas*. Plaintiffs seek to challenge federal policy as to where

---

[4] Without much to work with, Plaintiffs relegate to a footnote their argument that they have standing to challenge the use of Border Patrol officers. *See* Resp. at 19 n.13. Plaintiffs seem to suggest that the presence of federal officers in their jurisdictions vests them with standing. *Id.* No precedent is offered for that extreme position, and, as explained in Defendants' motion, Plaintiffs' arguments concerning "interference with sovereign functions" do not suffice for standing. *See* Mot. at 5–6.

arrests occur. But Article II reserves this decision to the Executive Branch, and a federal court will not sit in review of such decisions. *Texas*, 599 U.S. at 579. *Washington v. U.S. Department of Homeland Security*, 614 F. Supp. 3d 863, 876 (W.D. Wash. 2020), the one case Plaintiffs cite that agrees with their theory of standing based on alleged interference with judicial proceedings, predates *Texas*, and therefore should not guide this Court's analysis.

Even putting aside *Texas*, Plaintiffs also run into traceability and redressability issues. *See* Mot. at 15–16. Plaintiffs do not offer much a response by way of traceability, arguing only that decreased use of public services is a "predictable" reaction to Defendants' recission decision. Resp. at 31. But Plaintiffs' allegations do not allege "substantial evidence of a causal relationship" between the recission and decreased use. *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015). Instead, this decrease could just as easily been caused by the "administration's broader immigration crackdown." *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 11 (D.D.C. 2025) (finding no standing to challenge Sensitive Locations Policy); *see Fridley Public School District v. Mullin*, No. 26-cv-1023 (LMP/LIB), 2026 WL 1244043 (D. Minn. May 6, 2026) (same).

As for redressability, Plaintiffs respond that vacatur would "likely" decrease enforcement, Resp. at 31, but fail to appreciate the fact that "redressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (alteration adopted and emphasis omitted). And vacatur would not affect "federal agents' ability to initiate enforcement actions in or near sensitive locations." Mot. at 15; *see Fridley Public School District* at *10–12.

    2. Plaintiffs argue that the alleged Roving Patrols and Warrantless Arrest Policies

9

inflict quasi-sovereign injuries by undermining their "efforts to maintain public spaces and services for the use and enjoyment of residents," reducing cooperation with law enforcement, and diminishing trust between law enforcement and communities. Resp. at 31–32. Plaintiffs cite cases like *Kentucky v. Biden*, where courts sometimes recognize state standing when the federal government acts to displace contrary state actions in an "area traditionally left to the states." 23 F.4th 585, 599 (6th Cir. 2022). It is in this sense that the cases speak of "federal interference with the enforcement of state law." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015); *see, e.g.*, *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008). There is no such interference here—neither of the alleged policies purports to displace state or local policy. *See Washington*, 108 F.4th at 1176–78 (rejecting similar state sovereignty injury argument).

Plaintiffs also seemingly argue that their harm need not be concrete because this case does not concern a "statutorily-created right of action." Resp. at 32. But that is not correct. Sovereign or not, a plaintiff must allege a concrete harm. *See Kentucky*, 23 F.4th at 601 (requiring "concrete" harm). And *TransUnion* states that "intangible harms," like those Plaintiffs seek to vindicate, must typically share a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." 594 U.S. at 425; *see Patterson v. Howe*, 96 F.4th 992, 996 (7th Cir. 2024). Plaintiffs are right that *TransUnion* also says that Congress cannot simply "enact an injury into existence," 594 U.S. at 426, but this does not exempt Plaintiffs from the concreteness requirement. And as Defendants have explained, "an increased distrust in law enforcement and a resulting shuffling of law enforcement priorities" do not meet the test. Mot. at 9.

3. Finally, Plaintiffs claim that the alleged Biometric Scanning Policy renders ineffective Plaintiffs' interest in enforcing Illinois law's limitations on data collection. Resp. at 33. This alleged interest does not convey standing, though, because such limitations do not apply to

10

federal officers. *See, e.g.*, *Ohio v. Thomas*, 173 U.S. 276, 283 (1899) (recognizing that "federal officers who are discharging their duties in a state . . . are not subject to the jurisdiction of the state"). This is the holding of *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253 (4th Cir. 2011), a case on which Plaintiffs otherwise rely. There, Virginia enacted a statute contrary to the Affordable Care Act's individual mandate and sued on that basis, contending "that Congress lacked constitutional authority to enact the individual mandate." *Id.* at 267. The Fourth Circuit concluded that Virginia lacked standing to sue, despite the claimed conflict between the state and federal law. *Id.* at 269. Among other things, the Fourth Circuit concluded that the individual mandate did not "affect Virginia's ability to enforce" state law because "the Constitution itself withholds from Virginia the power to enforce the VHCFA against the federal government." *Id.* at 270.

The same logic applies here. The alleged Biometric Scanning Policy does not affect Plaintiffs' ability to enforce Illinois law because Plaintiffs never had the ability to enforce Illinois law against federal officers. In other words, Plaintiffs' "sovereign interests have [not] been injured." Resp. at 33. Plaintiffs fight this conclusion by arguing that, on the merits, they contend that Defendants have exceeded their statutory authority. But this does not distinguish *Cuccinelli*, where Virginia alleged that Congress exceeded its constitutional authority. *See* 656 F.3d at 267. Without any sovereign injury, Plaintiffs are left with their desire to seek compliance with their view of what federal law requires. This, of course, does not vest Plaintiffs with standing. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 482–83 (1982) ("This Court repeatedly has rejected claims of standing predicated on the right . . . to require that the Government be administered according to law.").[5]

## II. Plaintiffs Fail to State a Tenth Amendment Claim.

---

[5] Plaintiffs concede that they are unable to invoke *parens patriae standing*. Resp. at 34. Therefore, the Court should not consider any alleged harm to Plaintiffs' residents in evaluating their standing claims.

11

The Tenth Amendment does not reserve to the States the power to dictate the when, where, and how of federal law enforcement. Despite a history littered with episodes of disagreement between federal and state governments, Plaintiffs do not cite a *single* case agreeing with their view of the Tenth Amendment. Nor do Plaintiffs explain how their theory works. Plaintiffs claim that Defendants' actions have "crossed the line in violation of the Tenth Amendment," Resp. at 5, but they do not identify any such line, *see Minnesota v. Noem*, No. 26-CV-190 (KMM/DJF), 2026 WL 253619, at *10 (D. Minn. Jan. 31, 2026) (recognizing the line-drawing issues with this theory). Centuries into our federalist experiment, Plaintiffs have not pleaded a plausible Tenth Amendment claim. *Cf. Haaland*, 599 U.S. at 279–80 (faulting petitioners for failing to give the Supreme Court "something to work with," but instead framing "their arguments as if the slate were clean," as, "[m]ore than two centuries in, it is anything but"). The Court should therefore dismiss Count I.

**A.** In their response, Plaintiffs point to four groups of allegations. None of them, either alone or in tandem, plausibly allege a Tenth Amendment violation.

First, Plaintiffs point to Defendants' opposition to Plaintiffs' policies. Resp. at 5–6. In the litigation that has arisen from these policy differences, Plaintiffs have argued that the Tenth Amendment secures their right to decline to assist the federal government with immigration enforcement. *See, e.g.*, *United States v. Illinois*, 796 F. Supp. 3d 494, 532 (N.D. Ill. 2025). Even assuming that is a correct statement of the law, it is quite another thing to argue, as Plaintiffs do here, that the Tenth Amendment secures their right to dictate how the federal government proceeds in light of Plaintiffs' policy decisions. That reading flips federalism on its head. Indeed, with this litigation, Plaintiffs aim to "coerc[e]" Defendants "to conform to [Plaintiffs'] preferences." Resp. at 6. Our Constitution does not work that way. The fact that Defendants' commitment to immigration enforcement is met at every turn by resistance from Plaintiffs is no reason to conclude

12

that Plaintiffs have a constitutional veto. Instead, text, structure, and history teach that the opposite is true. *See Trump v. Vance*, 591 U.S. 786, 800 (2020).

Second, Plaintiffs cite "Defendants' tactics." Resp. at 6. But, as Plaintiffs themselves allege, these challenged tactics come in the light of the administration's goal of increased immigration enforcement. *See, e.g.*, Compl. ¶ 77. There is nothing about the tactics employed that is inconsistent with Defendants' enforcement objectives. Plaintiffs' disagreement with the effectiveness of these tactics is beside the point. *Texas*, 599 U.S. at 679. Plaintiffs' appeal to tactical precedent is similarly inapposite. To address the problems of the present, the federal government is not limited to the enforcement measures it has taken in the past. And to the extent Plaintiffs challenge the lawfulness of a specific law enforcement tactic, the Tenth Amendment is not the place to raise it. *Cf. Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment . . . must be the guide for analyzing these claims").

Third, Plaintiffs argue that it is "reasonable to infer" that Defendants intended to coerce Plaintiffs based on the "direct and predictable effects" of Defendants' enforcement efforts. Resp. at 6–7. But even taking these effects as true, they do not support the legal validity of Plaintiffs' claim. For one, as Defendants explained in the motion, Mot. at 26–27, Plaintiffs have not plausibly alleged coercion analogous to *National Federation of Independent Business v. Sebelius*, where states were at risk of losing all federal Medicaid funds, or "over 10 percent of a State's overall budget," 567 U.S. 519, 581–82 (2012) (*NFIB*). Plaintiffs offer no response.

Fourth, Plaintiffs turn to two facts outside the four corners of their complaint. Although this is improper, *see Mannie v. Potter*, 326 F. Supp. 2d 880, 882 (N.D. Ill. 2004) ("[A] court's inquiry is generally limited to the factual allegations contained within the four corners of the

13

complaint."), even if considered, neither fact saves Plaintiffs' claim from dismissal.

Plaintiffs first cite then-Attorney General Bondi's letter to Minnesota Governor Tim Walz. Resp. at 7. Plaintiffs fail to explain how a letter sent by the Department of Justice could shed light on the purpose of an operation undertaken by DHS months prior. *Cf. New York*, 588 U.S. at 780 ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."). Regardless, this letter is entirely consistent with the federal government's desire to enforce immigration law. And there is no hint of a quid pro quo in the letter; the letter does not, as Plaintiffs suggest, "offer[] to decrease ICE and Border Patrol's presence in Minnesota if the State altered sovereign policies unrelated to immigration." Resp. at 7. Instead, citing the adverse "consequences" of certain policy choices for the people of Minnesota, the letter attempts to find common ground on three different issues. Such communications should be encouraged as a feature of our system of dual sovereignty, not used as a basis to declare federal action unconstitutional. *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981) (noting the existence of "cooperative federalism").

Plaintiffs also rely on a social media post in which the President proposes to send ICE agents to airports to alleviate the stress caused by a lapse in funding. Plaintiffs claim that this suggests the President is not sincere about immigration enforcement, Resp. at 7, yet omit the part of the post that indicates the ICE agents will indeed be engaged in security and enforcement efforts, *see* Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 21, 2026, at 10:34 AM ET), https://truthsocial.com/@realDonaldTrump/posts/116267892671497457. In any case, it is absurd to suggest that the President's willingness to address a security need during a time when travelers were stuck in security lines during a government shutdown is somehow a reason to conclude that

DHS's enforcement efforts violated the Tenth Amendment.

**B.** Plaintiffs next argue that "*NFIB*'s holding and reasoning apply here." Resp. at 8–12. But this case is worlds different from *NFIB*, which involved coercion to states on a massively different scale and in a very direct way. Plaintiffs fail to convincingly respond to Defendants' three reasons why *NFIB* does not apply. Mot. at 24–25. Defendants also noted the factual differences between this case and *NFIB* with respect to the alleged burden on the State's independence. *Id.* at 26. Plaintiffs fail to respond to this point at all. *NFIB* does not save Plaintiffs' claim from dismissal.

1. To start, the *NFIB* Court was writing against a long line of cases speaking to federalism concerns unique to the Spending Clause context. Because the Spending Clause is "broad," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981), the Supreme Court has long been concerned that Congress could use its purse to exert "undue influence," *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937). Unless otherwise checked, the Spending Clause would give "power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people." *United States v. Butler*, 297 U.S. 1, 78 (1936). Therefore, in *NFIB*, the Supreme Court checked Congress by concluding that the Affordable Care Act's Medicaid expansion exceeded Congress's enumerated power under the Spending Clause. 567 U.S. at 581.

Plaintiffs fail to point to any case—beyond a preliminary injunction order that *rejects* an analogous claim—recognizing any similar concern when it comes to law enforcement efforts. And Defendants explained that this was likely because executive agencies can act only when Congress enacts a statute based on an enumerated power. *See* Mot. at 24. Plaintiffs disagree, suggesting that *NFIB* somehow also concerned the "enforcement of a federal law based on an enumerated power." Resp. at 8. But this is simply wrong. *NFIB* was not an enforcement case. No court has, to

15

Defendants' knowledge, extended *NFIB*'s reasoning to an enforcement action, and this Court should not be the first.

2. Another reason weighing against application of *NFIB* is that the necessary judicial inquiries are different. As Defendants explained, in *NFIB*, the Court encountered "legislative clarity." Mot. at 24–25. Regardless of subjective legislative intent, the Court's job was relatively straightforward—read the statute, consider the facts, and apply Spending Clause precedent. Here, on the other hand, the Court's necessary inquiry is much different. To evaluate Plaintiffs' argument, the Court will have to assess the propriety of a facially legitimate enforcement effort by inferring the subjective intent of an untold number of executive officials. And the inquiry would not end there. The Court would have to determine *when* that intent arose and *where* the enforcement effort crossed the line from lawful to unconstitutional. The Court would also have to consider issues of entirely permissible mixed motives. *See New York*, 588 U.S. at 781 (stating that agency "decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)"). In doing all of this, the Court could find itself in the position of adjudging how many officers the federal government can use to enforce federal law in Illinois. Neither "history" nor "tradition," both "meaningful guide[s] to the types of cases that Article III empowers federal courts to consider," *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008), indicate that this is a function for a federal tribunal.

In their response, Plaintiffs contend that no inference is needed given Attorney General Bondi's statement that, absent state and local assistance, the federal government would send in additional law enforcement officers. Resp. at 9; *see* Compl. ¶ 36. But this statement addresses the reality that, absent local support, more federal resources would be needed. There is nothing

16

unconstitutional about that basic reality of law enforcement, and Plaintiffs fail to plausibly allege otherwise. Plaintiffs also attempt to downplay the Supreme Court's direction that the judiciary should "normally" avoid inquiry into executive motivations by noting that federal courts do, sometimes, inquire into executive motivations. Resp. at 10–11. But none of these cases "run up against the Executive's Article II authority to enforce federal law" like this one does. *Texas*, 599 U.S. at 678. Given the President's "conclusive and preclusive" authority in this area, judicial interrogation is especially inappropriate. *Trump v. United States*, 603 U.S. 593, 620 (2024).

3.   Plaintiffs also try to downplay the difference between the requested remedy here— declaratory relief opining on the lawfulness of a federal enforcement effort—and the remedy in *NFIB*, which was the severance of the unconstitutional condition. Resp. at 11–12. This attempt falls flat. Even though a declaratory judgment might be the "least intrusive" remedy, Resp. at 12, it cannot possibly have *no* effect, or else it would be an advisory opinion. *See Haaland*, 599 U.S. at 293. And Plaintiffs do not even try to explain how a declaratory judgment in this context is compatible with the limits of Article III. Indeed, Plaintiffs do not offer a position on Defendants' questions about how such relief could possibly work. *See* Mot. at 25. This silence is telling. Indeed, it appears the relief Plaintiffs request would improperly establish this Court as the "supervisor" of immigration enforcement efforts in Chicago. *Chicago Headline Club v. Noem*, 168 F.4th 1033, 1037 (7th Cir. 2026). Even "[a]t this early stage," Resp. at 12, the separation-of-powers issues involved with Plaintiffs' requested remedy distinguish this case from *NFIB*.[6]

4.   Even if the Court agrees that the *NFIB* framework applies, it should still dismiss

---

[6] There is no basis for Plaintiffs speculation that Defendants would not adhere to a declaratory judgment issued by this Court. *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and . . . that they have properly discharged their official duties."). Plaintiffs' citation to other cases that have no relevance to this matter cannot overcome the presumption that the government defendants here will comply with a court order.

Plaintiffs' claim. Courts across the country have recognized that *NFIB* sets a high bar for the coercion it takes to reach an unconstitutional condition. *See* Mot. at 26. And as Defendants explained in their motion, on the facts alleged, this case is nowhere near *NFIB* as to the level of coercion in scale, scope, or directness. *Id.* at 26–27. Further, in *NFIB*, there was no doubt that Congress wanted to push states to participate in the Medicaid expansion. Here, by contrast, DHS is enforcing federal immigration law, not "forc[ing] unwilling States to sign up" for a federal program they find objectionable. *Id.* at 580. Plaintiffs remain free to pursue the policies of their choosing and "remain accountable to the people." *New York v. United States*, 505 U.S. 144, 168 (1992). Plaintiffs offer no response as to how this case features coercion analogous to *NFIB* and no explanation for how and when to separate a valid enforcement action from an unconstitutional one. In the light of this silence, the Court should not conclude that the enforcement action is unconstitutionally coercive under *NFIB*.

## III.    Plaintiffs' APA claims are not justiciable.

### A.    Most of Plaintiffs' APA claims fail to plausibly allege discrete agency action.

Plaintiffs claim in fifteen separate counts that Defendants are operating in Illinois under certain "policies" that violate the APA. For most of these claims, *see* Compl. ¶¶ 345–404, 419–453, Plaintiffs do not plausibly allege that the challenged "policy" even exists, much less that it is reflected in a discrete agency action susceptible to APA review. *See* Mot. 30–34. Plaintiffs' opposition does not meaningfully grapple with this shortcoming.

Most glaringly, Plaintiffs never claim to allege that these imagined policies are embodied in discrete agency actions—a threshold requirement for stating an APA claim. *Corner Post, Inc v. Bd. of Govs. of Fed. Reserve Sys.*, 603 U.S. 799, 808 (2024). Instead, Plaintiffs try to shrug off this requirement, arguing that a "formal," "written" statement is not a prerequisite to APA review. *See*

Resp. at 35.[7] But that's beside the point. Plaintiffs identify no statements of any kind, formal or informal, written or unwritten, that remotely resemble an "agency action"—*i.e.*, a "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13)— that reflects any of these alleged policies. Therefore, at best, the above-mentioned claims allege and seek to challenge abstract policies divorced from discrete agency action. They are thus unreviewable under the APA. *See Biden v. Texas*, 597 U.S. 785, 809 (2022) (considering it an "error" to "review[] an abstract decision apart from specific agency action, as defined in the APA"); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 890, 893 (1990) (a plaintiff "must identify some 'agency action'" within the meaning of the APA); *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 62 (2004) ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in [*National Wildlife Federation*]").

While the lack of discrete agency action is decisive, Plaintiffs also fall short of plausibly alleging that these challenged "policies" exist.[8] *See* MTD 30–33. For most of them, Plaintiffs largely rely on allegations regarding on-the-ground conduct of individual DHS agents. *See* Resp. at 36–39. But as already explained, *see* Mot. at 33, Plaintiffs cannot "simply attach a policy label to disparate agency practices or conduct" to plausibly allege the existence of a policy. *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1207 (S.D. Cal. 2019); *accord Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014); *L.A. Press Club v. Noem*, --- F. Supp. 3d ---, 2026 WL 103972, at *8 (C.D. Cal. Jan. 8, 2026). Nor do Plaintiffs get anywhere by repeatedly speculating,

---

[7] Plaintiffs cite a handful of out-of-circuit and district court cases for this proposition, but none of them apply the APA's definition of "agency action," as *Biden* and *Lujan* both instruct. So, aside from being non-binding, those cases are of no utility in resolving Defendants' motion.

[8] Given that Defendants argued over several pages that Plaintiffs' complaint contains no facts that plausibly suggest that these alleged policies exist, *see* Mot. at 30–34, Plaintiffs' assertion that Defendants "do not challenge the sufficiency of the allegations supporting each policy" is puzzling to say the least.

through vague and conclusory assertions, that DHS agents' alleged conduct was intended to "implement" an alleged policy. *See* Resp. at 36–39; *see also Taha v. Int'l Bhd. of Teamsters, Loc.*, 781, 947 F.3d 464, 469 (7th Cir. 2020) (a court should "reject sheer speculation, bald assertions, and unsupported conclusory statements" "when considering the viability of a claim" under Rule 12(b)(6)). In short, Plaintiffs cannot dress up "many individual actions" of law enforcement officers as a purported "policy" to challenge all of those actions at once, which is exactly what *National Wildlife* prevents. *See* 497 U.S. at 893.

Plaintiffs also rely on vague statements from individual DHS employees, *see* Resp. at 36, 38–39, none of which acknowledge the policies that Plaintiffs allege. For example, Plaintiffs infer the existence of a "policy" that DHS agents are to disperse tear gas "without warning and in the absence of active resistance," *see* Compl. ¶ 396, 401, based on former Chief Bovino's statement that agents who had dispersed tear gas during a particular incident "operate with extreme professionalism," *see* Compl. ¶ 187; *see also* Resp. at 39. Similarly, Plaintiffs infer the existence of a policy that DHS agents are to remove, obscure, and change license plates on DHS vehicles, *see* Compl. ¶¶ 424–25, 429, based on Assistant Secretary McLaughlin's statement that "DHS is not going to confirm our vehicles," *id.* ¶ 282, and a single agent's statement that "we"—whoever that may refer to—"change the plates out every day," *see id.* ¶ 281; *see* Resp. at 39. Neither alleged policy—nor any of the others—can be reasonably inferred from the statements on which Plaintiffs rely. *See Brown v. CACH, LLC*, 2021 WL 4133517, at *1 (N.D. Ill. Sept. 10, 2021) (courts do not draw "unreasonable inferences" to sustain a complaint against a Rule 12(b)(6) motion).

That leaves two documents that Plaintiffs cite, neither of which help them. As already explained, *see* Mot. at 31 n.2, the Privacy Threshold Analysis for the Mobile Fortify Mobile App does not suggest the existence of a policy of unrestricted scanning of Illinois residents' biometric

information. Nothing in that document purports to create, implement, summarize, or fully reflect DHS's policy regarding the collection and use of biometric information during immigration enforcement operations, including existing restrictions on that collection and use. *See* Ex. 2, DHS, *Privacy Threshold Analysis* at 1 (Feb. 2025), ECF No. 44-2. Nor does it suggest that DHS has rescinded any prior policy on the collection and use of biometric information, including Directive 026-11. *Contra* Resp. at 37. Plaintiffs' so-called "Biometric Scanning Policy" thus rests on sheer speculation and unsupportable inferences.

Even more puzzling is Plaintiffs' reliance on a May 12, 2025, memorandum that addresses the topic of administrative arrest warrants. *See* Resp. at 39–40. Plaintiffs cite this document to support their claim that DHS is operating under a policy of entering private property without a warrant, consent, or exigency to conduct searches for unlawfully present immigrants. *See* Compl. ¶¶ 437, 442. But putting aside that this document is never mentioned in the complaint and thus cannot be considered in resolving Defendants' motion,[9] it *belies* the policy that Plaintiffs allege. *See N. Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454–455 (7th Cir. 1998) ("[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."). As the document makes clear, while a DHS agent may rely on an administrative warrant "for the *arrest*" of a specified "alien with a final order of removal," such a warrant "is *not a search warrant* and should *only* be used to enter the residence of the subject alien to conduct an administrative immigration *arrest*"—*not* a search. *See* Mem. from Todd Lyons, Acting ICE Director, "Utilizing Form I-205, Warrant of Removal" (May 12,

---

[9] When ruling on a Rule 12(b)(6) motion, a court may consider a document that is not attached to the plaintiff's complaint only when that document is "referred to in" the complaint and is "central" to the plaintiff's claims. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013). Indeed, this Court has declined to consider a document submitted with a Rule 12(b)(6) motion where the complaint never mentioned the document. *See Rohde v. ADP, LLC*, 2020 WL 12139101, at *3 (N.D. Ill. Feb. 21, 2020) (citing cases in accord). It should do the same here.

2025), ECF No. 59-1 (emphasis added). Indeed, nowhere does this document say anything about entering private property under any circumstances to conduct searches for unlawfully present immigrants. It thus in no way supports the existence of the specific policy that Plaintiffs allege.

### B. Counts XI and XII fail to plausibly allege final agency action.

In Counts XI and XII, Plaintiffs seek to challenge two DHS memoranda—the Huffman and Lyons Memos, *see* Mot. at 35—that provide DHS immigration agents with guidance for conducting enforcement operations in certain sensitive locations. As explained, these routine policy statements are not *final* agency actions under the APA, as they impose no legally binding obligations or prohibitions on the general public or regulated parties. Indeed, they have no legal effect whatsoever. *Id.* at 36–37.

Plaintiffs dispute very little of what Defendants argue. They don't dispute that the Huffman and Lyons Memos are general policy statements that explain "how the agency will exercise its broad enforcement discretion," *New England Synod v. DHS*, 2026 WL 412329, at *27 (D. Mass. Feb. 13, 2026), nor do they dispute that policy statements like these rarely constitute final agency action, *see id.* (citing *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013)); *see also, e.g.*, *Arizona*, 40 F.4th at 387–89 (policy statement that created guidelines for the exercise of agency discretion was not final agency action); *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 715–718 (D.C. Cir. 2015) (same). They also don't dispute that the Huffman and Lyons Memos impose no legally binding obligations or prohibitions on the general public or regulated parties, do not constrain the agency's authority or discretion, and create no rights or benefits—all "telltale signs" of nonfinality. *Arizona*, 40 F.4th at 388. More still, Plaintiffs do not claim that they have suffered a *legal* injury or any other *legal* consequences directly from the Huffman and Lyons Memos—a necessary element of finality. *Dhakal v. Sessions*, 895 F.3d 532,

22

540 (7th Cir. 2018). In light of all of this, Plaintiffs have virtually conceded that these memoranda are not final agency action.

Plaintiffs' arguments do not change that calculus.

*First*, Plaintiffs contend that, under the Huffman and Lyons Memos, there's been an alleged increase in DHS arrests at certain sensitive locations, which in their view is a "concrete consequence" that satisfies finality's second prong. But finality's second prong asks whether an agency action has any "direct and appreciable legal consequences" for the plaintiff, not whether the action has any conceivable consequences, no matter how tangential. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597–98 (2016). So, even if there has been an increase in arrests at certain sensitive locations—a point Defendants do not concede here—that would be the result of DHS agents exercising discretion that the INA delegated to them and that the Huffman and Lyons Memos merely preserve, *not* because of any legal requirement imposed by those memoranda. *See Fridley Public School District*, 2026 WL 1244043 at *10 (recognizing that "whether DHS agents would engage in immigration enforcement activity at or near 'protected areas'" is subject to the "judgment and discretion of DHS officials").

Indeed, the Huffman and Lyons Memos do not obligate DHS agents to make any arrests at sensitive locations. Therefore, any alleged increase in such arrests cannot be said to be a "direct and appreciable legal consequence" of those memoranda.[10] *See Arizona*, 40 F.4th at 387 ("downstream" consequences that "arise only from officials who exercise their [statutory] discretion" are not a policy statement's "direct or appreciable legal consequences" (cleaned up)).

*Second*, Plaintiffs misrely on *Hawkes* in arguing that the recission of a "safe harbor"

---

[10] The same goes for Plaintiffs' contention that Illinois residents have been "dissuaded and intimidated … from using public services" because of enforcement operations since the Huffman and Lyons Memos were issued. *See* Resp. at 43. Such an abstract harm is certainly not a *legal* consequence, much less one that directly and appreciably results from the Huffman and Lyons Memos. *See supra*.

satisfies finality's second prong. *See* Resp. at 43. For one thing, Plaintiffs are simply wrong that certain sensitive locations were "considered 'safe harbors'" under the Mayorkas Memo, *id.*, a 2021 policy memo governing immigration enforcement in sensitive locations that the Huffman Memo rescinded, *see* Motion at 37. Contrary to what Plaintiffs suggest, *see* Resp. at 43, the Mayorkas Memo did not prohibit DHS agents from conducting enforcement operations at sensitive locations; rather, like the Huffman and Lyons Memos, the Mayorkas Memo permitted operations in sensitive locations and provided agents with guidance for determining whether to conduct such an operation. *See Mennonite Church*, 778 F. Supp. 3d at 12 ("[T]he Mayorkas Memorandum creates no legally enforceable rights and confers only limited protections against immigration officers' exercise of discretion."). This Court is not bound by Plaintiffs' contrary and erroneous reading of the Mayorkas Memo. *Burke*, 714 F.3d at 505 (a court is to "independently examine" any documents considered at the pleading stage and "form its own conclusion" regarding the documents' "proper construction and meaning"). At any rate, Plaintiffs (and the district court decision they rely upon) misread *Hawkes*, which used the term "safe harbor" to describe the legal effect of a final agency action that protected regulated parties from liability by prospectively binding the agency to a particular legal position. *See* 578 U.S. at 598–99. The Huffman and Lyon Memos do not have a similar effect on either regulated parties or the agency, and thus *Hawkes*'s safe-harbor analysis has no application here. *N.E. Synod*, 2026 WL 412329, at *27 (rejecting an identical "safe harbor" argument in holding that the Huffman Memo was not final agency action).

*Third*, contrary to what Plaintiffs contend, *see* Resp. at 43–44, it's immaterial that the Mayorkas Memo said that DHS agents had an "obligation" to follow its guidance and were to seek supervisory approval before conducting enforcement operations at sensitive locations. While that general policy statement expresses the agency's internal expectations for agents, it did not create

24

a legally binding requirement of any sort, nor did it restrain the agency's authority or discretion to change its position in any given case. *See Huerta*, 785 F.3d at 716–17; *Mennonite Church*, 778 F. Supp. 3d at 12. So although the Mayorkas Memo may have been intended to influence how DHS agents were to conduct themselves on the job, it did not have any *legal* consequences, as necessary for finality. *See Hawkes*, 578 U.S. at 597–98. Its rescission was thus legally inconsequential, too. *N.E. Synod*, 2026 WL 412329, at *27.

### C. Counts XI and XII challenge actions that are committed to agency discretion.

The APA also precludes review of the Huffman and Lyons Memos because they reflect decisions that the law commits to the agency's discretion. *See* 5 U.S.C. § 701(a)(2); *see also* Mot. at 38–42. Plaintiffs offer two arguments on this score, neither of which hit the mark.

*First*, although they vaguely suggest that there would be "law to apply" in reviewing the Huffman and Lyons Memos, *see* Resp. at 46–47, Plaintiffs point to no *statutory* standard (or any other standard, for that matter) by which this Court could judge the reasonableness of those actions. Whether the law commits an action to agency discretion turns on whether it is possible to discern a meaningful standard of review from the *statute* that confers the relevant decisionmaking authority to the agency. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *I.C.C. v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 282 (1987); *Scalise v. Thornburgh*, 891 F.2d 640, 648 (7th Cir. 1989). If, after examining the statute's language and structure, *Singh v. Moyer*, 867 F.2d 1035, 1038 (7th Cir. 1989), no such standard can be discerned, then "the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely," *Heckler*, 470 U.S. at 830, as is the case here. As explained, *see* Mot. at 39–40, the INA is silent regarding whether or when it is appropriate for immigration agents to enter or approach sensitive locations like churches or courthouses in exercising DHS's broad discretion in enforcing federal immigration laws. *See*

25

*Fridley Public School District*, 2026 WL 1244043 at *2. There is thus no discernable statutory standard that this Court could apply in reviewing the Huffman and Lyons Memos, and Plaintiffs—who cite no statutory language or structure, *contra Singh*, 867 F.2d at 1038—argue nothing to the contrary.[11] That alone should settle the matter.

*Second*, relying on out-of-circuit caselaw, Plaintiffs suggest that § 701(a)(2) precludes review only of "individual enforcement decisions," and thus cannot apply to an agency's broader policy decisions, like those reflected in the Huffman and Lyons Memos. *See* Resp. at 45–46. But that limitation is neither supported by § 701(a)(2)'s text nor recognized under Supreme Court or Seventh Circuit precedent, which recognizes § 701(a)(2)'s applicability to an agency's broader discretionary policy decisions. *See, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 193–94 (1993) (applying § 701(a)(2) in holding that a statute committed to the Indian Health Service's discretion whether to discontinue a healthcare program that it administered); *Scalise*, 891 F.2d at 648–49 (applying § 701(a)(2) in holding that a statute committed to the Attorney General's discretion whether to promulgate implementing regulations that govern the exercise of discretion in international prisoner transfer decisions).

### III. Count II Should Be Dismissed Because CBP Is Authorized to Enforce Federal Immigration Law Nationwide.

In Count II, Plaintiffs challenge the use of CBP officers and agents to enforce immigration law in Plaintiffs' jurisdictions. Compl. ¶¶ 335–344. Plaintiffs specifically dispute that Congress has authorized CBP to conduct immigration-enforcement operations in the interior of the United States, more than 100 miles from the border. Plaintiffs' restrictive interpretation of CBP's authority

---

[11] Plaintiffs' suggestion that the Mayorkas Memo provides "law to apply" is nonsensical, as an agency's general policy statement cannot provide a *statutory* standard to apply in reviewing agency action. *Heckler*, 470 U.S. at 830. Moreover, the Mayorkas Memo does not purport to create law, much less binding legal standards for judging the reasonableness of DHS's discretionary policy decisions regarding the enforcement of federal immigration law in sensitive locations.

neither finds support in the pertinent statutory provisions—which convey broad authority on *all* immigration officers, including CBP personnel—as well as the case law interpreting the scope of federal immigration authority.

Border Patrol agents and CBP officers and agents are immigration officers as defined by statute and DHS's implementing regulations. *See* 8 U.S.C. § 1101(a)(18); 8 C.F.R. § 1.2. As such, they can exercise all the functions and authorities of immigration officers. *See, e.g.*, 8 U.S.C. § 1357; 8 C.F.R. § 287.5 (implementing regulation containing no geographic limitation). As relevant to Count II, 8 U.S.C. § 1357(a)(1) & (2) authorizes CBP officers and agents to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and conduct warrantless arrests when the officer has "reason to believe" the alien is in the United States unlawfully and is likely to escape before a warrant can be obtained. *See* 8 C.F.R. § 287.5(a)(1), (c). CBP officers and agents also may "take and consider evidence concerning the privilege of any person to enter, reenter, pass through, or reside in the United State." 8 U.S.C. § 1357(b); *see* 8 C.F.R. § 287.5(a). Additionally, CBP officers and agents may "execute warrants of arrest for administrative immigration violations" under 8 U.S.C. § 1226 and "execute warrants of criminal arrest issued under the authority of the United States." 8 C.F.R. § 287.5(e)(3); *see* 8 U.S.C. § 1226(a) (stating that upon issuance of an administrative warrant, "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States").

Of the authorities enumerated in 8 U.S.C. § 1357, only § 1357(a)(3) (as implemented by 8 C.F.R. § 287.1(a)(2)) has a distance limitation. That provision, which pertains to warrantless searches close to a national border, is not implicated by the allegations in Plaintiffs' Complaint. That provision states:

> Any officer or employee of the Service authorized under regulations prescribed by
> the Attorney General shall have power without warrant . . . within a reasonable

27

> distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States.

This geographic limitation in only § 1357(a)(3) is notably absent from the remaining authorities that Congress bestowed on immigration officers in § 1357, including the authority "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," § 1357(a)(1), and "to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens." § 1357(a)(4).

The disparate language that Congress chose makes sense. Where immigration officers are operating close to a national border, Congress granted them the authority to "board and search for aliens any vessel" or "railway car, aircraft, conveyance or vehicle" and, within 25 miles of a border, to also have "access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." Where this geographic nexus is lacking, Congress has not authorized warrantless searches of these places. It does not follow, however, that Congress withdrew from CBP the authority to participate in immigration-enforcement operations in the interior United States. To the contrary, Congress understood that immigration enforcement would require intra-agency coordination and cooperation of the sort that occurs routinely. 6 U.S.C. § 211(c)(8) specifically references coordination with ICE and USCIS to "enforce and administer all immigration laws" as that term is defined in the INA to cover the entirety of Title 8, and "all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, expulsion, or removal of aliens." 8 U.S.C. § 1101(a)(17).

Given the breadth of the statutory authorities noted above, courts have repeatedly rejected

28

the argument that CBP (or the pertinent pre-DHS agency, the Immigration and Naturalization Service (INS)) lacks statutory authority to operate outside a close geographic nexus to the border. For example, in *United States v. Chen*, 2 F.3d 330, 331 (9th Cir. 1993), defendants in an alien smuggling prosecution sought to dismiss the indictment on the ground that the INS acted outside their statutory authority by conducting an undercover investigation in international waters. Accepting an argument materially similar to what Plaintiffs advance here, the district court concluded that because no other statutory provision or regulation specifically gave the INS authority to operate outside of United States territory, the INS's undercover operation exceeded the authority granted to it under 8 U.S.C. § 1357(a)(3) and was therefore unlawful. Reversing the district court, the Ninth Circuit concluded that "Congress need not confer such authority *explicitly* and *directly* on the INS agents themselves," in light of the "extremely broad" powers that Congress has provided to the Attorney General for the enforcement of the immigration laws. *Chen*, 2 F.3d at 333 (emphasis in original). As to the asserted geographical limitation, the Ninth Circuit held:

> We likewise infer from the broad language of section 1103(a) that Congress intended to grant the Attorney General the corresponding power to enforce the immigration laws both within and without the borders of the United States. Third, the Attorney General may delegate any of those powers to the [INS] Commissioner. Fourth, the Attorney General has direct control over all employees of the INS, whom he may call upon to guard United States borders.

*Id.* at 333–334. *Accord* 8 U.S.C. § 1103(a)(4) & (6) (DHS Secretary may confer on any member of DHS the powers formerly delegated to INS).

Other courts have similarly rejected the geographic restriction that Plaintiffs urge here. *See United States v. Leyba*, 627 F.2d 1059, 1065 (10th Cir. 1980) (expressly rejecting argument that that 8 U.S.C § 1357(a)(3) imposed geographic limitation on INS enforcement operations); *see also United States v. Magana*, 797 F.2d 777, 780 (9th Cir. 1986) (analyzing immigration enforcement stop "some 1500 miles away from the border" for reasonable suspicion); *United States v. Orozco*,

29

191 F.3d 578, 581 (5th Cir. 1999) (applying same analysis to immigration enforcement stop "some 200-300 miles away from the border"). Accordingly, Count II fails to state a valid claim for relief.

### V. Plaintiffs' *Ultra Vires* Claim Should Be Dismissed.

Plaintiffs' *ultra vires* claims are expressly a restatement of their claim (in Count II) that Defendants' deployment of CBP to Illinois is *ultra vires*. In this regard, Plaintiffs allege that "Congress's intent to restrict Border Patrol to interdiction and security at the border, rendering their action in Illinois ultra vires." Resp. at 13. For the reasons set forth above, *see supra* at 26–30, Plaintiffs' "Hail Mary pass" *ultra vires* claim in Count II fails. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025).[12]

### VI. Plaintiffs' Declaratory Judgment Claim Should Be Dismissed.

Count 19 seeks a declaration that Defendants' challenged policies and practices are unlawful, Compl. ¶¶ 460–464, based on the legal theories asserted in the 15 substantive counts (Claims 3–17). Declaratory judgments are remedies, not claims, so Plaintiffs' separate cause of action for a declaratory judgment also fails. *See Precision Shooting Equip. Co. v. Allen,* 646 F.2d 313, 314 n.4 (7th Cir. 1981). Plaintiffs effectively concede this point and assert that "[r]egardless of the label, Plaintiffs properly pleaded that they are entitled to declaratory relief." Resp. at 49. Because the Declaratory Judgment Act provides no independent basis for jurisdiction, Count 19 should be dismissed for failure to state a claim.

**CONCLUSION**

For these reasons, the Court should grant Defendants' Motion to Dismiss and enter an order dismissing the Complaint.

---

[12] Because Plaintiffs have clarified that their *ultra vires* claim is limited only to Count II, *see* Resp. at 12–19, Defendants address only that claim here. To the extent that Plaintiffs or this Court would construe Plaintiffs' *ultra vires* claim more broadly to encompass some or all of their APA claims, such claims would fail for the reasons that Defendants set forth previously in their opening motion.

30

Dated: May 8, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BRANTLEY T. MAYERS
Counsel to the Assistant Attorney General

*/s/ Andrew I. Warden*
ANDREW I. WARDEN (IN #23840-49)
Assistant Branch Director
LEE REEVES
Trial Attorney
U.S. Department of Justice
  Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 616-5084
Email: Andrew.Warden@usdoj.gov

*Counsel for Defendants*